Geoffrey D. Strommer, *pro hac vice (Lead Counsel)*
Hobbs, Straus, Dean & Walker, LLP
215 SW Washington St., Suite 200
Portland, OR 97204
gstrommer@hobbsstraus.com
Phone: (503) 242-1745
Fax: (503) 242-1072

Jerry C. Straus, *pro hac vice*
Riley F. Plumer, *pro hac vice*
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
jstraus@hobbsstraus.com
rplumer@hobbsstraus.com
Phone: (202) 822-8282
Fax: (202) 296-8834

T. Roe Frazer II*, pro hac vice*
FRAZER PLC
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
roe@frazer.law
Phone: (615) 647-6464
Fax: (866) 314-2466

J. Nixon Daniel, III, *pro hac vice*
W. Lee Elebash*, pro hac vice*
Beggs & Lane, RLLP
501 Commendencia Street
Pensacola, FL 32502
JND@beggslane.com
wle@beggslane.com
Phone: (850) 469-3306
Fax: (850) 469-3331

*Attorneys for Aleutian Pribilof Islands Association, Inc.*

- 1 -

COMPLAINT
CASE NO. 19-MD-02913-WHO

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALEUTIAN PRIBILOF ISLANDS ASSOCIATION, INC.,**<br><br>Plaintiff,<br><br>vs.<br><br>**JUUL LABS, INC.; ALTRIA GROUP, INC.; ALTRIA CLIENT SERVICES LLC; ALTRIA GROUP DISTRIBUTION COMPANY; PHILIP MORRIS USA INC.; JAMES MONSEES; ADAM BOWEN; NICHOLAS PRITZKER; HOYOUNG HUH; AND RIAZ VALANI,**<br><br>Defendants. | MDL Member Case No. ____<br><br>MDL Case No. 19-md-2913-WHO<br>Filed Pursuant to Direct Filing Order<br><br>The Honorable William H. Orrick<br><br><br><br>**COMPLAINT**<br>JURY TRIAL DEMANDED |

COMPLAINT
CASE NO. 19-MD-02913-WHO

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................. 1

II. PARTIES .............................................................................................................. 8

    A. Plaintiff Aleutian Pribilof Islands Association, Inc. ............................... 8

    B. Defendants ............................................................................................ 12

        1. JUUL Labs, Inc. ....................................................................... 12

        2. Altria Defendants ..................................................................... 13

        3. Management Defendants .......................................................... 15

III. JURISDICTION AND VENUE .......................................................................... 16

IV. FACTUAL ALLEGATIONS ............................................................................... 18

    A. Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time." .......................................................... 18

    B. Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction. .................................................. 26

        1. Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction. ................. 26

        2. Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes ............. 28

        3. Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company. ................................................................. 33

    C. JLI and Bowen Designed a Nicotine-Delivery Device Intended to Create and Sustain Addiction. .......................................................... 41

        1. JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale. ............................. 41

        2. JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness. ........................... 42

        3. JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes. ...................................................................... 45

        4. JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted. ........................................... 50

        5. JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection. .................................................................. 53

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

6.    JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors
      Without Ensuring the Flavoring Additives Were Safe for
4     Inhalation ............................................................................... 58

5          a.    JLI Develops Flavored JUUL Products That Would Appeal to
                 Youth............................................................................ 58

6
           b.    Defendants Developed and Promoted the Mint Flavor and
7                Sought to Preserve its Market. ....................................... 62

8                i.    JLI Manipulates Chemistry of Mint JUULpods ................... 62

9                ii.   JLI's Youth Surveillance Programs Confirmed that
                       Mint JUULpods are Preferred by Teens. ............................. 63

10   D.  Defendants Developed and Implemented a Marketing Scheme to Mislead
         Consumers into Believing that JUUL Products Contained Less Nicotine
11       Than They Actually Do and Were Healthy and Safe. ......................................... 66

12       1.    The Defendants Knowingly Made False and Misleading
               Statements and Omissions Concerning JUUL's Nicotine
13             Content............................................................................. 66

14       2.    JLI, the Management Defendants, and Altria Transmitted,
               Promoted, and Utilized Statements Concerning JUUL's
15             Nicotine Content that They Knew Were False and Misleading. ............. 71

16       3.    Defendants Used Food and Coffee Themes to Give False
               Impression that JUUL Products Were Safe and Healthy......................... 76
17
         4.    JLI's *Make the Switch* Campaign Intentionally Misled and
18             Deceived Users to Believe that JUUL is a Cessation Device. ................. 79

19       5.    JLI, Altria, and Others in the E-Cigarette Industry Coordinated
               with Third-Party Groups to Mislead the Public About the
20             Harms and Benefits of E-Cigarettes. ....................................... 91

21             a.    The American Vaping Association.................................. 91

22             b.    Vaping360................................................................ 93

             c.    Foundation for a Smoke-Free World ............................. 95
23
             d.    Vapor Technology Association...................................... 96
24
             e.    Retailer Lobbying ...................................................... 96
25
         6.    Altria Falsely Stated That It Intended to Use Its Expertise in
26             "Underage Prevention" Issues to JLI ....................................... 97

     E.  Defendants Targeted the Youth Market................................................ 98
27
         1.    JLI Emulated the Marketing of Cigarette Companies. ............................ 99

28

COMPLAINT
CASE NO. 19-MD-02913-WHO

**TABLE OF CONTENTS**
(continued)

Page

2.    The Management Defendants Intentionally Marketed JUUL to Young People. ...........................................................................101

3.    JLI Advertising Exploited Young People's Psychological Vulnerabilities. ...................................................................104

4.    JLI Pushed the Vaporized Campaign Into Youth-Targeted Channels. ...............................................................................108

    a.    JLI Placed Its Vaporized Ads on Youth-Oriented Websites and Media. ......................................................................108

    b.    JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience. .................................................110

    c.    JLI Used Viral Marketing Techniques Known to Reach Young People. .......................................................................112

5.    JLI Targeted Youth Retail Locations. ....................................115

6.    JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked. ......................116

7.    The Management Defendants' Direction of and Participation in JLI and in the Youth Marketing Schemes. ...............................119

    a.    The Management Defendants, and in Particular Pritzker, Valani, and Huh, Controlled JLI's Board at Relevant Times. ......119

    b.    Pritzker, Huh, and Valani were active, involved board members. .........................................................................121

    c.    The Management Defendants, and in particular Bowen, Monsees, Pritzker, Valani, and Huh, oversaw and directed the youth marketing scheme .................................................122

    d.    Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors .................................................129

8.    Pritzker, Valani, and Huh continued to exercise control over and direct the affairs of JLI even after a new CEO was appointed .............134

9.    Pritzker and Valani directed and controlled JLI's negotiations with Altria ........................................................................136

10.    JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products. ....................................................................138

    a.    JLI's Strategy Worked ...................................................138

**TABLE OF CONTENTS**
(continued)

Page

  b. JLI Closely Tracked Its Progress in Reaching Young
   Customers through Social Media and Online Marketing ............ 140

  c. JLI Worked with Veratad Technologies To Expand Youth
   Access to JUUL Products ............................................................. 143

 11. JLI Engaged in a Sham "Youth Prevention" Campaign....................... 152

 12. The FDA Warned JUUL and Others That Their Conduct is
   Unlawful .............................................................................................. 155

 13. In Response to Regulatory Scrutiny, Defendants Misled the
   Public, Regulators, and Congress that JLI Did Not Target Youth......... 156

F. Altria Knew JLI was Targeting Youth and, Together with the
 Management Defendants, Exercised Control Over JLI to Protect and
 Expand Youth Sales and Defraud The Public About Their Actions ................ 161

 1. Before Altria's Investment in JLI, Altria Knew JLI Was
   Targeting Youth ................................................................................... 161

 2. Altria Worked with Pritzker and Valani to Secure Control of
   JLI and to Exploit JLI for Their Mutual Benefit.................................... 163

 3. Altria Participated in and Directed the Fraudulent Acts of JLI
   Designed to Protect the Youth Market for JUUL .................................. 174

  a. Altria Participated in and Directed JLI's *Make the Switch*
   Campaign. ................................................................................... 174

  b. Altria Participated in and Directed JLI's Fraudulent Scheme to
   Keep Mint on the Market............................................................. 175

 4. JLI, the Management Defendants, and Altria Coordinated to
   Market JUUL in Highly Visible Retail Locations. ................................. 177

 5. Altria Works with the Management Defendants to Direct JLI's
   Affairs and Commit Fraud .................................................................... 178

  a. Altria Installs Its Own Executives into Leadership Positions to
   Direct the Affairs of JLI.............................................................. 180

  b. Altria Furthered the JLI Enterprise by Participating in and
   Directing the Marketing and Distribution of JUUL Products....... 185

G. JLI, Altria, and Others Have Successfully Caused More Young People to
 Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and
 Public Health Crisis. ..................................................................................... 193

 1. Defendants' Scheme Caused Consumers to be Misled into
   Believing that JUUL was Safe and Healthy. ......................................... 193

 2. Use of JUUL by Minors Has Skyrocketed ........................................... 194

COMPLAINT
CASE NO. 19-MD-02913-WHO

**TABLE OF CONTENTS**
(continued)

Page

H.   JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products.................................................................................................... 199

    1.   E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI ........................................................................... 199

    2.   JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation ........ 202

    3.   In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic ......................................... 211

    4.   The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done ............................. 212

I.   JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries................................................................ 213

    1.   JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries. ......................................................................................... 213

    2.   JUUL Products Cause Cardiovascular Injuries...................................... 218

    3.   JUUL Products Cause and Contribute to Seizure(s)............................... 219

    4.   Animal Studies Demonstrate Carcinogenic Potential of JUUL.............. 220

J.   JUUL and Indian Tribes................................................................................ 221

K.   Impacts on the the Aleutian Pribilof Islands Association, Inc. ......................... 224

V.   INTERSTATE AND INTRASTATE COMMERCE................................................... 227

VI.   CAUSES OF ACTION ............................................................................................ 227

COUNT I – VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*........................................................................................ 227

    1.   Violation of 18 U.S.C. § 1962(c) .......................................................... 227

        a.   JLI is an Enterprise Engaged in, or its Activities Affect, Interstate or Foreign Commerce .................................................... 228

        b.   "Conduct or Participate, Directly or Indirectly, in the Conduct of Such Enterprise's Affairs"....................................................... 229

        c.   Defendants Bowen and Monsees founded the JLI Enterprise and started its mission of hooking kids and lying to the public and regulators ...................................................................... 230

        d.   Defendants Pritzker, Huh, and Valani exercised control and direction over the JLI Enterprise.................................................. 233

**TABLE OF CONTENTS**
(continued)

Page

        e.    Bowen, Monsees, Pritzker, Huh, and Valani Exercised a Firm Grip over JLI .......................................................................... 234

        f.    Altria directly exercises control and participates in of the JLI Enterprise .......................................................................... 236

        g.    The Fraudulent Schemes ............................................................. 237

        h.    Fraudulent Marketing Scheme ................................................... 237

        i.    Youth Access Scheme ................................................................ 239

        j.    Nicotine Content Misrepresentation Scheme .............................. 240

        k.    Flavor-Preservation Scheme ...................................................... 241

        l.    Cover-up Scheme ...................................................................... 243

        m.    "Pattern of Racketeering Activity" ............................................. 247

        n.    Harm to Plaintiff, Aleutian Pribilof Islands Assocation, Inc. ....... 256

    2.    Violations of 18 U.S.C. § 1962(d) ..................................................... 258

COUNT II – VIOLATION OF ALASKA PUBLIC NUISANCE LAW .................... 260

COUNT III – NEGLIGENCE ......................................................................... 265

COUNT IV – UNFAIR COMPETITION: VIOLATIONS OF ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, AS § 45.50.471, *ET SEQ* ................................ 268

COUNT V – CIVIL CONSPIRACY .................................................................. 270

VII.    REQUEST FOR PUNITIVE DAMAGES .................................................. 272

VIII.    PRAYER FOR RELIEF ....................................................................... 277

IX.    DEMAND FOR JURY TRIAL ............................................................... 278

## I.  INTRODUCTION

1.     The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century.  After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory.  By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers.  Until now.  The United States, closer than ever to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions.  The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community, drawing governmental intervention at nearly every level—but it's too little, too late.

2.     This public health crisis is no accident.  What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s (JLI) co-founders Adam Bowen and James Monsees viewed as opportunity.  Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier.  To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes.  With help from their early investors and board members, who include Nicholas Pritzker, Riaz Valani, and Hoyoung Huh (together, the "Management Defendants"), they succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

3.     Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria.  JLI was created in the image of the iconic American cigarette companies, which JLI founders

COMPLAINT
CASE NO. 19-MD-02913-WHO

praised for creating "the most successful consumer product of all time. . . . an amazing product." The secret to that "amazing product"?  Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions.  Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

4.     Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth.  JLI and its co-conspirators adopted and mastered them all.  *First*, JLI and Bowen designed JUUL products to create and sustain addiction, not break it.  JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and Bowen designed was a starter product, not a cessation or cigarette replacement product.  JLI and Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

5.     *Second*, JLI, the Management Defendants and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products.  JUUL products' packaging and advertising grossly understates the nicotine content in its products.  Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine.  In partnership with Altria, JLI adopted a

COMPLAINT
CASE NO. 19-MD-02913-WHO

"Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI, the Management Defendants, and Altria also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth. JLI and the Management Defendants joined with these veteran cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, young and old, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

6.    *Third*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base. One of JLI's "key needs" was the need to "own the 'cool kid' equity." JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

7.    JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing

COMPLAINT
CASE NO. 19-MD-02913-WHO

campaigns and social media.  They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school.  JLI and the Management Defendants also employed young social-media "influencers" and celebrities popular with teenagers.  When the public, regulators, and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful.  JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018.  The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

8.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company.  In December 2018, Altria paid $12.8 billion to acquire a 35% stake in JLI.  Nicholas Pritzker and Riaz Valani led the negotiations for JLI and worked closely with Altria's executives to secure Altria's agreement to pull its own competing e-cigarette product off the market and instead throw its vast resources and cigarette industry knowledge behind JUUL.  Altria thus supported and ultimately directed JLI, working to ensure its continued success despite Altria's knowledge that JLI and the Management Defendants had mislead the public and targeted youth.  JUUL's market dominance was established, positioning Altria and the Management Defendants to share in JLI's profits.  Defendants' conduct prompted the Federal Trade Commission to sue JLI and Altria on April 1, 2020 alleging violations of the antitrust laws and seeking to unwind the JLI/Altria

COMPLAINT
CASE NO. 19-MD-02913-WHO

transaction. But even well before Altria announced its investment in JLI, the connections between the two companies ran deep. With the assistance and direction of the Management Defendants, Altria collaborated with JLI to maintain and grow JUUL sales, despite its knowledge that JUUL was being marketed fraudulently to all consumers and targeted to youth, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off regulation and public outcry and keep their most potent and popular products on the market. JLI (and the Management Defendants) have benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

9.     There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this public health crisis. At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction. Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer

COMPLAINT
CASE NO. 19-MD-02913-WHO

hospital stays than younger patients.  And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

10.     The Aleutian Pribilof Islands Association, Inc. (APIA), a tribal organization of the Unangan/Unangas people in Alaska that represents thirteen federally recognized tribes in the Aleutian Islands, brings this action for the wrongful actions and conduct in the marketing and sale of e-cigarettes by Defendants.

11.     Defendants have knowingly or negligently marketed and promoted JUUL products to the American Indian and Alaska Natives ("AI/AN") within the geographic areas APIA services in a manner that foreseeably injured, and continues to gravely injure, APIA and its service population by creating an epidemic (the "JUUL epidemic") involving severe medical problems primarily caused by the use of JUUL products.

12.     APIA is responsible for the protection of public health and safety within its jurisdiction, provides essential services to members of its service population.  The ability of APIA to carry out these essential functions has been, and continues to be, profoundly threatened by the JUUL epidemic that Defendants' actions have created.

13.     While the damage it has caused is widespread, the JUUL epidemic disproportionately impacts AI/AN communities and young members of Indian tribes across the United States.  The Centers for Disease Control and Prevention (CDC) reported that smoking rates among AI/AN people are the highest in the country compared to all other racial and ethnic groups.  The CDC has also reported that more than 20% of AI/AN middle and high school students have used tobacco products, with e-cigarettes the most commonly used product among this group.  The effects of the crisis created by Defendants are exacerbated by numerous factors that are specific to AI/AN communities such as the effect of historical trauma, high rates of

COMPLAINT
CASE NO. 19-MD-02913-WHO

poverty, limited health care funding, and lack of adequate housing, all of which make tribal communities particularly susceptible to health problems.

14.     Defendants specifically and deceptively targeted AI/AN communities with their highly addictive and damaging products.  JLI sought to take advantage of a vulnerable AI/AN population by making sales partnerships with numerous tribes, to implement deceptive and misleading sales and marketing such as the "switching programs."

15.     Through their actions, Defendants have fueled the JUUL epidemic for their own financial gain, causing Indian tribes across the United States, and the geographic area surrounding APIA's service area in particular, to be flooded with JUUL products, creating an environment where these products and their use and abuse are rampant.  Such abuse and the resulting harm were entirely foreseeable results of Defendants' actions in intentionally creating a market for dangerously addictive JUUL products through, in part, concealing the risks of addiction and shipping massive quantities of such products throughout the United States without taking reasonable and necessary steps to prevent diversion and misuse.  All of the Defendants in this action thus share responsibility for creating and perpetuating the JUUL epidemic.

16.     Defendants have caused foreseeable damages to APIA, including the costs of providing: (1) treatment of nicotine-caused illnesses and other health programs; (2) prevention and early intervention programs designed to curb the use of JUUL products among its youth and underage members; (3) law enforcement and public safety relating to the use of JUUL products within APIA's service area; and (4) costs of hazardous waste disposal of JUUL products.  APIA has also suffered substantial damages due to the lost productivity of tribal members served by APIA, increased administrative costs, lost opportunities for APIA's community growth and self-determination, and substantial damages relating to its ability to govern itself, the tribal members

COMPLAINT
CASE NO. 19-MD-02913-WHO

served by APIA, and territory as a direct result of Defendants' acts and omissions.  These damages have been suffered and continue to be suffered directly by APIA.

17.     APIA brings this action in its own capacity.  APIA is not asserting claims that belong to individual members of its service population nor seeking to recover on behalf of individual tribal members or users based on individual personal harm.  Instead, APIA is seeking damages for harm caused to APIA, as a tribal organization of thirteen federally recognized tribes in the Aleutian Islands, including recovery of the funds that it has already expended and must expend in the future to address the conduct described in this Complaint.

18.     APIA seeks injunctive relief, abatement, and damages arising out of the injuries to its members, property, and employees caused by Defendants' wrongful conduct in the marketing and sale of its JUUL products.

## II.     PARTIES

### A.  Plaintiff Aleutian Pribilof Islands Association, Inc.

19.     APIA is a tribal organization of the Unangan/Unangas people in Alaska with thirteen federally recognized Tribes as members[1] located on the Aleutian Islands, which extend westward over 1,100 miles from the southwestern corner of the Alaska mainland, and include the Pribilof Islands, which lie to the north.  This area consists of approximately 100,000 square miles.  APIA has its principal place of business in Anchorage, AK.

---

[1] APIA's 13 member Tribes include: (1) the Agdaagux Tribe of King Cove; (2) the Native Village of Akutan; (3) the Native Village of Atka; (4) the Native Village of Belkofski; (5) the Native Village of False Pass; (6) the Native Village of Nelson Lagoon; (7) the Native Village of Nikolski; (8) Pauloff Harbor Tribe; (9) the Qagan Tayagungin Tribe of Sand Point; (10) the Qawalangin Tribe of Unalaska; (11) the Pribilof Island Aleut Community of St. George; (12) the Pribilof Island Aleut Community of St. Paul; and (13) the Native Village of Unga.

COMPLAINT
CASE NO. 19-MD-02913-WHO

20.     APIA was chartered under Alaska law in 1976 as a nonprofit corporation in the State of Alaska.  A thirteen member Board of Directors governs APIA.  Each Director serves a three-year term, represents one of the thirteen constituent Aleut Tribes which are members of APIA, and is appointed by the community's tribal organization.  APIA has a service population of approximately 2,644 tribal members in and around the Aleutian Islands.

21.     APIA provides a broad range of governmental services, including health care services, to American Indians and Alaska Natives, and to other eligible individuals in the State of Alaska, pursuant to the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. §§ 5301-5399.  The ISDEAA authorizes Indian tribes and tribal organizations to enter into contracts and compacts to assume responsibility to provide programs and services that the federal government would otherwise be obligated to provide for the benefit of American Indians and Alaska Natives.

22.     In addition to federal funding, APIA contracts with state and local governments and secures private funding, on its own behalf and on behalf of its member tribes it represents, to provide this broad spectrum of services.  These services involve matters relating to health care, education, social, psychological, employment and vocational training, family services, public safety services, community development, environmental programs, energy, and traditional foods.

23.     APIA provides health care services to its member tribes and their members under the Alaska Tribal Health Compact, the "Compact", which is the umbrella agreement, entered into between Alaska Native Tribes and tribal organizations in Alaska and the Indian Health Service (IHS) pursuant to Title V of the ISDEAA, that authorizes those tribes and tribal organizations to operate health and health-related programs formerly operated by the IHS.  In addition, each tribal co-signer of the Compact enters into separate funding agreements with the IHS that govern the scope of programs and services to be performed by the tribal co-signers of the Compact.

COMPLAINT
CASE NO. 19-MD-02913-WHO

24. Over 99% of the IHS budget in Alaska is administered by tribes and tribal health programs under the Compact and other ISDEAA agreements. The Alaska Tribal Health System, which administers these programs and services, is composed of individual tribes and Tribal Health Organizations throughout the State, virtually all of whom are co-signers of the Compact.

25. APIA operates in one of the most isolated regions of the country, and is the sole health care provider in most communities in that remote service area. APIA serves high-needs populations with very limited resources, including those living in very remote areas where access to other providers does not exist or, at the very least, would require a flight (sometimes in a floatplane) or a boat to a larger community.

26. APIA provides health care services in Atka, Nikolski, St. George, and Unalaska to American Indians and Alaska Natives and to other eligible individuals within its service area. In the communities of Atka, Nikolski, and St. George, APIA operates Health Resources and Services Administration-designated Community Health Centers, which provide primary and emergency services to the general public, regardless of ability to pay.

27. APIA's Oonalaska Wellness Center (OWC) in Unalaska is staffed with a mid-level provider and Community Health Aides/Practitioners (CHA/Ps) And a regional medical director, while APIA's health clinics in Atka and Nikolski share a mid-level provider and CHA/Ps. The St. George Health Center is staffed with a mid-level provider as well as CHA/P.

28. APIA provides necessary behavioral health services as an integral part of the services provided to patients who are recovering from addiction, since much of the addiction is related to co-occurring mental health challenges. At any one time over the last several years, APIA has employed between two to five doctor level behavioral health clinicians and two to three master-level behavioral health clinicians.

COMPLAINT
CASE NO. 19-MD-02913-WHO

29.     APIA employs clinicians and a behavioral health aide working out of its Unalaska Behavioral Health clinic.  APIA also has employed a behavioral health aide working in both the Atka and St. George clinics for the past few years.

30.     APIA also provides community-based training as well as emergency medical services (EMS) related supplies and equipment.

31.     The diversion of funding and resources to address a public health crisis like the JUUL created vaping epidemic, including associated overhead and administrative costs, has had devastating impacts on the ability of APIA to provide an adequate level of basic health care and other needed specialty care in these areas, to meet its obligations under the ISDEAA and agreements with the IHS, and to carry out its organizational missions.

32.     In addition to health care services, APIA provides Village Public Safety Officers (VPSOs) to the Aleutian Pribilof regional communities.  VPSOs perform law enforcement duties and are first responders to many types of emergencies, to include but not limited to, fire, medical, and search and rescue.

33.     In collaboration with USAFV in Unalaska, APIA administers the Family Violence Grant Fund, which provides funds for immediate shelter and support services to adult and youth victims and their dependents, of family violence, domestic violence, or dating violence, while also providing funds for prevention training and services.

34.     APIA's Indian Child Welfare Act (ICWA, 25 U.S.C. § 1901, *et seq.*) Program serves as the Tribal Representative and represents Tribal children on behalf of twelve of the Tribes in the region by intervening when families are involved with child protection services. APIA also provides Family Services, including childcare.

COMPLAINT
CASE NO. 19-MD-02913-WHO

35.     APIA also provides supportive services to help participants gain volunteer and work experience to increase marketable job skills and to enable them to build resumes and cover letters needed to obtain full-time, unsubsidized employment after the training period.

36.     Defendants engaged in activities and conduct that took place on their tribal property or had a direct impact on the communities of APIA's member tribes.  The design, marketing, and false and misleading statements about Defendants' products created the JUUL epidemic which resulted in a foreseeable crisis and significant harm to APIA, its member tribes and their members.

37.     APIA has standing to recover damages it incurred as a result of Defendants' actions and omissions.

**B.  Defendants**

    **1.  JUUL Labs, Inc.**

38.     Defendant JUUL Labs, Inc. (along with its predecessors, "JLI"), is a Delaware corporation with its principal place of business in San Francisco, California.  JLI designs, manufactures, sells, markets, advertises, promotes and distributes JUUL e-cigarettes devices, JUULpods, and accessories (collectively "JUUL" or "JUUL products"), including throughout Alaska and the geographic area where APIA provides services to Alaska Natives and their dependents.  Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007.  In 2015, Ploom, Inc. changed its name to PAX Labs, Inc.  In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc.  That new subsidiary, PAX Labs, Inc. (PAX), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

### 2. Altria Defendants

39.     Defendant Altria Group, Inc. ("Altria Group" or together with its wholly owned subsidiaries and their predecessors, "Altria"), is a Virginia corporation with its principal place of business in Richmond, Virginia.  Altria is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century.

40.     Defendant Philip Morris USA, Inc. ("Philip Morris"), is a wholly owned subsidiary of Altria.  Philip Morris is also a Virginia corporation that has its principal place of business in Richmond, Virginia.  Philip Morris is engaged in the manufacture and sale of cigarettes in the United States.  Philip Morris is the largest cigarette company in the United States.  Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years.

41.     On December 20, 2018, Altria Group and Altria Enterprises LLC purchased a 35% stake in JLI.  Altria and JLI executed a Services Agreement that provides that Altria, through its subsidiaries, Philip Morris, Altria Client Services LLC, and Altria Group Distribution Company, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

42.     Defendant Altria Client Services LLC ("Altria Client Services" or "ACS") is a Virginia limited liability company with its principal place of business in Richmond, Virginia.  Altria Client Services provides Altria Group, Inc., and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs.  Pursuant to Altria's Relationship Agreement with JLI, Altria Client Services assists JLI in the sale, marketing, promotion and distribution of JUUL products.  Such services include database support, direct marketing support, and premarket product application support.  On September 25, 2019, the former senior vice president and chief growth

COMPLAINT
CASE NO. 19-MD-02913-WHO

officer of Altria Client Services, K.C. Crosthwaite, became the new chief executive officer of JLI.

43.    Defendant Altria Group Distribution Company ("AGDC") is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc., with its principal place of business in Richmond, Virginia.  Altria Group Distribution Company provides sales, distribution, and consumer engagement services to Altria's tobacco companies.  Altria Group Distribution Company performs services under the Relationship Agreement to assist JLI in the sale, marketing, promotion, and distribution of JLI.  Such services include JUUL-distribution support, the removal by Altria Group Distribution Company of Nu Mark products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JUUL products and fixtures, and sales support services.

44.    Defendants Altria Group, Philip Morris, Altria Client Services LLC, and AGDC are referred to collectively as the "Altria Defendants."

45.    While Plaintiff APIA has attempted to identify the specific Altria defendant which undertook certain acts alleged in this Complaint, it was not always able to do so due to ambiguities in Altria's and JLI's own documents.  References in these internal documents to "Altria" without further detail are common.  In other words, Defendants do not always specify which entity is involved in particular activities in their own internal documentation.  Moreover, key employees moved freely between Altria Group, Inc. and its various operating subsidiaries, including defendants Altria Client Services, Altria Group Distribution Company, and Philip Morris USA Inc.—each of which is a wholly owned subsidiary of Altria Group, Inc.  For example, K.C. Crosthwaite (who would later become CEO of JLI) was at various points from 2017 through 2019 employed by Altria Client Services, Philip Morris, and Altria Group.  And in its own annual reports to Shareholders, when identifying the "Executive Officers" of Altria

Group, Altria states that the "officers have been employed by Altria *or its subsidiaries* in various capacities during the past five years."

46.     Notably, Altria Group directs the activities of its varying operating companies, including defendants Altria Client Services, AGDC, and Philip Morris.  For this reason, and unless otherwise specified, the term "Altria" refers to Altria Group Inc. as the responsible entity, by virtue of its control over its various operating subsidiaries.  To the extent such an assumption is incorrect, the knowledge of which Altria Group Inc. subsidiary is responsible for specific conduct is knowledge solely within the possession of the Altria Defendants.

### 3.  Management Defendants

47.     Defendant James Monsees is a resident of the San Francisco Bay area, California.  In 2007, he co-founded Ploom with Adam Bowen.  He served as Chief Executive Officer of JLI until October 2015.  Since October 2015, he has been Chief Product Officer of JLI.  At all relevant times, he has been a member of the Board of Directors of JLI until he stepped down in March 2020.

48.     Defendant Adam Bowen is a resident of the San Francisco Bay area, California.  In 2007, he co-founded Ploom with Defendant Monsees.  At all relevant times, he has been Chief Technology Officer and a member of the Board of Directors of JLI.

49.     Defendant Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco.  Pritzker received a J.D. from the University of Chicago.  In 2011, he invested in JLI.  He has been on the Board of Directors of JLI since at least August 2013.  At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors and served as Co-Chairman.  He

COMPLAINT
CASE NO. 19-MD-02913-WHO

controlled two of JLI's seven maximum Board seats (the second of which was occupied at relevant times by Alexander Asseily and Zachary Frankel).

50.     Defendant Hoyoung Huh currently lives in Florida.  During most of the relevant time period, he lived and worked in the Silicon Valley area, California.  He holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering.  He has been CEO or a Board member of numerous biotechnology businesses, including Geron Corporation.  Huh has been on the Board of Directors of JLI since at least June 2015.  At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors.  Huh occupied the Board seat appointed by a majority of the JLI Board.  Huh resigned from JLI's board in May 2018.

51.     Defendant Riaz Valani lives near San Jose, California, and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm.  He first invested in JLI in 2007 and has been on the Board of Directors of JLI since at least 2007.  At least from October 2015 to August 2016, he was on the Executive Committee in the Board of Directors.  He controlled two JLI's maximum seven Board seats.  Beginning around March 2015, Valani's second seat was occupied by Hank Handelsman; Zach Frankel may have occupied Valani's second seat starting in 2017, though Handelsman remained on the board.

52.     Defendants Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "Management Defendants."

53.     The Altria Defendants, Monsees, Bowen, Pritzker, Huh, and Valani are referred to collectively as the "RICO Defendants."

### III.     JURISDICTION AND VENUE

54.     APIA brings this action in *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, Case No. 19-md-02913-WHO, and files directly in the U.S.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   District Court for the Northern District of California as permitted by Second Amended Case

2   Management Order No. 3, ECF No. 996 (Sept. 21, 2020).  In the absence of direct filing, APIA

3   would have filed this Complaint in the U.S. District Court for District of Alaska.

4          55.     This Court has subject matter jurisdiction over this action because APIA's suit

5   involves a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331.

6   The Court also has supplemental jurisdiction over APIA's state law claims pursuant to 28 U.S.C.

7   § 1367 because the state law claims are part of the same case or controversy.

8          56.     This Court independently has federal subject-matter jurisdiction over APIA's

9   state law claims under 28 U.S.C. § 1332(a)(2), because: (i) the amount in controversy exceeds

10  $75,000, exclusive of interest and costs, and (ii) and no Defendant is a citizen of the same state

11  as APIA.

12         57.     This Court has personal jurisdiction over each Defendant because JLI is

13  headquartered and does business in the State of California and because each Defendant has

14  purposefully availed itself or himself of the privilege of exploiting forum-based business

15  opportunities, including by promoting, marketing, and the sale of the products at issue in this

16  lawsuit.  Defendant JUUL and the Altria Defendants have significant contacts in each States and

17  Territories of the United States, such that personal jurisdiction would be proper in any of them.

18  Defendants Monsees, Bowen, Pritzker, and Valani reside within the Northern District of

19  California and are subject to the general jurisdiction of this Court.  Defendant Huh resided in the

20  Northern District of California when he engaged in the conduct alleged herein.  This Court also

21  has personal jurisdiction over all Defendants under 18 U.S.C. § 1964(c).

22         58.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the

23  events or omissions giving rise to the claims asserted herein arose in this District and Defendants

24  are subject to personal jurisdiction in this District.

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

## IV.   FACTUAL ALLEGATIONS

**A. Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."**

59.     JLI's co-founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."  This statement, which ignores the fact that cigarettes have caused more deaths than any other human invention, contained a kernel of truth.  When U.S. smoking rates peaked in the mid-1960s, 42% of adults smoked cigarettes.  Cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the office, and at sports games.  Movie stars and sports heroes smoked.  Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

60.     But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

61.     Years of anti-smoking campaigns, including work by local government public health departments and school-based anti-tobacco programs, have made great strides towards denormalizing cigarette smoking.  But where public health officials and schools saw progress, others saw an opportunity.

62.     Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder Adam Bowen set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."  Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."  Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

63.     Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette.

COMPLAINT
CASE NO. 19-MD-02913-WHO

But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by Bowen, Monsees, or others at JLI.

64.     When it became clear that Bowen and Monsees could not achieve vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

65.     Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani, and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

66.     Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016, Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public.  They overrode other board members' arguments that JLI's youth-oriented marketing campaign should be abandoned or scaled back, directed the continuation of the marketing campaign that they knew was actively targeting youth, and cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."  Once their leadership was secure, defendants Pritzker, Valani, and Huh pressed for even "more aggressive rollout and [marketing]."

67.     Defendants Bowen, Monsees, Pritzker, Valani, and Huh thus, as further set forth in this Complaint, controlled JLI and used it to make fraudulent misrepresentations or omissions regarding Juul's intentional addictiveness and method of nicotine delivery, combined with the

COMPLAINT
CASE NO. 19-MD-02913-WHO

intent, contrary to their public statements, to grow the market of nicotine-addicted individuals for their own financial gain.

68.    And, as set forth in this Complaint, Defendants Bowen, Monsees, Pritzker, Huh, and Valani sought to personally profit from their unlawful acts, using their control of JLI to position the company for acquisition.  By no later than August 2015, and likely earlier, Defendant Monsees was in talks with Japan Tobacco International (an early investor in Ploom, JLI's predecessor), British American Tobacco, and Philip Morris International regarding a potential acquisition of the JUUL business.  Monsees had already received "a couple good faith lowball offers" from British American Tobacco and was awaiting a proposal from PMI that month.  At the same time, Monsees was looking for "banking support to give an internal tobacco champion the tools to argue for a sizeable deal."

69.    By no later than August 2015, Defendants Bowen, Pritzker, Valani, and Huh joined in the discussions of a potential acquisition by a major cigarette company, as they knew, in the words of Defendant Bowen, "big tobacco is used to paying high multiples for brands and market share."

70.    Unable to secure an early acquisition, the Management Defendants knew that their desire to monetize a massive new market for JUUL would be aided if they could convert Altria, a competitor through its e-cigarette subsidiary Nu Mark LLC and an experienced cigarette company with a history of marketing to youth and covering it up, into an ally and eventual purchaser.  They began that effort as late as the spring of 2017.  While Defendants JLI, Bowen, Monsees, Valani, and Huh are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a century.

71.    Altria, for its part, desperately sought a replenishing customer base.  Cigarette companies have long known that profitable growth requires a pipeline of "replacement"

COMPLAINT
CASE NO. 19-MD-02913-WHO

customers.  After decades of tobacco litigation and regulation, Altria (including through its subsidiary Philip Morris) had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900s.  In 2017, Altria's combustible cigarette products (sold through Philip Morris) were facing increasing regulatory pressures.  In late July 2017, Altria's stock value plummeted shortly after the Food and Drug Administration (FDA) announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.  In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and adverse health impacts of smoking cigarettes.

72.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.  Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.  Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.

73.     In the face of this continued downward trend in the traditional cigarette market, Altria had undertaken its own efforts at marketing an e-cigarette product through its subsidiary Nu Mark LLC.  Altria, through Nu Mark, had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blu e-cigarettes.  Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.  Altria was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at

COMPLAINT
CASE NO. 19-MD-02913-WHO

the time of MarkTen's launch.  The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette.

74.     Altria had also been acquiring small companies in the e-cigarette industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."  In 2016, Altria acquired an e-cigarette product called Cync, from Vape Forward.  Cync is a small e-cigarette device that uses prefilled pods in a variety of flavors, similar to the JUUL.

75.     At the same time that Altria was struggling to market a successful e-cigarette product through Nu Mark, it was carefully studying JUUL.  A May 13, 2016 presentation by Altria Client Services titled "JUUL Market Summary" included detailed information on the sale of JUUL, including market share, the number of chain stores selling JUUL, the price of JUUL and JUULpods, updates to the design of JUUL and JUULpods, new flavor names, the purported nicotine strength of JUULpods, the "Target consumer" for JUUL, and the "Business Model/Sources of Funding" of JLI (then PaxLabs).

76.     In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."  In his remarks, Altria Group's current then-CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year.  It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations."  He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."  In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.  Thus, despite its public statements to the contrary,

Altria knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

77.    With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria saw a solution in JLI, with its exponential growth and large youth market.  That youth market would be key to replacing Altria's lost profits for years to come.  So Altria Group and Altria Client Services set out to court the leaders of JLI in an eighteen-month dance, all the while signaling that a massive payout would await those leaders if they maintained JLI's large youth market.

78.    Essential to maintaining JLI's large youth market, of course, was delaying or preventing regulation or public outcry that could interfere with Altria's and the Management Defendants' efforts.  Altria, with its decades of experience doing just that, aided JLI and the Management Defendants in these efforts along the way, ultimately attempting to deceive the public and the FDA itself in order to defraud consumers when the specter of regulation threatened the value of its impending investment in late 2018.  Altria's best bet for maintaining its sales by increasing the number of users, addicted to nicotine was to partner with JLI's leadership (1) to maintain or increase the number of users, hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

79.    For those reasons and others, Altria began coordinating with the Management Defendants in the spring of 2017.  So, with Defendants Bowen, Monsees, Pritzker, Valani, and Huh looking for a big payout and Altria and Altria Client Services looking for new customers, this group of Defendants began to work together, using JLI to further their unlawful ends, in the Spring of 2017.  Of course, these Defendants were not strangers to one another.  Before the Spring of 2017, Altria (through Altria Client Services) and JLI were members of at least one

COMPLAINT
CASE NO. 19-MD-02913-WHO

industry group that shared information and coordinated public statements regarding vaping, and Ploom's advisory committee included Altria's former growth officer.  As Howard Willard, Altria's CEO said, the company followed "JUUL's journey rather closely" from its early beginnings.

80.      As discussed further below, Altria first contacted JLI's leadership, including Defendants Pritzker and Valani, about a partnership by early 2017, with "confidential discussions" beginning in the spring of 2017.  JLI's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent nicotine formulation was "cornering" the consumables market with the highest customer retention rate of any e-cigarette.

81.      By the fall of 2017 JLI, through its leadership including the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand JUUL's market share, knowing that it was based on sales to youth and fraudulent and misleading advertising to consumers of all ages.

82.      The "confidential discussions" continued, with Altria's leadership meeting regularly with Prtizker and Valani for "a period of approximately 18 months."  Defendants Pritzker and Valani took the lead on these discussions (together with JLI CEO Kevin Burns), working to establish the formal JLI-Altria partnership.  On August 1, 2018, Pritzker, Valani, and JLI's CEO Kevin Burns met Willard and William Gifford, Altria's CFO, at the Park Hyatt Hotel in Washington, D.C., to discuss their partnership and Altria's support of JUUL's mission.

83.      During the roughly 18-month negotiating period, Pritzker, Valani, and JLI's leadership communicated regularly with Altria as they all worked together to fraudulently growth and maintain JUUL's market share.  Through their control of JLI, Bowen, Monsees, and also Huh remained critical to the success of these efforts.  Without their control of the JLI Board

COMPLAINT
CASE NO. 19-MD-02913-WHO

of Directors and prior fraudulent conduct, the close coordination between JLI's leadership and Altria and Altria's investment in JLI to support JUUL's mission would not have been possible.

84.     In December 2018, Altria decided to take the next step in its coordination with the Management Defendants and JLI's leadership by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history.  This arrangement was profitable for Altria, as well as enormously lucrative for Defendants Monsees, Bowen, Pritzker, Valani, and Huh, as detailed below.

85.     Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies.  Altria, for its part, increasingly guided and directed JLI and the Management Defendants in these areas and helped them devise and execute schemes to preserve JLI's youth appeal and market, including by deceiving consumers of all ages and regulators.

86.     JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a youth market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create a highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes.  As detailed more fully throughout this Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

COMPLAINT
CASE NO. 19-MD-02913-WHO

**B.  Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

    **1.  Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

87.    The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product.  Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive, and the key ingredient that drives addiction to cigarettes.  Nicotine's addictive properties are similar to heroin and cocaine.

88.    Route of administration and speed of delivery are key to understanding nicotine's addictive potential.  Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote:

> After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement.  The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration.

89.    Again, according to Dr. Benowitz,

> The rapid rate of delivery of nicotine by smoking . . . results in high levels of nicotine in the central nervous system with little time for development of tolerance.  The result is a more intense pharmacologic action.  The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction.

90.    Nicotine fosters addiction through the brain's "reward" pathway.  Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation.  Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain.  When nicotine binds to these receptors it

COMPLAINT
CASE NO. 19-MD-02913-WHO

triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety.  With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

91.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic."  Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.

92.     The above statements apply equally, if not more so, to e-cigarettes.  Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults:

> Until about age 25, the brain is still growing.  Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells.  Young people's brains build synapses faster than adult brains.  Because addiction is a form of learning, adolescents can get addicted more easily than adults.

The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.  A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."

93.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive

COMPLAINT
CASE NO. 19-MD-02913-WHO

pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.

94.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education, and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

95.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.  By 2014, teen smoking also hit a record low.  In June 2014, the Centers for Disease Control and Prevention (CDC) reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less."

96.     The United States Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause.  The good news is that we know which strategies work best.  By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."

97.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, Defendants saw an opportunity.

**2.  Following the Cigarette Industry Playbook, Defendants Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

98.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (i.e., well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   higher levels of consumer addiction than ever before.  JLI marketed that highly addictive device

2   as healthy, safe, cool, and available in kid-friendly flavors.

3   99.   In doing so, JLI followed the cigarette industry's playbook.  Monsees admitted

4   that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements,

5   and product design revealed in cigarette industry documents that were uncovered through

6   litigation and made public under the November 1998 Master Settlement Agreement between the

7   Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four

8   largest cigarette manufacturers in the United States.  "[Cigarette industry documents] became a

9   very intriguing space for us to investigate because we had so much information that you

10  wouldn't normally be able to get in most industries.  And we were able to catch up, right, to a

11  huge, huge industry in no time. And then we started building prototypes."

12  100.   In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly

13  admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and

14  addiction."  JLI researched how cigarette companies engineered their products and chemically

15  manipulated nicotine to maximize delivery: "We started looking at patent literature.  We are

16  pretty fluent in 'Patentese.'  And we were able to deduce what had happened historically in the

17  tobacco industry."  With access to the trove of documents made public to curb youth smoking

18  and aid research to support tobacco control efforts, JLI was able to review literature on

19  manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal

20  "throat hit."

21  101.   Through studying industry documents, JLI learned that the cigarette industry had

22  tried for years to figure out ways to create and sustain addiction by delivering more nicotine in

23  way that would be easy to ingest—without the nausea, cough, or other aversive side effects that

24  many new smokers experienced.  In the 1970s, R.J. Reynolds scientists eventually found a

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

solution: Combine the high-pH nicotine with a low-pH acid.  The result was a neutralized compound referred to as nicotine salt.  In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive.  A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."  Pefetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018.  Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts.  As described in herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

102.    JLI also engaged former cigarette industry researchers to consult on the design of their product.  As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore.  If you go to Altria's R&D facility, it's empty."  The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."

103.    One of the keys to JLI's success was its ability to fuse addiction and technology.  The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUULpod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL").  The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor.  JLI manufactures and distributes JUULpods that contain liquid

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   that includes nicotine, flavoring, and other additives.  Each JUULpod is a plastic enclosure

2   containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater.  When a sensor in the

3   JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in

4   the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine

5   solution in the JUULpod into a vapor consisting of nicotine, benzoic acid, glycerin, and

6   propylene glycol along with myriad chemical flavorings and other chemicals, many of which are

7   recognized as toxic.



16   104.    JLI sells the JUULpods in packs of four or two pods, and until recently, in a

17   variety of enticing flavors.  Many of the flavors have no combustible cigarette analog, including

18   "cool" cucumber, fruit medley, "cool" mint, and crème brûlée.  Figure 1 below shows the JLI

19   device and a JLI "Starter Kit" with four flavored JUULpods:

COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9
10



**Figure 1**

11

12      105.     JLI attempted to distinguish JUUL products from the death and disease associated

13  with cigarettes by deliberately providing a false assurance of safety.  For example, on May 8,

14  2018, a document titled "Letter from the CEO" appeared on JUUL's website.  The document

15  stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat

16  nicotine liquid and deliver smokers the satisfaction that they want without the combustion and

17  the harm associated with it."

18      106.     JLI even took this message to ninth graders: in 2018, a representative from JLI

19  spoke at a high school during a presentation for ninth graders, stating that JUUL "was much

20  safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative

21  than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99%

22  safer than cigarettes . . . and that . . . would happen very soon."

23      107.     This was not just a rogue employee.  Internal messaging around JUUL, crafted by

24  the executives, emphasized that JUUL was safer than smoking.  In a "Marketing Update"

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

presentation dated March 26, 2015, a message from then-Chief Marketing Officer Scott Dunlap stated that "[v]aporization technology is fundamentally disruptive, because it is *safer*, faster, more effective and less intrusive than alternatives."  More than a year later, on April 28, 2016, Tim Danaher sent Tyler Goldman a slide deck aimed at investors which he said that "James [Monsees] owns" and "will pull / update the relevant slides."  The deck claimed that "PAX Labs' new delivery system is faster, *safer*, more effective and less intrusive than[,]" among other options, "[s]moking[.]"  The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

108.   JLI's mission was not to improve public health.  Rather, JLI sought to introduce a new generation of consumers to nicotine.  JLI's business model was never about reducing addiction.  As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."

109.   JLI, Bowen, and Monsees achieved their vision.  Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high concentrations of nicotine like never before.  Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States.  Its revenues grew by 700 percent in 2017 alone.  By 2019, JLI owned three-quarters of the e-cigarette market.

**3.   Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company.**

110.   JLI, along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

COMPLAINT
CASE NO. 19-MD-02913-WHO

111.    That growing customer base was crucial to JLI's and the Management

Defendants' long-term objective—lucrative acquisition by another company.  They recognized

that JLI's product, with its potential to dominate the nicotine products market by hooking new

users, would appeal to one segment of the economy in particular: the cigarette industry.

112.    JLI and the Management Defendants also recognized that their business goal—

becoming part of the cigarette industry—was unlikely to endear them to the consumers that they

needed to purchase their products.  Years of anti-smoking campaigns have successfully

stigmatized cigarette smoking.  When Monsees and Bowen presented their thesis and product

design to their classmates, they included a clip from a South Park episode showing the characters

assembled at the Museum of Tolerance and shaming a smoker.

113.    Monsees and Bowen needed to shape social norms such that the public attitude

towards e-cigarettes would allow consumers to use their product without the stigma and self-

consciousness smokers experienced.  Monsees and Bowen saw a market opportunity in a

generation of non-smoking consumers brought up on anti-smoking norms.  In Monsees's words,

they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but

don't self-identify with—or don't necessarily want to be associated with—cigarettes."

114.    Part of this approach was consistently portraying JUUL as an enemy of the

cigarette industry, with a publicly announced goal of eliminating the cigarette.  In an interview,

Bowen asserted that he and Monsees spent a lot of time talking about "the kind of typical

thoughts of evil Big Tobacco companies like coming down and squashing you."  The "Mission

Statement" on JLI's homepage proclaims:

> Our mission is to transition the world's billion adult smokers away
> from combustible cigarettes, eliminate their use, and combat
> underage usage of our products.
>
> We envision a world where fewer adults use cigarettes, and where

COMPLAINT
CASE NO. 19-MD-02913-WHO

adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.

In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind JLI is "eliminating cigarettes."

115.    This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the market for cigarettes.  From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies.  Bowen and Monsees's initial foray into the e-cigarette business, Ploom, launched its e-cigarette as the ModelOne in 2010, using pods of loose-leaf tobacco heated by butane.  It did not catch on.  Ploom only sold a few thousand devices.  By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.

116.    Help came from Japan Tobacco International ("Japan Tobacco" or "JTI"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world.  In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner.  In a statement regarding the agreement, Monsees said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."  As Bowen explained in an interview, "We were still doing a lot of our own internal product development, but now we had access to floors of scientists at [Japan Tobacco]."

117.    According to internal documents, JLI (then known as Pax) entered into a "strategic partnership" with Japan Tobacco after it "evaluated all major tobacco industry

COMPLAINT
CASE NO. 19-MD-02913-WHO

companies." When JLI was getting ready to launch JUUL, its business plan called for a "massive distribution for JUUL," to "be distributed by the four largest US tobacco distributors." In addition, in 2015, JLI counted among its advisors Charles Blixt, the former general counsel of Reynold American, Chris Skillin, former director of corporate business development at Altria Group, Bryan Stockdale, the former SVP/President & CEO of R.J. Reynolds / American Snuff Company, and Chris Coggins, a toxicologist at Reynolds for 20 years.

118.    JLI and the Management Defendants even retained the investment bank Stifel to help JLI "establish strong international partnerships with leading tobacco companies (LT) to accelerate JUUL." According to Stifel, "JUUL could be a multi-billion opportunity to LT [leading tobacco companies] over time," and Stifel offered to manage a process that: "Identified the best Partner(s) for JUUL"; "Best positions JUUL to each Partner"; "Creates a catalyst for [leading tobacco company] decision making"; and "drives strong economic value and terms through competition." The end result of the process would be an exclusive agreement with the cigarette industry that would "maximize JUUL Growth Trajectory".

COMPLAINT
CASE NO. 19-MD-02913-WHO

119.   Stifel's presentation to the JLI Board of Directors, which included each of the Management Defendants, also emphasized both the stagnant and declining cigarette market, and the sharply growing e-cigarette market:



120.   According to Stifel, "[s]ince 2013 [leading tobacco companies] have aggressively but unprofitably entered the vape category . . . with products that are not compelling."  Stifel's

COMPLAINT
CASE NO. 19-MD-02913-WHO

conclusion was that in light of the leading cigarette companies' failures to develop an appealing

e-cigarette product: "JUUL Presents a Prime Opportunity for [leading tobacco companies] to

Compete with [vaporizers, tanks and mods] in Form Factor and Dominate the E-cig Experience

Through Retail Channels that Leverage its Distribution Strengths."

121.    Consistent with Stifel's presentation, and the profits it was forecasting, a draft

December 7, 2015 presentation to the board of directors included as a "management committee

recommendation" that JLI position itself for "strategic alternatives (including licensing or sale)":

**JUUL**

**Position JUUL for strategic alternatives (including licensing or sale) by EOY by strengthening the core proposition**
- Improve IRI report traction through dollar contributions and ACV
- Continue to improve repeat rates by adding more pre-qualified consumer doors
- Significantly strengthen IP portfolio
- Continue to support pillar accounts as required to preserve a strong brand reputation

**Demonstrate a path towards positive JUUL margin contribution**
- Ensure COGS improvements are realized and future improvements are clearly attainable
- Increase same store sales by focusing on high ROI doors
- Improve BDF requirements, particularly at pillar accounts, by reducing POP costs and negotiating improved sell-in cost repayment schedules.
- Reduce brand awareness and identity building programs until positive ROI is proven

COMPLAINT
CASE NO. 19-MD-02913-WHO

122.    The presentation also made clear that the "strategic alternative" for JLI envisioned by management was its acquisition by a large cigarette company:



123.    This goal—acquisition by a major cigarette company—was a motive that JLI and the Management Defendants would return to in making decisions about the manufacture and marketing of JUUL products.  As an example, in a 2016 email exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Defendant Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."  Bowen knew that to achieve the ultimate goal of acquisition JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

124.    JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the Defendants.

COMPLAINT
CASE NO. 19-MD-02913-WHO

125.    These schemes were an overwhelming success.  In December 2016, Monsees observed in an email to Valani that "Soon enough [JUUL's success] will catch the eyes of big tobacco and they'll either swing a new product more directly towards us, get aggressive about acquisition or do both in parallel."  By the close of 2017, according to Nielsen data, JLI had surpassed its competitors in capturing 32.9% of the e-cigarette market, with British American Tobacco at 27.4% and Altria at 15.2%. The total e-cigarette market expanded 40% to $1.16 billion.

126.    By 2018, JLI represented 76.1% of the national e-cigarette market, and JLI's gross profit margins were 70%.  In a complaint it filed in November 2018 against 24 vape companies for alleged patent infringement, JLI asserted that it was "now responsible for over 95% of the growth in the ENDS [Electronic Nicotine Delivery System] cartridge refill market in the United States" and included the following chart:

**Appendix 5: U.S. ENDS Pod Market Retail Unit Sales Growth 2018**

4-Week Unit Sales by End Date

| | Nielsen | | | IRI | | |
|---|---|---|---|---|---|---|
| | Apr 21 | Sep 8 | Share of Growth | Apr 22 | Sep 9 | Share of Growth |
| Total Market | 36,002,645 | 55,773,039 | 100% | 29,546,883 | 50,793,955 | 100% |
| Juul | 22,618,886 | 41,501,172 | 95.5% | 14,964,158 | 35,166,120 | 95.1% |
| Vuse | 6,385,922 | 6,172,595 | -1.1% | 7,204,900 | 7,409,312 | 1.0% |
| MarkTen | 3,677,300 | 4,240,285 | 2.8% | 2,904,168 | 3,230,237 | 1.5% |
| Logic | 1,785,167 | 2,018,023 | 1.2% | 1,928,841 | 1,876,006 | -0.2% |
| Blu | 1,062,360 | 1,461,127 | 2.0% | 1,305,209 | 1,937,225 | 3.0% |
| Other | 473,010 | 379,837 | -0.5% | 1,239,607 | 1,175,055 | -0.3% |

127.    JLI shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months—four times faster than Facebook.  This all came just three years after its product launch.

**C.  JLI and Bowen Designed a Nicotine-Delivery Device Intended to Create and Sustain Addiction.**

128.    JLI was well aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity.  One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."  It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers.  Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market."  In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market.  In my opinion this will require new brands tailored to the youth market."  Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh, and he specifically recommended an acidic smoke "by holding pH down, probably below 6."  As seen below, JLI heeded Dr. Teague's advice.

**1.  JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.**

129.    As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007.  Over time, e-cigarettes developed a small group of regular users, who were primarily current or former smokers.  By 2014, the e-cigarette market in the U.S. was in decline.

COMPLAINT
CASE NO. 19-MD-02913-WHO

130.    E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.  Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.  When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.  This experience is often referred to as a "throat hit."  The higher the concentration of free-base nicotine, the more intense the "throat hit."  While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

131.    Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.  None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

132.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit.  JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

### 2. JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness.

133.    JLI intentionally designed its product to minimize "throat hit" and maximize "buzz."  JLI's first known testing of JUUL-related products occurred in 2013 when it conducted "buzz" experiments that included non-smoker participants and measured "buzz" and throat harshness.  JLI officers and directors Adam Bowen, Ari Atkins, and Gal Cohen served as the initial subjects in the "buzz" experiments.  These early tests were performed with the assistance

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2

of Thomas Perfetti, the same RJR chemist who had studied nicotine salt decades ago to help RJR palatably deliver more nicotine.

3

4

5

6

7

8

9

134.    In these early tests, JLI's goal was to develop a "buzz-effective e-cig formulation," which would principally turn on "effectiveness (buzz, harshness)," followed by shelf life and patentability.  The aim was to develop a nicotine salt formulation that maximized buzz and minimized harshness.  "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street.  Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."

10

11

12

13

135.    The "buzz" experiments, which used heart rate as a qualitative measurement for buzz, showed that Bowen tested a 4% benzoate (nicotine salt) solution, which caused his resting heart rate to increase by about 70% in under 2 minutes, far exceeding all other formulations JLI was considering:

14

15

16

17

18

19

20



21

22

23

24

136.    Because they personally consumed these formulations, Bowen, Cohen, and Atkins knew that the 4% benzoate solution delivered a strong buzz that matched or exceeded a cigarette but had minimal throat hit.

25

137.     A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit.  The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.  Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine.  For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84, resulting in over 14 mg/ml of free-base nicotine.  The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."

138.     Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths.  The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."  The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."

139.     Reducing the harshness of nicotine also allows more frequent use of e-cigarettes for longer periods of time and masks the amount of nicotine being delivered.  By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction.  The Duell study further concluded that JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."

COMPLAINT
CASE NO. 19-MD-02913-WHO

### 3. JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes.

140.     In 2014, after the "buzz" experiments, JLI engineers ran a pilot pharmacokinetic study in New Zealand called the Phase 0 Clinical Study. The participants in the study—Adam Bowen, Gal Cohen, and Ari Atkins—had their blood drawn while vaping prototype JUUL aerosols. From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895 patent), for which JLI applied on October 10, 2014 and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing.

141.     Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin. As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The Phase 0 study also tested a 2% benzoate formulation, which had a similar Cmax as a Pall Mall cigarette, and a variety of other formulations. The following graph shows the pharmacokinetic results of the Phase 0 study:



COMPLAINT
CASE NO. 19-MD-02913-WHO

142.     According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher.  The total nicotine exposure (as measured by Area Under the Curve or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher.  The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

143.     Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine.  According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."  The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."

144.     In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery.  The rate of nicotine absorption is key to providing users with the nicotine "kick" that drives addiction and abuse.  Because "nicotine yield is strongly correlated with tobacco consumption," a JUULpod with more nicotine will strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL.  For example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine

COMPLAINT
CASE NO. 19-MD-02913-WHO

levels." In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

145. Another study corroborates the key result of the Phase 0 study that the 4% benzoate solution delivers more nicotine than a combustible cigarette. The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered 164 ± 41 micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff. Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, a Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

146. Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher than those seen in the Phase 0 study. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)." With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUULpod easily exceeds the nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.

COMPLAINT
CASE NO. 19-MD-02913-WHO

147.    Around 2014, JLI engineers designed the JUUL vaping device, which also was designed for addictiveness.  On average, the JUUL was engineered to deliver between four to five milligrams of aerosol per puff, which is an unusually massive puff:



148.    Given the concentration of nicotine in a JUULpod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (μg) of nicotine.  As noted by Dan Myers, a JLI scientist, in an internal 2018 email to Adam Bowen and Ziad Rouag, a regulatory employee at JLI at the time, "much more nicotine than 150 per puff could be problematic" because, according to Myers, cigarettes deliver between around 100-150 μg of nicotine per puff.  In other words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize up to 2.5 times as much nicotine per puff as a cigarette.  Myers also noted that "Adam put in his recommendation of ~4mg/puff as the target" for a pharmacokinetic study.

149.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic.  Chenyue Xing stated that "[y]ou hope that they get what they

COMPLAINT
CASE NO. 19-MD-02913-WHO

want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop.  According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."  For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly.  JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."  For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"  But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."

150.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis.  Instead, it programmed the device to emit puffs for up to six seconds.  JUUL knew from the Phase 0 pharmacokinetic study in 2014 and the CH-1702 pharmacokinetic study in 2017 that puffs of three seconds generate pharmacokinetic profiles matching that of a cigarette.

151.    Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came from consumer research that Ploom commissioned in 2014.  Ploom hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette.  On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, emailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies.  She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."  Ms. Collinsworth added that "the qualitative information suggests J1 could fit into the e-cig or vapor category for the younger group.  The qualitative findings suggested *this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake*."

COMPLAINT
CASE NO. 19-MD-02913-WHO

152.    On October 1, 2014, Ms. Collinsworth followed up with additional comments. She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes.  When they approached the product like they would a Blu or other inexpensive e-cig, they were floored by the delivery and didn't really know how to control it."

153.    Survey responses showed that the least important product attribute for the adult smokers and non-smokers in that group was "buzz."  Comments from the study's subjects included "overwhelming when I first inhaled," "too much for me," "it was too strong," and "it caught me off-guard."  Comments on the device's style said JUUL "might manage to make smoking cool again"; others "thought it was a data storage device."

154.    The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees and then-Chief Marketing Officer Richard Mumby.

155.    In late 2014, knowing the results of the buzz tests, the Phase 0 study and the consumer research, JLI executives, including Bowen, selected the 4% benzoate formulation to serve as the model for all formulations to be used in the JUUL product to be released in 2015. All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels in the Phase 0 study.  JUULpods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

**4.   JLI and the Management Defendants Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine than Smokers Needed or Wanted.**

156.    The JUUL e-cigarette launched in 2015.  After the launch, JLI and the Management Defendants continued to collect information about the addictiveness of JUUL.

COMPLAINT
CASE NO. 19-MD-02913-WHO

This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

157.   For example, on April 22, 2017, an e-cigarette retailer emailed Gal Cohen expressing concern about the addictiveness of JLI's products. He wrote:

> I am very concerned about the JLI products.  People's addiction behavior is SEVERE with this JLI device.  I don't think I can justify carrying this anymore.
>
> The Brooklyn store is run by someone else and he still wants to carry it.  I am not really happy about this.  It was a simple product for users who do not want to fill tanks and change atomizers and it was easy to sell, but I really don't feel good about selling it.  I know we talked about this back a few years ago before we were carrying the product, but I am curious to know what is in the liquid.  I know the nicotine salts are added but I would like to know what else is in it.  Do you guys have a GCMS or ingredient listing for the liquid?  Are there other additives?  I want to feel more comfortable so I can keep carrying these, but **I have seen what it is doing to people and I am very uncomfortable with it**.  Last year when the news came to me and wanted me to help them with the story that teens were using JLI I shut that story down by telling them it wasn't true.  **It is true. kids are getting hooked on this thing and they don't even understand half the time that it has nicotine in it!  Little kids.. like 14 and 15 year olds.**  They try to come in my shop and we tell them it is 21 and over and get them out... but it is REALLY bad!
>
> I have kids calling and trying to order using delivery services as well.  We will only allow pickup and delivery for regular customers whose ID we have already checked... but they TRY and that worries me because the smoke shops and bodegas are NOT checking that the person they are picking up for is old enough to buy the product.
>
> I agree that it is certainly less hazardous than smoking... but to intentionally increase the addictiveness of nicotine seems really irresponsible and makes me feel like Big Tobacco pushing people onto a really addictive product.  I just don't think that it is necessary and I don't feel good about it.
>
> Anyway... if there is any info you have that might make me feel better about selling it let me know... or if you could send me

ingredient listing (I know Pax applied for the patent on the liquid with the nicotine salts so it should be ok to share now?) I would appreciate it.

158.     Another example came just days later.  On April 28, 2017, JLI held a science meeting discussing the scientific information in JLI's possession with outside scientists.  Notes from the meeting state that "concern was raised that because the nicotine update [sic] is slightly faster the data could be interpreted as feeding an addiction faster.  Given the current climate with addictions to OxyContin how the data is presented needs to be considered carefully."

159.     Additionally, Dan Myers wrote to Adam Bowen in October 2017 that "single puff data from Juul suggests that a small number of puffs, at the beginning of the pod's lifetime, may contain 2-3X" the levels of nicotine in the puffs from the rest of the pod, "i.e., 200-300 [μ]g/puff."  This is consistent with a central goal of the product's design: capturing "users with the first hit."

160.     None of this information was a surprise, nor did it cause JLI or the Management Defendants to change JLI's products or marketing.  In fact, they embraced it.  On November 3, 2017, Steven Hong, JLI's Director of Consumer Insights, described JUUL's "design and chemical formulation (fast acting nic salts)" as JLI's "ace in the hole" over the competition.

161.     The following year, JLI and the Management Defendants obtained even more evidence that the amount of nicotine in JUULpods was needlessly high.  By no later than May of 2018, JLI had completed Phase I of "Project Bears," a JLI study of smoker and vaper nicotine strength preferences.  The results showed that "[a]cross the smoker segments, product liking is very similar[,]" and the "heaviest smokers (21+ cigs) like 1.7% more than higher strengths" such as 3% and 5%.  Similarly, "for those who evaluated the 5% pod, when given the choice of lower level pod strengths, at least half would choose a lower strength pods."

COMPLAINT
CASE NO. 19-MD-02913-WHO

162.    The same tests also showed that, contrary to JLI's expectations, smokers did not increase their use of the 1.7% formulation relative to the 5% formulation in order to achieve nicotine satisfaction.  "Smoking volume does seem to be a driver of vaping volume, but this does not vary much by strength within a given smoker type."

163.    Thus, Project Bears revealed that 5% JUULpods delivered more nicotine than necessary to satisfy cigarette smokers, even those characterized as "heavy" smokers.

164.    At some point during the coordination between JLI, the Management Defendants, and Altria, but no later than the due-diligence period for Altria's investment in JLI, either JLI (through its employees) or one or more of Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided Altria with a copy of the Project Bears findings.

165.    Nonetheless, JLI, the Management Defendants, and Altria have maintained and promoted the 5% JUULpods as JLI's flagship offering of JUULpods although they knew that even current smokers prefer a *lower* nicotine content.  They pushed the 5% JUULpod because it hooked users faster and kept them addicted to nicotine.

166.    In addition to Project Bears, JLI and the Management Defendants (and potentially Altria) were aware of other internal studies that established that its 5% JUULpod product would not be a successful cessation tool, as it was not attractive to an audience looking to reduce cigarette consumption.

   **5.  JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection.**

167.    Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers.  In January 2015, six months before JUUL's launch, JLI's Marketing Director, Sarah Richardson, identified "key needs" for JUUL's PR strategy, including "Establish premium positioning to

COMPLAINT
CASE NO. 19-MD-02913-WHO

entice the "masses" to follow the trend setters; own the 'early adopter' /'cool kid, equity as we build out volume", and highlighted that "JUUL deliberately doesn't resemble e-cigs or cigalikes" that are "awkward" and "douche-y".  Instead, JUUL is "elegant" and "cool".

168.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new.  Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'" Again, JUUL followed the cigarette playbook verbatim.

169.    JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized.  JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

170.    Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent.  And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke.  Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use.  As a result, young users can, and do, use JUUL—in class or at home—without detection.

171.    The JUUL device is also designed to be small and discrete.  Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide.  The JUUL device resembles a memory stick and can be charged in a computer's USB drive.  This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces like schools and even charged in school computers.  JLI has been so successful in emulating harmless technology that its small, rectangular devices are often mistaken for or passed off as flash drives.  According

1    to one high school senior, "that's what people tell the teachers a lot, too, if you charge it in class,

2    they'll just say it's my flash drive."





172.    Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and

high-tech, which made it appealing to youth.  JLI co-founder Bowen drew on his experience as a

design engineer at Apple Inc. to make JUUL resonate with Apple's popular aesthetics.  This

high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device.

This wasn't smoking or vaping, this was JUULing."  The evocation of technology makes JUUL

COMPLAINT
CASE NO. 19-MD-02913-WHO

familiar and desirable to the younger tech-savvy generation, particularly teenagers.  According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now.  Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."  A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products.  And then this is another product.  And it's just another product.  Until you're addicted to nicotine."

173.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors.  "Party mode" is activated by the user by waving the JUUL device back and forth until the white LED light starts flashing multiple colors, so that the rainbow colors are visible while the person inhales from the JUUL device.  "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors permanently.  Party mode on the JUUL is described by users to be "like an Easter egg in a video game" and allows for "some cool tricks that are going to drive [] friends crazy."  This feature was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it even more appealing and "cool" to young users.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9



10       174.       According to Dr. David Kessler, a former Commissioner of the FDA and current

11   Professor of Pediatrics at the University of California, San Francisco, JUUL's "fundamental

12   design appears to ease young people into using these e-cigarettes and ultimately, addiction."  Dr.

13   Kessler emphasized the reduced harshness of JUUL's nicotine salt formulation, the high nicotine

14   content, discreet vapor cloud, and use of flavors as design features that appeal to youth.  On

15   April 24, 2018, the FDA sent JLI a letter, based on the FDA's concern "about the popularity of

16   JUUL products among youth" and stated that this popularity may be related to "the product

17   design."  As a result, the FDA requested documents related to product design, including its

18   "shape or form," "nicotine salt formulation" and "nicotine concentration/content," "flavors," and

19   "features such as: appearance, or lack thereof, or plume . . . [and] USB port rechargeability."

20
21
22
23
24
25

COMPLAINT
CASE NO. 19-MD-02913-WHO

### 6. JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.

#### a. JLI Develops Flavored JUUL Products That Would Appeal to Youth.

175.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine.  A 1972 Brown & Williamson memorandum: Youth Cigarette – New Concepts, specifically noted the "well known fact that teenagers like sweet products."  A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.

176.    Altria's subsidiary U.S. Smokeless Tobacco Company (formerly called United States Tobacco Company) described the initiation of new customers through flavored products as "the graduation theory":

> New users of smokeless tobacco—attracted to the product for a variety of reasons—
> are most likely to begin with products that are milder tasting, more flavored, and/or
> easier to control in the mouth.  After a period of time, there is a natural progression
> of product switching to brands that are more full-bodied, less flavored, have more
> concentrated "tobacco taste" than the entry brand.

177.    A sales manager who worked at U.S. Tobacco in the 1980s told the Wall Street Journal that "They talked about graduation all the time—in sales meetings, memos and manuals for the college program.  It was a mantra."

178.    A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.

COMPLAINT
CASE NO. 19-MD-02913-WHO

179.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).  JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.



JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.



180.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009.  "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.  In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."

COMPLAINT
CASE NO. 19-MD-02913-WHO

181.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors.  A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month.  Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."

182.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.  Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

183.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUULpod.

184.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.

185.    Flavors like mint and menthol are attractive to youth.  According to Robin Koval, CEO and president of Truth Initiative, mint and menthol are among the most popular flavors for youth and that "[w]e also know, as does the tobacco industry, that menthol has been and continues to be the starter flavor of choice for young cigarette users."  According to the FDA, "younger populations have the highest rate of smoking menthol cigarettes" and "menthol in cigarettes is likely associated with increased initiation and progression to regular [] cigarette smoking."

186.    A significant majority of under-age users chose flavored e-cigarette products.  By at least early 2017, JLI knew that its flavors had attracted young people and non-smokers in droves.  Instead of taking corrective action or withdrawing the kid friendly flavors, JLI

COMPLAINT
CASE NO. 19-MD-02913-WHO

capitalized on their popularity with kids continued to promote JUUL's flavors. In a social media post from August 2017, for example, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste." In another August 2017 tweet, JLI compared JUUL to dessert: "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULpods."

187. JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Richard Durbin. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

188. A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."

189. JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

b.  **Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market.**

190.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause.  With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, JLI's leadership, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors.  In order to maximize the value of its mint line of JUULpods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

191.    In July 2013, Reynolds American Inc. released the Vuse, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.  Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like. JLI would enter the market in June 2015.

192.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories, Reynolds, Altria, and JLI had all introduced mint-flavored products within a year of each company's initial release.  By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.  By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

193.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUULpods.

COMPLAINT
CASE NO. 19-MD-02913-WHO

194.    JLI's flavored JUULpods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

195.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors.  So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

### i.    JLI Manipulates Chemistry of Mint JUULpods.

196.    One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:

| | $C_{nic}/C_{tot}$ | $\alpha_{fb}$ |
|---|---|---|
| Benzoic acid | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

Anna K. Duell et al., Nicotine in tobacco product aerosols: 'It's déjà vu all over again'

197.    These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

### ii.    JLI's Youth Surveillance Programs Confirmed that Mint JUULpods are Preferred by Teens.

198.    In January 2018, Kevin Burns, JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

COMPLAINT
CASE NO. 19-MD-02913-WHO

199.     One part of this initiative included studying consumer reactions to flavor names. By February 2018, McKinsey & Company had provided a roadmap to JLI's Consumer Insights department, which included multiple flavor studies including a flavor "likability" tests, which was carried out under JUUL's marketing and commercial department.

200.     In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.

201.     In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising campaigns for JUUL products.  This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.

202.     Under the guise of this youth prevention program, *JLI directly studied 13- to 17-year-old teens' e-cigarette flavor preferences*.  These studies, undertaken at a time when JLI and Altria were coordinating their activities, asked teens to rank a variety of e-cigarette flavors in terms of appeal and included the names of current JUUL flavors, JUUL flavors under development, and flavors offered by JLI's competitors.  Though they were not made public, through document requests two such studies have been identified from April 2018.

203.     The first study carried out by McKinsey & Company generated over 1,000 responses from teens aged 13 to 17 years old.  The second study, conducted by DB Research, appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and Baltimore, Maryland.

204.     Both studies found that teens' co-favorite JUUL flavors were mango and mint, and that teens found only one third-party flavor more desirable than mango and mint: "Cotton Candy" (McKinsey) and "Fruit Loops" (DB Research).

COMPLAINT
CASE NO. 19-MD-02913-WHO

205.    Though the McKinsey study did not survey teens' preference for menthol, the DB Research study did and found that while 28% of teens found menthol appealing, 72% of teens liked mint.

206.    In other words, these surveys showed that teens respond to mint the way they respond to their favorite candy flavors and respond to menthol the way they respond to traditional tobacco flavors typically disfavored by youth.  This is unsurprising, as the "Mint" flavor was designed not to taste like a Menthol cigarette.  Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like [C]ool [M]int."

207.    Because of these and other studies, JLI, the Management Defendants, and the Altria Defendants knew that mint is an attractive flavor for kids.  According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored pods, including mango, from the market in a purported attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."  And it was public knowledge that mint and menthol have a well-documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age.  Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco.  Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products.  The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.

208.    If the purpose of these youth prevention studies was to "better understand how different flavor profiles appeal to different age groups to inform youth prevention," as the McKinsey slides presenting that study's findings indicate, the lesson for JLI, the Management

COMPLAINT
CASE NO. 19-MD-02913-WHO

Defendants, and the Altria Defendants was that teens like mint as much or more than any other

JUUL flavor, including mango, fruit medley, crème brulee, cucumber, and more than a dozen

other candy-like flavors produced by third parties for use with the JUUL device.

209.    With that knowledge and with no genuine interest in youth prevention, and as

detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint

as a flavor for as long as possible.  Indeed, to further this goal, Defendants Pritzker and Valani

poured additional money into JLI as part of a $600 million funding round.

210.    By keeping mint on the market long after other flavors were pulled, these

Defendants continued to expand the number of addicted e-cigarette users.

**D.  Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

211.    Having created a product designed to hook users to its nicotine, JLI had to

mislead consumers into believing JUUL was something other than what it actually was.  The

company engaged in a years-long campaign to downplay JUUL's nicotine content, nicotine

delivery, and the unprecedented risks of abuse and addiction JUUL poses.  Defendants devised

and knowingly carried out a material scheme to defraud and addict consumers by

(a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products,

(b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party

groups to spread false and misleading narratives about e-cigarettes and JUUL in particular.

**1.  The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

212.    As part of their strategy to market to youth and nonsmokers, JLI and the

Management Defendants also did not effectively inform users that JUUL products contain

COMPLAINT
CASE NO. 19-MD-02913-WHO

nicotine. Despite making numerous revisions to JUUL products' packaging since 2015, JLI did not include nicotine warnings until forced to do so in August 2018.

213. Even after Defendants added a nicotine warning to JUUL products, they continued to mislead youth and the public about the amount of nicotine in a JUULpod. Every 5% strength JUULpod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false, and misleading. As JLI's regulatory head explained internally to former CEO Kevin Burns in 2018, each JUULpod contains "roughly *twice the nicotine content* of a pack of cigarettes."

214. In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15mg of nicotine per cigarette and each cigarette yields between 1.0 to 1.4 mg of nicotine, meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUULpod to the user. JLI's own internal studies suggest a nicotine transfer efficiency rate of closer to 100%.

215. Defendants also knew that the use of benzoic acid and nicotine salts in JUULpods affects pH and facilitates "absorption of nicotine across biological membranes." JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. Defendants knew this, as Adam Bowen advised the Board of Directors at an October 2015 Board meeting on JLI's "nicotine salts patent application." And the Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

216.    JLI and Defendant Bowen, knowing that the Phase 0 results illustrated that the nicotine content was greater than they wanted to represent, sought to engineer test results that differed from those results and were more consistent with JLI's deceptive messaging.  In May 2014, within weeks of the Phase 0 study, JLI and Defendant Bowen carried out a second pharmacokinetics study in New Zealand.  This study was called the CH-1401, or the "Phase 1" study.  This study again examined the effects of inhaling aerosol from various 2% nicotine solutions: nicotine benzoate (blend A), nicotine malate (blend B), and free-base nicotine (blend C).  In a further departure from the Phase 0 study, which used experienced e-cigarette users, the Phase 1 study used subjects that had not previously ingested aerosolized nicotine vapor, and who had certainly never ingested aerosolized nicotine vapor from nicotine salts.  As Defendants JLI and Bowen knew, this difference is critical.  Just as first-time smokers would not inhale as much cigarette smoke as regular smokers, inexperienced (or "learning") e-cigarette users will not inhale vapor at a rate that maximizes nicotine delivery.  JLI's decision to omit participants with previous e-cigarette experience from the criteria for inclusion in CH-1401 resulted in artificially deflated Cmax results.

217.    The Cmax recorded in the Phase 1 study was approximately a third of that achieved by smoking a cigarette.  Specifically, e-cigarette users recorded a Cmax of approximately 12.87 ng/ml, compared with the 31.47 ng/ml Cmax resulting from smoking a Pall Mall.

218.    In possession of the results from both the Phase 0 and Phase 1 studies, JLI nevertheless decided to launch a 5% nicotine salt solution as its commercial product.  An internal memo explained JLI's reasoning as follows: "[s]ince the Cmax of the [2%] nicotine salt was about 1/3 that of cigarettes, we chose a concentration of 5% for our commercial product (JUUL), which should provide a Tmax and Cmax consistent with a cigarette."

COMPLAINT
CASE NO. 19-MD-02913-WHO

219.    Instead of testing a 5% solution, JLI *estimated* the Cmax result of a 5% nicotine solution using a model.  But the Phase 0 data showed that a 4% benzoic acid / 5% nicotine solution would have a higher Cmax and AUC than those of a cigarette, not one that was equal.

220.    JLI and the Management Defendants knew that JLI's studies indicated that their 5% solution product was more potent and more addictive than a typical cigarette.  But JLI and the Management Defendants then used their unsupported extrapolation of their flawed studies to market JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true.  In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

221.    In the United States, the unsupported extrapolations from what appears to be the Phase 1 study were used to create charts, which JLI posted on its website, shared with journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution achieved a pk profile just below that of a cigarette.  For example, the following chart appeared on the online publication TechCrunch:



COMPLAINT
CASE NO. 19-MD-02913-WHO

222.    Simultaneously, while providing extrapolated data to the public, Phase 1 was used as the basis for representations to retailers that a *2% solution* achieved a pk profile equaling that of a cigarette.  In a pitch deck dated March 25, 2015, and labeled as being intended for the convenience store distributor Core-Mark, JLI presented interim Phase 1 data showing this equivalence:



223.    These misrepresentations to the public were not accidental, nor were they the work of a rogue employee.  In a June 2014 Ploom Board meeting in London, the Ploom executives' presentation to the Board, which at that time included Defendants Bowen, Monsees, Pritzker, and Valani, explained the differences between the Phase 0 and Phase 1 results as "due to averaging across more subjects with variability in puffing behavior."  Their explanation did not note that "variability in puffing behaviour" was partly a result of the fact that participants in the Phase 0 study were experienced e-cigarette users whereas the participants in the Phase 1 study were not.  Thus, Defendants Bowen, Monsees, Pritzker, and Valani were privy to both the Phase 0 and Phase 1 results.  And they *knew* that the data JLI (then Ploom) was pushing on the

COMPLAINT
CASE NO. 19-MD-02913-WHO

public was false and misleading, but none made any effort to correct or withdraw those false and misleading statements. Aside from submitting the testing protocol and results of the Phase 0 study with the '895 patent, JLI, Bowen, Monsees, Pritzker, and Valani otherwise ignored the Phase 0 study and omitted it from public discussion of JUUL's nicotine delivery.

### 2. JLI, the Management Defendants, and Altria Transmitted, Promoted, and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Were False and Misleading.

224. As set forth above, the statements in JLI advertisements and on JUULpod packaging that each JUULpod contains about as much nicotine as a pack of cigarettes are deceptive, false, and misleading. Defendants knew this.

225. JLI and the Management Defendants caused deceptive, false, and misleading statements that a JUULpod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL products to the consuming public, including Plaintiff APIA and the tribal members served by APIA, through acts of mail and wire fraud.

226. By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUULpod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs." The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery."

227. As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUULpods and deceptive, misleading, and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, which they caused to be transmitted over

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    the wires and mails, were untrue, JLI and the Management Defendants have made no effort to

2    retract such statements or correct their lies.  Moreover, by no later than July 2018, James

3    Monsees required JLI employees to personally seek his approval for the artwork on all JUUL

4    and JUULpod packaging.

5        228.    In addition to approving the JLI website, knowing that it contained deceptive,

6    misleading, and false statements, JLI (through its employees) and the Management Defendants

7    also were directly responsible for the interstate transport, via U.S. mail, of JUULpod packaging

8    contained misrepresentations and omissions.  At the same Board Meeting where Defendants

9    Pritzker, Huh, and Valani were installed as the Executive Committee, the Board directed JLI's

10   management on, among other things, "the need to rely on distributors and the challenges in

11   reaching customers otherwise."

12       229.    JUULpod packages that were sent via U.S. mail stated that a single JUULpod is

13   "approximately equivalent to about 1 pack of cigarettes."  These statements, as well as the

14   statements on the JLI website, are false and misleading.

15       230.    The statement on the JLI website, and in its advertisements and packaging, that

16   each JUULpod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is

17   false and likely to deceive and mislead, because the actual amount of nicotine contained in a

18   JUULpod is as much as twice as high as that in a pack of cigarettes.

19       231.    AGDC and Altria Client Services greatly expanded the reach of this fraud by

20   providing their retail and distribution might for JLI products, causing millions of JUULpods to

21   be sent via U.S. mail with packaging stating that JUULpods contain only 5% nicotine by weight

22   and are "approximately equivalent to about 1 pack of cigarettes."  JLI, the Management

23   Defendants, and the Altria Defendants knew that these statements were false and misleading, but

24   nevertheless utilized JUUL product packing, marketing, and advertising to maintain their fraud.

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

232.     The Altria Defendants knew in 2017 that a JUULpod delivered more nicotine than one pack of cigarettes.  In 2017, Altria, through its wholly owned subsidiary Nu Mark, launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered.  Even though JUUL was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, Altria (through Nu Mark) chose to bring a less potent 4% formulation to market.

233.     According to Altria's own pharmacokinetic testing (likely conducted by Altria Client Services) as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes.  In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation. MarkTen Bold 4%

234.     Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes.  In addition to data Altria and Altria Client Services received from JLI, their due diligence undoubtedly included a

1    careful examination of JLI's intellectual property, including the '895 patent, which provides a

2    detailed overview of nicotine benzoate's pharmacokinetic profile.

3    235.    Thus, JLI, the Management Defendants, and the Altria Defendants knew that the

4    statement on JUULpod packaging that each JUULpod contains 5% nicotine and about as much

5    nicotine as a pack of cigarettes is literally false and they intended such statements to mislead.

6    Neither the Altria Defendants nor JLI or the Management Defendants have made any effort to

7    correct or retract the false and misleading statements as to the true nicotine content in JUULpods.

8    Instead, they have continued to misrepresent the product's nicotine content and design, with the

9    goal of misleading and deceiving consumers.

10    236.    From JUUL's pre-release announcements to this day, JLI has continuously

11    represented that each pod is approximately equivalent to a pack of cigarettes.  These claims,

12    which JLI repeats widely in advertisements, press releases, and its web site, have been

13    distributed via the wires and mails and disseminated by reputable and widely reliable sources

14    that accepted those representations as true.

15    237.    Not only have JLI and the Management Defendants misrepresented or concealed

16    the actual amount of nicotine consumed via JUULpods, but they also did not effectively or fully

17    inform users about the risks associated with the potent dose of nicotine delivered by JLI's

18    products.  Despite going through numerous revisions since 2015, the JUUL packaging did not

19    include nicotine addiction warnings until JLI was forced to add them in August 2018.  The

20    original JUUL product labels had a California Proposition 65 warning indicating that the product

21    contains a substance known to cause cancer, and a warning to keep JUULpods away from

22    children and pets, but contained no warnings specifically about the known effects, or unknown

23    long-term effects, of nicotine or consuming e-cigarettes/inhaling nicotine salts.

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

238.    Moreover, the form of nicotine JUULpods contain is particularly potent.  JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUULpods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

239.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL product—the nicotine content—and has misled consumers to their detriment.  Resellers, apparently assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among consumers by stating that JUULpods contain "50 mg/ml," which they do not.

240.    If JLI and the Management Defendants did not know when JLI released JUULpods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUULpods' nicotine content.  By 2017, studies revealed that smokers did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette.  Though this was identified as a "pain point" for new users, JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

241.    The "5% strength" statement in Defendants' advertisements is also misleading. At least two independent studies testing multiple varieties of JUULpods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUULpod versus a pack of combustible cigarettes could be even greater.

COMPLAINT
CASE NO. 19-MD-02913-WHO

### 3. Defendants Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy.

242.    In late 2015, JLI and the Management Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL."  The campaign framed JUUL's addictive pods as "flavors" to be paired with foods.  JLI described its Crème Brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."  In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly addictive nicotine vapor: "Have a sweet tooth? Try Brulee."  JLI similarly promoted the fruit medley pods using images of ripe berries.  JLI described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."



COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9
10
11



12
13      243.    Again, none of these advertisements disclosed that JUUL was addictive and

unsafe.

14      244.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to
15
coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.
16
JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine,
17
like a cup of coffee.
18      245.    JLI's reference to coffee is no mere marketing gimmick; it reflects the larger
19
effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing
20
the false and dangerous concept that if a substance is "not harmful," then addiction to that
21
substance cannot be harmful.
22
23
24
25

COMPLAINT
CASE NO. 19-MD-02913-WHO

















COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2

3

4

5

6

7

 

246.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

**4.    JLI's *Make the Switch* Campaign Intentionally Misled and Deceived Users to Believe that JUUL is a Cessation Device.**

247.    JLI, the Altria Defendants, and the Management Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JLI's staggering market share) was to mislead potential customers about the true nature of JUUL products.  Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash.  Therefore, JLI (with the knowledge and support of the Management Defendants) and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device and falsely and misleadingly used the mails and wires to spread the subterfuge.  JLI, the Management Defendants, and the Altria Defendants committed these deceptive, misleading, and fraudulent acts intentionally and knowingly.  In making these representations, JLI, the Management Defendants, and the Altria Defendants intended that

23

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

consumers, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.

248.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million *Make the Switch* television advertising campaign.  This campaign, which was a continuation of JLI's web-based Switch campaign, was announced less than a month after the Altria Defendants announced Altria's investment in JLI.

249.    The *Make the Switch* television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."  According to JLI's Vice President of Marketing, the *Make the Switch* campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."  These statements were false as JUUL was not intended to be a smoking cessation device.  JLI and the Management Defendants committed acts of wire fraud when they caused the *Make the Switch* campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers.  The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the *Make the Switch* campaign to be distributed with packages of Altria's combustible cigarettes.

250.    The *Make the Switch* campaign was fraudulent and was made to protect, maintain, and expand the tremendous market share gained by lying to consumers and hooking youth on nicotine by convincing regulators and the public that JUUL was actually as cessation device and JLI's marketing was never aimed at youth.

251.    Defendants continually and intentionally sought to frame JUUL products as smoking cessation devices in their public statements and on their website as part of their scheme

1    to mislead and defraud the public. Defendant Monsees explained during his testimony before

2    Congress:

> ***The history of cessation products have extremely low efficacy.***
> ***That is the problem we are trying to solve here.*** So, if we can
> give consumers an alternative and market it right next to other
> cigarettes, then we can actually make something work.
>
> [T]raditional nicotine replacement therapies, which are generally
> regarded as the gold standard for tools, right, for quitting, those are
> nicotine in a patch or a gum form, typically, and the efficacy rates
> on those hover just below about a 10 percent or so.  JUUL-we ran
> a very large study of JUUL consumers, ex-smokers who had
> picked up JUUL, and looked at them, looked at their usage on a
> longitudinal basis, which is usually the way that we want to look at
> this, in a sophisticated fashion ... what we found was that after 90
> days, 54 percent of those smokers had stopped smoking
> completely, for a minimum of 30 days already.  And the most
> interesting part of this study is that if you follow it out further, to
> 180 days, that number continues to go up dramatically, and that is
> quite the opposite of what happens with traditional nicotine
> replacement therapies.

252.    In response to a direct question about whether people buy JUUL to stop smoking,

Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an

alternative to traditional tobacco products."

253.    Following Defendants Monsees's and Altria's lead, Defendants caused a number

of other misleading public statements—suggesting that Juul would help existing adult smokers

even though it delivered more nicotine than cigarettes and was designed to appeal to kids—to be

made, including the following:

- "JUUL Labs was founded by former smokers, James and Adam, with
  the goal of improving the lives of the world's one billion adult smokers
  by **eliminating cigarettes**.  We envision a world where fewer adults
  use cigarettes, and **where adults who smoke cigarettes have the tools
  to reduce or eliminate their consumption entirel**y, should they so
  desire."  (JLI Website, April 2018 (or earlier));

COMPLAINT
CASE NO. 19-MD-02913-WHO

- "JUUL Labs, which exists to **help adult smokers switch** off of combustible cigarettes." (JLI Website, September 19, 2019); and,

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);

- "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, **a world leader in switching adult smokers** . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);

- "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**." (Letter to FDA Commissioner Gottlieb, 10/25/18);

- "We have long said that **providing adult smokers with superior, satisfying products with the potential to reduce harm** is the best way to achieve tobacco harm reduction. **Through Juul**, we are making the biggest investment in our history toward that goal." (Altria Press Release, Dec. 20, 2018);

- "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also **support and even accelerate transition to noncombustible alternative products by adult smokers**." (Altria Earning Call, January 31, 2019); and

- We expect the **JUUL product features that have driven JUUL's success in switching adult smokers in the U.S.** to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019).

254.    Defendants knew that the "switch" messaging they initiated for JUUL was false, deceptive, and misleading.  JUUL does not have FDA approval as a cessation product.  The *Switch* advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting.  For example:

- 82 -

255.    Representative Rashida Tlaib, upon presenting this ad to Monsees, had the

following exchange:

> **Rep. Tlaib:** After 30 lines, starting with "quit," the ad says
> "switch," followed by no further mentions of start smoking again.
> You were a smoker.  Does this ad give a smoker hope that there
> might be a way to quit cigarettes for good?

> **Mr. Monsees:** I think the intention of this ad is to make it very
> clear to consumers that there is an alternative, finally, to
> combustible cigarettes.  I am one of those people.

256.     Defendants' tacit message in their *Switch* advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

257.     Defendants' false, deceptive, and misleading *Switch* campaign suggests that purchasing a JUUL will "switch" a smoker to a non-smoker and that it was designed to switch adult smokers off cigarettes rather than addict youth to nicotine.

258.     Defendants know that a large number of smokers who use JUUL products do not end up switching but instead end up consuming both cigarettes and JUUL.

259.     Moreover, Defendants know that, by design, a large number of their customers are first-time youth users and that JUUL was never designed to be a cessation device.

260.     JLI has advertised cost-savings calculators as part of its *Switch* campaign.  Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUULpod a day).  Defendants know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

261.     JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:



COMPLAINT
CASE NO. 19-MD-02913-WHO

262.   Other advertisements similarly marketed the product as smoking "evolved":



263.   The goal of these advertisements was to convey the deceptive, misleading, and false impression that JUUL products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe.  But, as noted above, that is simply not the case. Defendants never disclosed to consumers that JUUL e-cigarettes and JUULpods are at least as addictive as combustible cigarettes, if not more.  And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

264.   In addition, the notions that JUUL products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan, and intentions on several fronts.  First, Defendants sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers.  Second, JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine.  Third, as noted above, JLI's own internal testing revealed that JUUL products were often more potent than combustible cigarette

COMPLAINT
CASE NO. 19-MD-02913-WHO

smokers prefer.  Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants.  Despite this knowledge, these Defendants made numerous deceptive, false, and misleading public statements that JUUL was intended to be a cessation device.

265.    JUUL is not a product adults typically use to quit smoking.  Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped e-cigarette devices, like JUUL, and only 2% of adults currently used them.  By contrast, a recent study found that 15- to 17-year-olds are *sixteen times* more likely to use JUUL products than 25 to 34-year-olds.

266.    JLI's own marketing research indicated that JUUL was not appropriate as a cessation device for adults.  In 2014, JLI (then called Ploom) hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette.  On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, e-mailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies.  She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."  Ms. Collinsworth added that "The qualitative findings suggested *this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake*."  On October 1, 2014, Ms. Collinsworth followed up with additional comments.  She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes."  The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees and then-Chief Marketing Officer Richard Mumby.

COMPLAINT
CASE NO. 19-MD-02913-WHO

267.    The deceptive, misleading, and fraudulent nature of the *Make the Switch* campaign is evident when comparing the campaign's advertisements to JUUL's initial advertising, as demonstrated below.  The fact that these advertisements are for the same product confirms that, notwithstanding the advice JLI and the Altria Defendants received from their media consultants, the Defendants never intended to target only adult smokers.







COMPLAINT
CASE NO. 19-MD-02913-WHO

268.    Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption.  According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."  As described above, JLI and Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

269.    The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that JUUL is not a smoking cessation product.  In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.

270.    The FDA and other government regulators, enforcing existing laws addressing e-cigarettes, publicly criticized the *Make the Switch* campaign and other efforts by Defendants to depict JUUL as a smoking cessation device.  Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or

COMPLAINT
CASE NO. 19-MD-02913-WHO

labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."

271.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.

272.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."  The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL products as "modified risk tobacco products" without prior approval.

273.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's *Switch* marketing campaign.  "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's *Switch* advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."

274.    The FDA specifically highlighted the *Switch* campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "*Make the Switch*."  The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's *Switch* campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.

COMPLAINT
CASE NO. 19-MD-02913-WHO

275.     On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.

276.     Perhaps unsurprisingly, the *Make the Switch* campaign was spearheaded by a marketing firm with long-standing ties to the cigarette industry.  In particular, it was led by a subsidiary of Omnicom Group, Inc., one of the "Big Four" advertising holding companies dominating marketing and communications worldwide since the 1990s, second only to WPP.  Omnicom is the parent company of Mercury Public Affairs which, by at least April 2018, counted both Altria and JLI as its clients.  Mercury lobbied for Altria on tobacco regulations and helped JLI push back against negative press coverage of youth usage of its products.

277.     For example, on April 2, 2018, a managing director from Mercury, Erick Mullen, emailed Defendant Valani and Daniel Cruise, Chief Public Affairs Officer at JLI, with a numbered list of actions in response to *The New York Times* article published that day, "'I Can't Stop': Schools Struggle With Vaping Explosion."  Mercury's list includes the recommendation to push the idea that JLI's nicotine formulation is no more harmful than water, sugar, and caffeine: "Engage the press on all the definitions in every fucking story: it's not a 'cigarette' of any kind; there's no smoke and nothing medical science has on the books says water and nicotine is more harmful than water, sugar and caffeine."

278.     Defendant Valani and Cruise each separately forwarded the email to JLI CEO Kevin Burns, with Cruise commenting, "Kevin, recent email from friend Erick—a possible 'campaign manager'" for us.  His argument is in line with yours.  We need to be systematic, aggressive and relentless.  Btw we are not tobacco—have [you] corrected today's NYT story?"

COMPLAINT
CASE NO. 19-MD-02913-WHO

279.    In August 2018, Omnicom agency DDB Chicago sent JLI a proposal for an estimated $11 million campaign "to more firmly establish the true intent of the company," noting that JLI was "moving *very* fast."  This campaign was "*Make the Switch*."

### 5. JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes.

280.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants, and others in the e-cigarette industry leveraged third parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth**,** to mislead the public about the impacts of consuming e-cigarettes.

281.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated.  These organizations receive funding from the e-cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

### a. The American Vaping Association

282.    The American Vaping Association (AVA) is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.  Other executive members of the AVA possess business interests in e-cigarettes.  For example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vapornine LLC.  Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.  Half of the AVA's functional

COMPLAINT
CASE NO. 19-MD-02913-WHO

expenses are for lobbying efforts.  It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.

283.     Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news.  The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.  AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

284.     The AVA receives its funding from sponsors, who are organized into tiers such as Platinum, Gold, Silver, Bronze, and Green.  Current advertised sponsors include e-cigarette distributors and retailers such as E-Cigarette Empire, and VaporBeast.  Prior sponsors are a who's who of e-cigarette retailers.  In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.

285.     On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.

286.     JLI actively sought out the AVA to promote JUUL.  In January 2016, e-mails between employees at JLI (then known as PAX) discussed a "list of thought leaders [JLI] can tap for stories for JUUL" which included Conley at the AVA and Satel.

287.     In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the risks associated with JUUL.  In an e-mail exchange between Christine Castro of JLI and a "Stratcomms" internal mailing list, Castro lamented a "testy conversation" with a USA Today reporter who pointed out that JLI's marketing and advertising appeared to feature and target minors and teenagers.  Castro noted that "I hit back at [the reporter] very aggressively but we can

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   expect the usual B.S. Greg Conley is being allowed to write a 300-word rebuttal.  I will email

2   him and copy you Ashley [JLI employee] just so we can stay coordinated."

3          288.    The AVA also coordinated with JLI on pro-e-cigarette research.  In March 2018,

4   Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the

5   University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and

6   Gal Cohen, then Director of Scientific Affairs at JLI.  In the e-mail, Conley asks Farsalinos to

7   send Cohen "some info on your flavor study" to which Farsalinos responds by sending Conley

8   and Cohen an attachment: "USA FLAVORS SURVEY.pptx" and the note: "[A]ttached is a

9   powerpoint presentation about the study we proposed."

10         289.    The proposed study was a survey aimed at determining what flavors different

11  demographic groups preferred as e-cigarette flavors, which flavors they use frequently, and

12  which flavors they used when they first started consuming e-cigarettes. While the study was

13  purportedly to determine the impact of e-cigarette flavors on e-cigarette and smoking behavior,

14  the data obtained from such a study would have allowed JLI to understand which flavors were

15  not only the most popular, but which flavors were most popular by demographic.

16              **b.  Vaping360**

17         290.    Vaping360 is a website dedicated to news regarding the e-cigarette industry.  The

18  website boasts "40 million smokers and vaping enthusiasts reached since 2015."  This entity has

19  a big social media presence and huge publication strategy.

20         291.    Vaping360's main message misleads the public about the health impacts of

21  consuming e-cigarettes.  Vaping360 has published various articles, including "10 Lies and Myths

22  About Juuling Exposed."  This article, published in May 9, 2018, claimed, among other things,

23  that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung";

24  JUUL was not popular among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."

292.    Vaping360 regularly published articles praising JUUL, promoting JUUL, or downplaying the risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."

293.    One of the main writers at Vaping360 is Jim McDonald, who aggressively attacks any negative science as fake news.  For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but also comments on others' posts extensively disputing negative news about consuming e-cigarettes.

294.    Vaping360 has taken funding from e-cigarette manufacturers and in return coordinates with e-cigarette manufacturers to promote their products while publishing favorable content.  Vaping360 was paid by JLI for advertising and was given kickbacks (referred to as commission) for every coupon used for JUUL that originated from Vaping360's website.

295.    In March 2017, JLI (then PAX) communicated with Chris Kendell and others at Vaping360 to discuss promoting JLI's products with a 15% discount coupon on Vaping360's website.  JLI representative Andy Martin also noted that JLI "figured out the commission issue," and expressed excitement at JLI's new mango flavor JUULpod.  They also discussed a Facebook advertising link whereby Vaping360 could offer similar discounts for JLI products on social media.

296.    In November 2017, Martin of JLI and Rawad Nassif of Vaping360 discussed a meeting agenda, with topics such as "new affiliate commission terms," "JLI funnelling [sic] project," and "exploring further opportunities."

COMPLAINT
CASE NO. 19-MD-02913-WHO

297.    In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed." As of 2020, Vaping360 continues to offer discounts for JUUL products.

### c. Foundation for a Smoke-Free World

298.    The Foundation for a Smoke-Free World ("the Foundation") was founded in 2017 and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction." It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation. The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.

299.    The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.

300.    In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research. This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke, and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

301.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes. For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, i.e., they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes. Industry-funded

COMPLAINT
CASE NO. 19-MD-02913-WHO

authors then regularly cite to each other's studies in their own research.  On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### d.  Vapor Technology Association

302.   The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry.  It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."

303.   In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of membership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.

304.   The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes and testifies in opposition to flavor bans.

### e.  Retailer Lobbying

305.   Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts.  The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that examine the negative impacts of consuming e-cigarettes.  For example, when JLI donated $7.5 million towards a study on the impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."

### 6. Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI

306.    Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.  Altria made the same representations to its investors.

307.    Although Altria claimed its investment in JLI had an altruistic motive—"When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience.  In Altria's October 2019 letter to Senator Richard Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."  Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."  But as Altria knew, as reflected in its letter to the FDA just two months prior, that mission had resulted in usage throughout the youth market.  Altria's admission that pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.

308.    Altria recognized that JLI's market share dominance in the e-cigarette market, a share that it knew was gained via youth targeting and false and misleading advertising, was the path to Altria's continued viability and profitability.  In a January 31, 2019 earnings call, Altria explained:

COMPLAINT
CASE NO. 19-MD-02913-WHO

When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment.

JUUL's growth was, as Altria well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the youth vaping crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly."

309.    Altria's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, Altria coordinated with JUUL to capture and maintain the youth market.

### E. Defendants Targeted the Youth Market

310.    Having created a product like combustible cigarettes that sought to get users addicted to nicotine, and while taking steps to ensure that consumers and regulators did not appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American consumers, JLI, Bowen, and Monsees needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in Pritzker, Huh, and Valani.

311.    Under the leadership of the Management Defendants, JLI marketed nicotine to kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young consumers. JLI and the Management Defendants' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

**1. JLI Emulated the Marketing of Cigarette Companies.**

2
3
4
5
6

312.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and more than 80% of underage smokers choose brands from among the top three most heavily advertised.  The overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation."

7
8
9
10

313.    Struggling to define their own identities, teenagers are particularly vulnerable to image-heavy advertisements that psychologically cue them on the "right" way to look and behave amongst peers.  Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.

11
12
13

314.    For decades, cigarette companies spun smoking as signifier of adulthood.  This turned smoking into a way for teenagers to project independence and enhance their image among their peers.

14
15
16
17

315.    Youth marketing was critical to the success of cigarette companies.  In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.

18
19
20

316.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens".

21
22

317.    It wasn't just Philip Morris.  The strategy of hooking kids was an open secret in the cigarette industry.

23
24
25

COMPLAINT
CASE NO. 19-MD-02913-WHO

318.    As detailed below, JLI and the Management Defendants sought to emulate this approach.  Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.

319.    The emulation is obvious.  A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.



COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9



10    320.    JLI and the Management Defendants deployed this same strategy but adapted it to

11 modern advertising tactics.

12        **2.    The Management Defendants Intentionally Marketed JUUL to Young
13             People.**

14    321.    The risk that children would use a new e-cigarette product was well known and

15 well publicized in the months leading up to the launch of the JUUL e-cigarette.  For example, in

16 April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.  The

17 CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among

18 middle (3.9%) and high (13.4%) school students."  Moreover, "[b]etween 2011 and 2014,

19 statistically significant increases were observed among these students for current use of both e-

20 cigarettes and hookahs (p<0.05), while decreases were observed for current use of more

21 traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco use."

22 The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and]

23 flavors'—the same things that were originally found to be problematic with cigarette ads."

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

322.    Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception.  In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

323.    JLI knew that its initial customer base would be the key to its growth.  On June 15, 2015, JLI's COO Scott Dunlap wrote on article on Entrepreneur.com called "6 Ways to Get a Fanatical Customer Base," #1 of which was "Seed your initial customer base:"

> Your first group of customers is the foundation of all future growth, so know who they'll be, why they'll rave and help them tell your story.  They'll first act as role models and then as advocates to help spread your mission, so make locating and engaging those core customers a priority.  This is especially important if you're introducing something completely new to a traditional industry.

324.    Despite this professed knowledge that JLI's "first group of customers is the foundation of all future growth" and consistent with Monsees's position that he has no "qualms" with marketing to people that were not yet addicted to nicotine, JLI's marketing strategy targeted people that were "flavor-seeking, social 'vapers,'" and those who "have very limited experience with traditional tobacco cigarettes."

325.    JLI's first major marketing hire, Cult Collective Ltd. ("Cult Collective"), presented a pitch deck to JLI in late 2014, which defined the "target consumer" as a person "within a life stage or mindset where they are defining their own identity."  The study described the "modern vaper" as "trendy, sophisticated image managers seeking to balance their desire for originality against acceptance."  Put differently, their target consumer was an adolescent.

326.    JLI professedly wanted kids to think JUUL was cool.  In an email dated January 29, 2015, Sarah Richardson—then Director of Communications—sent a document dated December 31, 2014, to Dima Martirosyan, Director of Digital Marketing, who forwarded it to Rafael Burde, Director of Ecommerce.  The document stated that "[m]ost e-cigarettes to date are unsatisfying and seem 'douche-y'.  The JUUL product delivers nicotine far more effectively, and

COMPLAINT
CASE NO. 19-MD-02913-WHO

the product design is elegant and cool.  We need to tell this story in a credible fashion through press, influencers and social media."  The document repeatedly referred to Pax Labs's plan to target the "cool kids[.]"  For example, it described as one of the "Key needs" to "Establish premium positioning to entice the 'masses' to follow the trend setters; own the 'early adopter' / 'cool kid' equity as we build out volume[.]"  The document noted that "the voices of influencers can build strong demand."  Messaging to media similarly focused on "coolness" and the message that "JUUL singlehandedly made e-cigarettes cool."

327.    This focus on "cool kids" continued up to and after launch. On May 18, 2015, Kate Morgan, field marketing manager, emailed Richard Mumby, Chief Marketing Officer, and a variety of other marketing employees about "Some Music Options for JUUL Party" and noted that one of the options was a pair who were both "cool kids."  On June 7, 2015, Rafael Burde emailed Scott Dunlap, then Chief Operating Officer, stating that the JUUL launch party "was a resounding success (at least in my mind) in terms of winning over the cool kids . . . ."  Pax Labs employees used similar wording regarding interest in targeting "cool kids" in an email from Sarah Richardson on August 12, 2015, and emails from Ashley Marand on September 15, 2015, and October 21, 2015.  The consistency of the language around this target demographic confirms that marketing to "cool kids" was a company policy set by the executives and the Board, particularly because, before selling the Ploom assets to JTI, James Monsees said similar things about Ploom.

328.    JLI identified its competitor in this space as cigarette companies, complaining that "cigarettes continue to own the 'cool' equity," and identifying a "key pillar to go-to-market" as "win[ning] with the 'cool crowd'" away from cigarettes.

329.    With this goal in mind, JLI hired the Grit Creative Group ("Grit"), which billed itself as an agency whose marketing appealed to "cool kids."  Grit helped JLI to "use external

COMPLAINT
CASE NO. 19-MD-02913-WHO

audiences to communicate nuanced messages around early adoption 'coolness' and product performance."

330.    In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

### 3.  JLI Advertising Exploited Young People's Psychological Vulnerabilities.

331.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

332.    This was not the only marketing scheme JLI could have adopted.  JLI had other options.  In 2014, JLI engaged Cult Collective to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best advertising strategy to market the JUUL e-cigarette.

333.    In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements.  Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evoluution of smoking."



COMPLAINT
CASE NO. 19-MD-02913-WHO

334.    This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

335.    JLI rejected this approach.

336.    Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign. The express mission of the Vaporized campaign was to "own the 'early adopter'/'cool kid' equity."

337.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models and bold colors and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness, and being "cool."

338.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."

 

COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6



7        339.    In the months leading up to the launch of JUUL e-cigarettes, Pax Labs executives

8  and directors discussed how to market the new product, and the Board approved specific

9  marketing materials used in JUUL's launch.  On March 23, 2015, there was a meeting of the

10  Board of Directors in which the upcoming advertising campaign was discussed.  The Board at

11  that time had five members: Pritzker, Valani, Monsees, Bowen, and Handelsman (occupying

12  Valani's second seat).  According to Chelsea Kania, then Brand Manager at Pax Labs, prior to

13  this meeting, she had met with the Board to discuss the models who would be used in the

14  marketing collateral accompanying the JUUL launch.  At that meeting, "there was some

15  commentary at the youthfulness of the models[,]" but "nobody disliked them" and "everybody

16  agreed they are pretty 'effective[.]'"  Ms. Kania also noted that she told the Board that "we have

17  quite the arsenal of model images to work with, and that they should let us know if the ones we

18  selected are going to be problematic.  So just waiting on any further feedback if they do a pass

19  with the board."  The Management Defendants knew that the ads targeted youth and had the

20  authority to determine which models to use, but "Juul's board of directors signed off on the

21  company's launch plans[.]"  In addition, "Monsees, who was CEO at the time, personally

22  reviewed images from the billboard photo shoot while it was in session."  A senior manager later

23  told *The New York Times* that "he and others in the company were well aware" that the

24  marketing campaign "could appeal to" teenagers.

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

340.     As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square.  Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement.



341.     These ads, which ran for nearly a month, generated an estimated 1.5 million impressions per day.

342.     In fact, JLI's Vaporized campaign was so effective that it gained national attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers. As Colbert joked after viewing the close-up video of young models dancing in place:

> Yeah! There is something about vaping that just makes me want to dance in a way that doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown.

COMPLAINT
CASE NO. 19-MD-02913-WHO

343.    The Vaporized campaign was not limited to the Times Square billboards however. The ads were also placed in nationally distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

344.    To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook.  By way of comparison, cigarette advertisements, are required to display a health warning in high contrast black and white, covering 20% of the image.

345.    Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction.  But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising. Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.

### 4.   JLI Pushed the Vaporized Campaign Into Youth-Targeted Channels.

#### a.   JLI Placed Its Vaporized Ads on Youth-Oriented Websites and Media.

346.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students.  These advertisements, which included the images of models from the Vaporized campaign, began appearing on websites as early as June 2015.  The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

COMPLAINT
CASE NO. 19-MD-02913-WHO

347.    A picture of the homepage of nickjr.com is below:



348.    JLI also purchased banner advertisements on websites providing games targeted to younger girls, educational websites for middle school and high school students, and other teen-targeted websites.

349.    JLI knew what it was doing.  In May 2015, Chelsea Kania contacted Cult Collective to raise concerns about advertising on younghollywood.com.  Kania explained that the website's demographics are "age 12-34 . . . and *weighing the % who could actually afford JUUL against the risk we'd run being flagged for advertising on that site* – I don't think we should do it."  Nevertheless, JLI continued to push its campaign on websites with young demographics.

350.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

351.    JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

352.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

COMPLAINT
CASE NO. 19-MD-02913-WHO

353.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.



354.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.

**b.  JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

355.    JLI used "influencers" to push their product to young people.  Influencers are "high-social net worth" individuals who have developed large social media followings—i.e., the "cool kids" of the social media world.  Influencers are prized sources of brand promotion on social media networks.

356.    Like its Vaporized campaign, JLI's influencer strategy was youth focused, with the stated aim of "show[ing] that the tastemakers, cool kids and early adopters who consume tobacco use JUUL."  In keeping with this strategy, JLI targeted influencers that were young and popular with adolescents.  One influencer JLI targeted was Tavi Gevinson, who was nineteen

1  years old in the summer of 2015.  The year before, Rolling Stone magazine described Gevinson

2  as "possibly the most influential 18-year-old in America."

3      357.    JLI contracted with Grit to enlist influencers by sending them free JUUL e-

4  cigarettes.

5      358.    Grit also provided free JUULs to Luka Sabbat, known as the "the Internet's

6  Coolest Teenager," who was 17 years old during the summer of 2015.

7      359.    Grit targeted celebrities with large numbers of underage fans, including Miley

8  Cyrus, former star of "Hannah Montana," a series that aired for four seasons on the Disney

9  Channel and won eight Teen Choice Awards.

10     360.    JLI encouraged its distributors, wholesalers, and other resellers—either explicitly

11 or implicitly— to hire affiliates and influencers to promote JLI's brand and products.  Even if not

12 paid directly by JLI, these influencers profited from the promotion of JUUL products either

13 because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-

14 compatible products.

15     361.    For example, YouTube user Donnysmokes (Donny Karle, age twenty-one)

16 created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which

17 were from users under the age of eighteen.  Since that time, Karle has made a series of videos,

18 including videos titled "How to hide your JUUL from your parents" and "How to HIDE & HIT

19 Your JUUL at SCHOOL WITHOUT Getting CAUGHT."  Karle has admitted to earning

20 approximately $1,200 a month from unspecified sources simply from posting videos of himself

21 consuming e-cigarettes, especially JUUL products, online.

22     362.    In or around 2017, JLI began using a company called Impact Radius for the

23 management of JLI's affiliate program.  Impact Radius's affiliate application stated that JLI

24 "auto-approve[d]" applications and did not ask for or confirm the affiliate's age.  JLI's affiliates

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL products.

363.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

**c.  JLI Used Viral Marketing Techniques Known to Reach Young People.**

364.    JLI deployed "viral marketing" techniques to great success.  Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."  Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network.  The success of viral marketing depends on peer-to-peer transmission.  Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

365.    As JLI boasted in a pitch deck to potential investors dated December 2016, "Viral Marketing Wins."



366.    Social media platforms are the most effective way to launch viral marketing campaigns among young people.  As of May 2018, among teenagers, 95% reported use of a

COMPLAINT
CASE NO. 19-MD-02913-WHO

1  smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online

2  "constantly."

3       367.   A key feature of JLI's viral marketing campaign was inviting user-generated

4  content.  This strategy revolves around prompting social media followers to provide their own

5  JUUL-related content—e.g., post a selfie in your favorite place to use JUUL.  The response

6  provided by a user is then typically distributed—by the social media platform employed—into

7  the user's personal network.  In this way, brands can infiltrate online communities with

8  personalized content that promotes their product (e.g., a picture of a friend using a JUUL e-

9  cigarette).



22       368.   Within a few months of the JLI's commercial release in June 2015, a former JLI

23  executive reportedly told *The New York Times* that JLI "quickly realized that teenagers were, in

24  fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

369.     To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. JLI's hashtag marketing went beyond passive posts to being "very proactive to find and reach out to people who are (or might be) interested in JUUL.  This means searching hashtags to engage, using widely used hashtags, paying close attention to our followers, being responsive to posts, etc."



370.     JLI's hashtags attracted an enormous community of youthful posts on a wide array of subjects.  According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.

371.     Just as JLI intended, JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul.  They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using

COMPLAINT
CASE NO. 19-MD-02913-WHO

JUUL.  The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts.

372.    JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL."  It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls.  It did not do so.

### 5.  JLI Targeted Youth Retail Locations.

373.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products.  Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

374.    For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales.  JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops.  By distributing in those kinds of stores, JLI increased the likelihood that these people would purchase its product.

375.    JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device.  The retail marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.

376.    Like all in-store cigarette advertising, JLI's point-of-sale materials played a major role in driving youth addiction.  JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts.  And JLI actively encouraged its retailers to

COMPLAINT
CASE NO. 19-MD-02913-WHO

leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

377.   Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

378.   As a 2015 marketing plan shows, JLI's in-store promotional content "stands out" from competing tobacco products by conveying that the "JUUL brand is colorful, approachable, and fun—core elements of trade support assets."



### 6.   JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked.

379.   JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada.  The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.

1
2
3
4
5
6
7



8   Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of

9   marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber

10  parties.  Photographs from these events indicate that they drew a youthful crowd.  Product

11  promotion through sponsored events was a long-standing practice for cigarette companies, but it

12  is now prohibited.

13          380.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which

14  contain a JUUL device and 4 JUULpods of various flavors.  JLI gave away samples at music

15
16
17
18
19
20
21
22
23
24



25

COMPLAINT
CASE NO. 19-MD-02913-WHO

events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park. Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.



Juul's container bar

381.    JLI also held sampling events in stores.  By September 2015, JLI was on schedule to host sampling events in more than 5,000 stores in twenty cities in twelve states.  Documents obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these events and required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a JUUL-branded case.

382.    Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events, it continued to reach out to new users by offering samples, sometimes at $1 "demo events."  Like so many of JLI's initiatives, promotions of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

383.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

384.     According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.  And this was just to get people started.

### 7. The Management Defendants' Direction of and Participation in JLI and in the Youth Marketing Schemes.

#### a. The Management Defendants, and in Particular Pritzker, Valani, and Huh, Controlled JLI's Board at Relevant Times.

385.     During the relevant time frame, JLI's operative Voting Agreements provided for a maximum of seven board seats.  By March 2013, Valani, through Ploom Investments LLC, controlled two of JLI's maximum seven board seats.  Valani continued to control two JLI board seats at all relevant times.  Pritzker joined Monsees, Bowen, and Valani on JLI's board in August 2013.

386.     In March 2015, after JTI's board appointees resigned, Hank Handelsman—a lawyer who serves as general counsel for the Pritzker Organization, and was a senior executive officer and general counsel for the Hyatt Corporation for several decades—joined Monsees, Bowen, Pritzker, and Valani on JLI's board.  JLI documents indicate that Handelsman occupied Valani's second seat on the board.  Thus, by March 2015, Pritzker and Valani controlled three board seats, which comprised a majority of the board at the time since only five of seven possible seats were filled then.  Defendants Monsees and Bowen held the other two board seats.

387.     JLI's Fourth Amended and Restated Voting Agreement, dated March 2015, provided for a maximum of seven board seats.  Monsees and Bowen each occupied one seat, Valani had two seats, Pritzker had one seat at that time, another investor would obtain one board seat if enough shares were raised (but ultimately, they were not), and one seat was to be filled by vote of a majority of the board.  Sometime after that, Pritzker assumed control of a second board seat.

COMPLAINT
CASE NO. 19-MD-02913-WHO

388.     By the summer of 2015, Hoyoung Huh and Alexander Asseily joined the Board. At that time, the Board had seven members: Monsees, Bowen, Valani, Pritzker, Handelsman, Huh, and Asseily.  Handelsman continued to occupy Valani's second seat.

389.     Valani, Pritzker, and Huh continued to control JLI's board through at least 2018. In June 2017, Altria was already contemplating a deal with Juul and asked its financial advisor, Perella Weinberg Partners, to conduct diligence on JLI.  Altria reported Perella Weinberg's findings while preparing for a meeting with JLI, noting that "Valani and Pritzker control majority of voting power and 44% economic interests."

390.     JLI's December 2016 Fifth Amended and Restated Voting Agreement provided that Monsees and Bowen controlled the two seats they occupied, Valani controlled the two seats occupied at that time by himself and Handelsman, Pritzker controlled the two seats occupied at that time by himself and Asseily, and Huh occupied the seat appointed by a majority of board members.  JLI's March 2017 Sixth Amended and Restated Voting Agreement provided the same board seat composition as the Fifth.

391.     Even after Huh resigned from JLI's board in May 2018, Pritzker and Valani continued to control the board, as they still controlled four of seven board seats.  JLI's June 2018 Seventh Amended and Restated Voting Agreement provided that Monsees and Bowen controlled the two seats they occupied, Valani controlled the two seats occupied at that time by himself and Handelsman, Pritzker controlled the two seats occupied at that time by himself and Zach Frankel, and Kevin Burns occupied the seat appointed by a majority of board members.  Consistent with this distribution of board seats, an internal Altria presentation from October 2017 reported on Altria's "continued dialogue with key [JLI] investors," noting that Valani and Pritzker "indicate that they control majority of voting power."  JLI also noted in 2017 and 2018 that Pritzker and

Valani "have two board seats" each, and they "are active on the board as well as providing strategic advice to the company on a weekly basis."

392.     The Bylaws of the JLI Board of Directors provide that "all questions and business shall be determined by the vote of a majority of the directors present, unless a different vote is required by law, the Certificate of Incorporation or these bylaws."  So, by virtue of their control of four of the seven seats on the JLI Board of Directors, Defendants Pritzker and Valani had the ability to approve or reject any matter considered by the Board of Directors.  This power included, among other things, the decision to remove any officer of JLI (which only required an "affirmative vote of a majority of the directors" – which, as stated above, rested with Pritzker and Valani during all relevant times).  In this way, Pritzker and Valani ensured JLI would be run as they saw fit.

**b.  Pritzker, Huh, and Valani were active, involved board members.**

393.     JLI's board members, and especially Pritzker, Valani, and Huh, were "more involved than most" boards.  In June 2015, then-COO Scott Dunlap observed that "[o]ur board members are more involved than most, and likely crazier than most, given the depth of experience they have in this industry," specifically referencing comments made by Pritzker and Valani about JLI's Vaporized marketing campaign.  They were so involved, in fact, that Dunlap worried that "the board [will] try and write copy" for future branding changes, and he encouraged Richard Mumby to prepare branding materials in advance so that "we could lead that discussion, should it happen."  (Dunlap's efforts to wrestle control over marketing from Pritzker, Valani, and Huh failed—he was the first person fired when their Executive Committee began to clean house, as discussed below.)

394.     JLI's board met far more frequently than is typical: they had *weekly* board calls in addition to monthly meetings.  Hoyoung Huh began joining these weekly board calls starting in

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    May 2015, before he formally took a seat on the board.  In the months following JUUL's June

2    2015 launch, the youth appeal of JUUL's marketing became a "common conversation" at weekly

3    board calls.  Weekly meetings continued into at least 2018.  JLI told investors in 2017 and 2018

4    that Pritzker and Valani "are active on the board as well as providing strategic advice to the

5    company on a weekly basis."  Then-CEO Tyler Goldman told an investor in June 2017 that

6    "Nick [Pritzker] has been a driving force in the building the [JLI] business."

7                    **c.    The Management Defendants, and in particular Bowen, Monsees,
                           Pritzker, Valani, and Huh, oversaw and directed the youth marketing
8                           scheme.**

9            395.    The Management Defendants were well aware that JUUL branding was oriented

10   toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine.

11   The Management Defendants directed and approved JUUL branding to be oriented toward

12   teenagers.  The Management Defendants directed and participated in every marketing campaign

13   pushing the JUUL e-cigarette, as they had "final say" overall marketing campaigns (including

14   the Vaporized campaign and the other formal and informal marketing efforts described above),

15   and Monsees provided specific direction on the content of the website to JLI employees.

16           396.    James Monsees testified to Congress in 2019 that the Board of Directors had

17   "final say" over marketing campaigns, and he was not speaking to only the current state of

18   affairs at the time.  As noted above, from 2015 on, JLI's own documents establish that the Board

19   of Directors closely reviewed and approved marketing plans and specific marketing materials,

20   and set the marketing strategy for the company.

21           397.    As early as November 2014, Monsees, Pritzker, and Valani discussed "the

22   addiction issue" with JUUL, working on "defining our strategy" for how to frame and market

23   their nicotine product.

24

25
                                        - 122 -

398.     In January 2015, JLI's Board of Directors, including Monsees, Bowen, Valani, and Pritzker, met and discussed JLI's marketing.  At this meeting, the "key pillars" identified included "win[ing] with the 'cool crowd' in critical markets," "build[ing] demand among the masses," "lead[ing] with digital and ecommerce foundation," and "us[ing] external audiences to communicate nuanced messages around early adoption 'coolness.'"  The presentation for this meeting also included "how" to market JUUL, including "PR & influencer coverage with regarded national media in targeted markets, including LA & NYC at launch," and "build[ing] loyal consumer community via social media."  The Board recognized that JLI had to act quickly because "[o]nline regulatory restrictions may affect [its] future e-commerce strategy."  In short, the entire marketing strategy, including the planned partnership with the #1 youth media magazine, Vice, was presented to the Board for approval before its launch.

399.     The Board, including Pritzker and Valani, also controlled JLI's messaging on nicotine even before JUUL launched.  In January 2015, the Board directed the marketing team on several key topics related to JLI's marketing approach regarding nicotine.  Sarah Richardson noted that "[a]fter yesterday's board meeting conversation," she and Gal Cohen sought to clarify in a follow-up meeting with Adam Bowen "direction from the board on their comfort level with" aspects of the marketing approach.  She noted that sales materials reference JUUL's "cigarette-level nicotine satisfaction," "nicotine delivery akin to a cigarette," and "nicotine absorption rates."  The marketing team planned to ask the Board to clarify its "comfort level with 'satisfying' messaging," and "Is our goal still that we are champions of transparency, public health, and consumer interests?  If so – at what level are we comfortable being proactive in achieving this?"

400.     On March 23, 2015, JLI's Board of Directors—at that time composed of Monsees, Bowen, Valani, Pritzker, and Handelsman (occupying Valani's second seat)—met and

COMPLAINT
CASE NO. 19-MD-02913-WHO

1  discussed, among other things, their plan for JUUL, including summaries for the launch, what

2  was next, and "ROI opportunities."  The presentation for the meeting noted that "to build a

3  company worth $500B+ you need INNOVATION that fundamentally disrupts MANY $100B+

4  industries . . . and creates entirely new $B industries along the way."  The meeting included a

5  "JUUL launch update," which noted that "Influencer Marketing has begun."

6       401.    The Board also approved specific marketing materials used in JUUL's launch.  In

7  March 2015, the Board approved of the Vaporized marketing campaign despite its obvious youth

8  appeal.  The Board reviewed Vaporized marketing images and made "some commentary at the

9  youthfulness of the models[,]" but "nobody disliked them" and "everybody agreed they are

10  pretty 'effective[.]'"  The Board knew that the ads targeted youth, but "Juul's board of directors

11  signed off on the company's launch plans[.]"

12       402.    Because the Board of Directors—which in March 2015 included only Bowen,

13  Monsees, Pritzker, Valani, and Handelsman (in Valani's second seat)—reviewed and approved

14  these marketing campaigns, Defendants Bowen, Monsees, Pritzker, and Valani caused the

15  Vaporized campaign, including its omission of any reference to nicotine content, to be

16  distributed via the mails and wires.  Notably, Pritzker and Valani, who controlled three of the

17  five Board seats filled at that time, had veto power over the launch plans which included this

18  youthful advertising with no representations of nicotine content, yet they approved the marketing

19  to go forward.

20       403.    After launch, executives and directors discussed whether to rein in the advertising

21  to teenagers.  According to Scott Dunlap, then Chief Operating Officer, in June 2015, Nicholas

22  Pritzker commented that the branding "feels too young[.]"  At the June 17, 2015 Board meeting,

23  the Board heard:

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

[A]n update on the rollout of JUUL. . . . Mr. Mumby then provided the board with his perspective on the JUUL launch and customer feedback. The Board discussed the Company's approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer term strategy led by Mr. Monsees.

404. According to an anonymous former company manager: "Inside the company, the first signs that Juul had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015." "[E]arly signs of teenage use kicked off an internal debate . . . Some company leaders . . . argued for immediate action to curb youth sales. . . . The counter-argument came from other company directors, including healthcare entrepreneur Hoyoung Huh and other early investors"—that is, Pritzker and Valani—who "argued the company couldn't be blamed for youth nicotine addiction."

405. In early July 2015, Alexander Asseily "spoke to James [Monsees] at length" on the "JUUL approach." Asseily also spoke "at length" with Valani and Pritzker, following up with a lengthy email advocating against continued youth marketing. He began by noting that "our fears around tobacco / nicotine are not going away. We will continue to have plenty of agitation if we don't come to terms with the fact that these substances are almost irretrievably connected to the shittiest companies and practices in the history of business." He stated that "an approach needs to be taken that actively, if implicitly, distances us from [Big Tobacco]: what we say, the way we sell, the way we run the company, what we emphasi[z]e, who we hire, etc." Referring to JLI's strategy to use the same marketing techniques as major tobacco companies used to market to youths, Asseily added that "[t]he trouble with just doing 'what the others do' is that we'll end up as Nick [Pritzker] rightly points out in the same ethical barrel as them, something none of us want no matter the payoff (I think)." He continued that "the world is transparent and increasingly intolerant of bullshit. It's not about faking it - it's about doing it correctly....which could mean **not doing a lot of things we thought we would do like putting**

COMPLAINT
CASE NO. 19-MD-02913-WHO

**young people in our poster ads or drafting in the wake of big players in the market**." He pushed for an alternative marketing plan targeting only "existing smokers" and laid out a vision for the company "making products based in science and with a state goal of doing right by our customer."

406.    Pritzker, Valani, and Huh rejected this approach, opposing any actions to curb youth sales.  Youth sales were a large potential source of revenue.  As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth."  And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.

407.    In October 2015, the debate was resolved in favor of selling to teens.  Although JLI's highly sanitized Board minutes do not reflect whether this debate was put to a vote, Huh, Pritzker, and Valani were the driving force behind this decision.  They were aligned in favor of continuing youth marketing, and Valani's second board seat (occupied by Handelsman) would have given them a majority if a vote was necessary (regardless of Bowen's vote).  Pritzker, Valani and Huh's position ultimately prevailed—JLI continued marketing JUUL to youths, Monsees was removed as CEO, and Pritzker, Valani, and Huh appointed themselves the newly formed Executive Committee.  Even though the directors and executives of JLI knew—and explicitly stated—that what they were doing was wrong, they pressed ahead with JUUL's youth-oriented Vaporized ad campaign through early 2016.

408.    The company also implemented the Board's decision to target and sell to minors in many other ways.  For example, in early October 2015, sales and marketing employees of Pax Labs noted that only 74% of users were able to pass the age gate on the website, "which is a steep decline in sales for us."  In mid-January 2016, a similar group of employees estimated that

COMPLAINT
CASE NO. 19-MD-02913-WHO

about 11% of those reaching the JUUL Purchase Confirmation Page on Pax Labs's own website were under 18 years old.  But, rather than strengthen JUUL's age verification system, Pax Labs worked to weaken it.  In February 2016, Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.  By changing the age verification process so that users were more likely to pass—while knowing that some minors had already been able to pass before the change—Pax Labs deliberately chose to continue selling to underage purchasers.

409.    In July 2015, Asseily suggested "a cheeky campaign that asks existing smokers to return their unused cigarette packets (or other vaping products) to us in return for a discount on JUUL" because that would "send the only message that's needed: JUUL is a superior alternative to conventional smoking and mediocre vaping products."  But JLI did not run this campaign then and in fact did not begin focusing its advertising on switching from combustible cigarettes until 2018.

410.    By March 2016, however, JLI employees internally recognized that JLI's efforts to market to children were too obvious.  On March 2, 2016, Richard Mumby, the Chief Marketing Officer, sent a document related to JLI's branding to Hoyoung Huh and a number of other marketing employees of JLI.  According to Mumby, he was sending the document because Hoyoung Huh "indicated that [he] would review [JLI's] brand and collateral positioning on behalf of the board."  The attached document noted that "[t]he models that we used for the #Vaporized campaign appeared to be too youthful for many consumers (and the media)[.]"  Under a header that listed as one of JLI's "Objectives" to "Be Different & Have Integrity[,]" the document stated that "[w]e need to be sensitive to the subjectivity of youthfulness by positioning the brand to be mature and relatable."  On March 11, 2016, Mumby sent another version of this document to Hoyoung Huh and Zach Frankel (who was then an observer on the Board and would later become a director), and Mumby thanked them "for the support on this."  Around this time,

COMPLAINT
CASE NO. 19-MD-02913-WHO

Pax Labs reoriented its JUUL advertising from the explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young.  The advertising's key themes continued to include pleasure/relaxation, socialization/romance, and flavors—all of which still appealed to teenagers, as was made clear in the previous litigation against the cigarette industry and Altria and Philip Morris in particular.

411.    Pritzker, Valani, and Huh, along with Bowen and Monsees, continued to direct and approve misleading marketing campaigns long after launch.  For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint.

412.    Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

413.    Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL products.

414.    JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine and that ultra-high concentration of nicotine was designed to addict.  They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system.  Despite that knowledge, JLI and the Management Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2

   **d. Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors.**

3

4

5

6

7

415.   Although Defendants Bowen and Monsees were the visionaries behind JLI and the most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early-to mid-2015, JLI (through the individuals running the company), Bowen, Monsees, Pritzker, Valani, and Huh were each intimately involved in the planning and execution of activities.

8

9

10

11

12

416.   For example, JLI stopped interacting with the press in the summer of 2015 while its Board of Directors, controlled by Bowen, Monsees, Pritzker, Huh, and Valani, was finalizing a "messaging framework."  A legitimate business enterprise would typically ramp up, rather than shut down, press outreach at the very time the company is supposed to be building awareness for its recently launched product.

13

14

15

16

17

18

417.   But the Management Defendants at this point were taking actions that went beyond the regular and legitimate business operations of JLI.  At the same time JLI stopped traditional press engagement, the Board of Directors was directing and monitoring the launch plans that they had set in motion—including the launch of sponsored content on social media in July 2015 (which content did not include any warnings about JUUL's nicotine content or health risks).

19

20

21

22

418.   And at the same time the Management Defendants had approved the early JLI marketing campaigns that were intentionally targeting youth, there was a fundamental shift in roles when Defendants Pritzker, Valani, and Huh took charge of the instrumentalities of JLI, including its employees and resources.

23

24

419.   Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani,

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.  The Management Defendants, and in particular Huh, wanted to continue their fraudulent marketing, knowing that these ads were also targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine addiction[.]"

420.    Keeping the company's youth marketing on track was critical to and consistent with Pritzker, Valani, and Huh's objective of accelerating JUUL's growth and expanding its customer base—and increasing profitability.  Monsees reported to investors that the Executive Committee was "formed to provide more consistent and focused direction to the company," and Monsees stepped down as CEO so that the Executive Committee could "usher in the next phase of growth for the business."  Hoyoung Huh served as the Executive Chairman and Pritzker as Co-Chairman.

421.    On October 6, 2015, the day after Pritzker, Valani, and Huh ousted Monsees as CEO and rejected suggestions to abandon the current youth-oriented marketing, Richard Mumby acknowledged in an email to Huh, Pritzker, and Valani that their seizing power would facilitate JUUL's growth: "Many thanks for the candid conversation yesterday.  Not an easy moment for PAX Labs, but I'm excited about the future that these changes will afford. . . . Clearly, improving our sales strategy and integrating sales/marketing better is crucial to our growth."

COMPLAINT
CASE NO. 19-MD-02913-WHO

422.     JLI's organizational charts later reflected the executive committee in the place of a CEO.  Before late 2015, the company's organizational charts showed the CEO at the head of the company, reporting to the Board.

**org chart - October 2015**



423.     After Monsees was removed as CEO, the Executive Committee appeared in the place of the CEO.



424.     Board minutes also illustrate how the Executive Committee of Pritzker, Valani, and Huh acted as CEO of JLI during this time period, taking direct control of the company and

COMPLAINT
CASE NO. 19-MD-02913-WHO

making critical decisions about how to market JUUL.  Until late October 2015, Monsees (then the CEO) ran Board meetings.  In late October 2015 and thereafter, however, Huh (then Executive Chairman and member of the Executive Committee) began running Board meetings. Also, the late October minutes report that the "Board discussed . . . the additional responsibilities that would be assigned to Bryan White" (who was a Vice President of Engineering and Product Design at the time), and furthermore that "[a] discussion followed regarding who Bryan should report to, and it was agreed that the executive committee that had been formed since the last Board meeting, consisting of Messrs. Huh, Pritzker, and Valani, would address this issue." Additionally, the Board "discussed how these new roles and responsibilities would be communicated internally."  Over time, the list of direct reports to the board grew.  By early 2018, every senior JUUL executive officer was reporting to the board directly.

425.    By December 2015, it was confirmed that "Hoyoung [Huh] will make decisions on behalf of the BOD [Board of Directors] Exec[utive] Comm[ittee]" and "3-4 days/week Nick [Pritzker] and/or Hoyoung [Huh] will be in the office" to "help us manage our people[.]"

426.    Consistent with his role as Executive Chairman, Huh delivered the "Vision for the company" agenda item at the December 2015 Board meeting.  Huh laid out JLI's action plans going forward, and the explicit goal was to grow JUUL for sale to or joint venture with "Big Tobacco."  To this end and as part of the discussion about how to "grow and sell Juul," Defendants Huh, Pritzker, and Valani wanted even "more aggressive rollout and [marketing]."

427.    Huh served as the Executive Chairman of the Board from October 2015 until at least May 2016, and others, particularly Monsees, deferred heavily to Huh as the decision-maker during that period.  For example, a JLI executive emailed Huh, Valani, Pritzker, and Handelsman to organize a Board call with Fidelity on December 16, 2015, and added "let me know if you

COMPLAINT
CASE NO. 19-MD-02913-WHO

think we should invite James [Monsees]."  Pritzker deferred that decision to Huh, who decided

that Monsees was allowed, responding, "Am fine w[ith] James joining."

428.    In December 2015, Monsees expressed concerns about JLI's marketing budget to

Huh in an extremely deferential way, concluding, "As I've said, I'm highly sensitive right now to

not overstepping my mandate and risk deteriorating the management committee dynamic.  I

request your assistance in helping me find the right time and place (if any) to present and discuss

these concerns.  I'm at your service."

429.    Again expressing concerns about JLI's leadership and management, Monsees sent

Huh an email in December 2015, discussing what he perceived as needed changes, including

Board restructuring, the appointment of an interim CEO, and restructuring of Executive

Committee.  Monsees communicated these concerns in the form of a draft letter written on Huh's

behalf to Pritzker, Valani, and Hank Handelsman.  These suggestions ultimately were not

implemented.

430.    In May 2016, Monsees responded to an inquiry from potential investors, saying

that "Hoyoung Huh (our Executive Chairman)" should be involved in any discussions.  Monsees

separately sought Huh's advice and guidance on how to respond to unsolicited investor inquiries

like this, adding "if there's something else you'd like me to do (pass along to you or someone

else?) I'll be happy to do so."

431.    Over the next year, until the installation of a new CEO in August 2016,

Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand

the number of e-cigarette users through fraudulent advertising and representations to the public.

They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the

company."  Despite any potential internal misgivings about their fraudulent conduct, notably,

none of Management Defendants terminated their relationship with JLI during this time period.

COMPLAINT
CASE NO. 19-MD-02913-WHO

**8. Pritzker, Valani, and Huh continued to exercise control over and direct the affairs of JLI even after a new CEO was appointed.**

432.    Although JLI hired a new CEO in August 2016, Pritzker, Valani, and Huh's Executive Committee does not appear to have been dissolved, and these three Defendants continued to exercise control over and direct the affairs of JLI.

433.    In 2017, the Board—controlled at that time by Pritzker, Valani, and Huh—continued to make decisions on the details of the media plans for marketing.  For example, a JLI marketing employee reported to JLI's media vendor, Mediasmith, that JLI's chief marketing officer "presented the entire media plan to the board," but "we need to put the plan on hold" because the Board did not approve.  She also acknowledged that JUUL's board was aware their message was reaching a youth audience, noting that "What we need to do now is educate the board" on "the ways we can ensure [the] message is NOT reaching an unintended, young audience."

434.    In December 2017, Valani directed aspects of JLI's distribution and dissemination.  For example, he initiated a conversation checking the progress on plans to sell JUUL devices in vending machines, asking for early design images and constructs.

435.    Pritzker also controlled several aspects of JLI's branding.  He was directly involved in creating JUUL's corporate website in May 2017.  Pritzker dictated specific changes to the content on the site in a conversation with Ashley Gould (Chief Administrative Officer).

436.    Also in May 2017, Ashley Gould asked the Board for their feedback on a proposed name for JUUL's parent company, and Pritzker weighed in by saying "I'd like to discuss," and also evaluated potential names, and sought to ensure that if the new name were to appear on any packaging, the JUUL brand name would still be the most prominent.

COMPLAINT
CASE NO. 19-MD-02913-WHO

437.    In October 2017, the Board reviewed sample marketing campaign materials, and Pritzker rejected a specific proposal, noting that he "didn't like 'smokers deserve better alternatives.'"

438.    Pritzker even got involved in customer service issues.  In July 2017, Dave Schools, a JUUL customer, member of a famous band, and influencer, complained about bad customer service and defective devices.  Schools' email to JLI begins, "Please note I have copied Nick Pritzker on this email only because he asked me to do so."

439.    Pritzker and Valani were also in close control of JLI's public relations and media strategies.  For example, Pritzker received an email from a teacher addressing youth use of JJUUL in schools, forwarded it to the team, and directed a specific and personal response to the teacher.  In January 2018, Ashley Gould reported directly to Valani, Monsees, and Kevin Burns about a study linking teen e-cigarette use to an increased likelihood of trying cigarettes.  Valani responded with a detailed messaging strategy and action items to respond to this negative press, including running "strategic media analysis [to] see where these articles are coming from," "debunk[ing] the studies, . . . ideally in coordination with independent researchers," financially supporting efforts to raise the tobacco minimum legal sales age to twenty-one years old, hiring a "credible head" of youth policy, and estimating "the number of adult smokers that have switched."  Valani directed Gould to give a "week-by-week progress" report on these tasks.

440.    Valani sent Gould another unfavorable news article about e-cigarettes in April 2018, and she responded that her teams were already working on "next steps" in response. Valani asked Gould for an update later the same day.

441.    After Kevin Burns replaced Tyler Goldman as JLI's CEO, Burns worked closely with Pritzker and Valani in particular, seeking their approval regularly.  For example, in April 2018, Kevin Burns suggested making several key hires to Valani and Pritzker, seeking their

COMPLAINT
CASE NO. 19-MD-02913-WHO

input; he also noted that he would seek Pritzker and Valani's approval on a draft response to an inquiry by U.S. Senators and a press release regarding youth prevention efforts. Also in April 2018, Valani edited a press release about JUUL's "Comprehensive Strategy to Prevent Underage Use" and sent his redline to the CEO. In December 2018, CEO Kevin Burns sought approval from Valani and Pritzker on a specific advertising campaign, saying, "I suggest we proceed" with specified television, print, and radio spots. Valani, copying Pritzker, approved only certain videos, deciding "[w]e shouldn't air the short form ones."

442.    Also in December 2018, JLI's marketing team prepared slides for Burns to give a marketing overview presentation to the board, and Burns sent the slides to Pritzker and Valani in advance, inviting their feedback. Likewise, in January 2019 Burns sent Valani and Pritzker a news article characterizing the *Make the Switch* campaign as aimed at adult smokers, noting that the article said "this campaign and positioning is starkly different from 2015." Valani responded, copying Pritzker, "Really good. Happy to see this reaction."

443.    In March 2019, Burns sent a copy of his op-ed in the Washington Post, called "Vape Makers Must Do More to Stop Kids from Using E-Cigarettes," to Pritzker and Valani, saying, "We just got word that our youth survey has been accepted for peer review and will be published in 2-3 weeks by a well regarded journal." Pritzker responded "Awesome. And I like the timing and wording of the op ed." Valani also responded, saying "This is really great. Nicely written." Pritzker and Burns then discussed making a "strategic decision" about the availability of flavors in retail stores.

**9.    Pritzker and Valani directed and controlled JLI's negotiations with Altria**

444.    Pritzker and Valani, along with Kevin Burns, were the lead negotiators for JLI on the Altria deal.

445.     Altria knew that when it was negotiating with JLI, Pritzker and Valani had control of the company.  In June 2017, Altria, preparing for a meeting with JLI, noted that "Per Perella Weinberg Partners, Valani and Pritzker control majority of voting power and 44% economic interests."  A later internal Altria presentation reported on Altria's "continued dialogue with key [JLI] investors," noting that Valani and Pritzker "indicate that they control majority of voting power."

446.     On paper, negotiations were between Howard Willard (Altria's then-CEO), and Pritzker, Valani, and Kevin Burns for JLI.  In April 2018, Willard sent confidential "Exchange of Volume Information" to Pritzker, copying Valani and Burns.  Williard also sent a detailed email to Pritzker and Valani, along with Burns, regarding Altria's proposed "collaboration . . . [that] creates a plan to manage that [antitrust] risk," and "productive partnership that can create substantial value above what is achievable under a standalone scenario in a dynamic tobacco category environment."  Many other email exchanges related to the deal are between Altria's team, Pritzker, Valani, and Kevin Burns.

447.     But some key discussions involved only Pritzker and Valani as the real power brokers for JLI.  For example, an April 2018 email string discussing how to resolve a standstill and restart the Altria deal negotiation included only Willard, Pritzker, and Valani.  Pritzker told Willard what he and Altria's lawyers needed to work out to have "the continuing right to talk to Riaz [Valani] and me."

448.     Pritzker and Valani worked to build a partnership with Altria.  After attending a closing dinner, Hank Handelsman, JLI Board member and proxy for Pritzker and Valani, emailed Willard and stated, "More importantly to me was the camaraderie shown after a bruising negotiation!  In 45 years of doing deals, some in the tobacco industry, I have not seen the 'we are at peace, let's move on' attitude that I witnessed that lovely evening!"  In response, Pritzker

COMPLAINT
CASE NO. 19-MD-02913-WHO

25

added KC Crosthwaite to the email chain and thanked Willard and the Altria personnel for the dinner, and stated, "We truly appreciate our partnership, and look forward to an even deeper collaboration in the future."

449.    Pritzker and Valani continued to communicate with Altria's CEO on behalf of JLI after the negotiations ended.  On May 26, 2019, Pritzker asked Willard whether he was planning to attend "the youth/PMTA meeting in DC," and "if so, do you think we can find time for you, Riaz [Valani] and I to get together separately?"

450.    Pritzker, Valani, Willard, and Crosthwaite coordinated a response to the Youth Vaping Prevention Plan in July 2019.  Willard offered his "reaction to the [Youth Vaping Prevention] Plan" and advised JLI, based on his experience as a cigarette company CEO, not to publicly commit to using the plan or otherwise make an announcement addressing it.

### 10. JLI and the Management Defendants Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products.

#### a.   JLI's Strategy Worked.

451.    The Management Defendants knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth.  As Reuters has reported:

> the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the liquid nicotine.

A former senior manager told *The New York Times* that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices."  He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."  Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"  On January 5, 2016,

COMPLAINT
CASE NO. 19-MD-02913-WHO

Gal Cohen forwarded a presentation dated December 16, 2015, which asked the question: "If *large numbers of youth are initiating tobacco use with flavored e-cigarettes*, but adults [*sic*] smokers may benefit from completely switching to an e-cigarette, what should the market look like?" It was common knowledge within JLI that JUULs were being sold to children.

452. After the Vaporized campaign, retail stores began selling out of JUUL products, and JLI had a difficult time trying to meet demand coming from its online ordering platform.

453. Furthermore, it was obvious to those outside the company that JLI was selling JUUL products to children. In June 2015, reporting on the "Vaporized" campaign that accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]" Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented." JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."

454. Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, on July 16, 2016, Adam Bowen emailed Tyler Goldman about social media posts by children about JUUL e-cigarettes, stating, "I'm astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on." Bowen added that "Riaz [Valani] was thinking maybe we can leverage user generated content."

COMPLAINT
CASE NO. 19-MD-02913-WHO

**b. JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing.**

455.    Tracking the behaviors and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products.  Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

456.    As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."  Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group."

457.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market.  As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."

458.    However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past.  With industry connections, e-mail, social media, and online forums, JLI can track, and has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.

459.    First, JLI knew from its sales data that the large majority of its customers were under the age of 21.  In December 2017, JLI employees discussed potentially supporting raising the legal age to purchase e-cigarettes to 21 and started that based on the data collected by Avail Vapor, "this would be a devastating mistake" because "70% + of sales would be eliminated."  According to Avail's data, 70% of purchasers of JUUL were between 18 and 21 years old, 15%

COMPLAINT
CASE NO. 19-MD-02913-WHO

of customers were 22 to 29 years old, 7% of customers were 30 to 44 years old, 6% of customers were 45 to 64 years old, and just 1% of customers were 65 years old or older.  JLI employees only noted that "Retailers know well that younger adults buy in greater quantities than mature adults" and supporting a raise of the legal age to 21 "would show we simply do not understand our product success" and "would alienate a large portion of our existing consumers and advocates."  The JLI employee also noted that "we need to understand (at least at the senior decision maker level) that our current success is fuel primarily by younger adult users" and not by "mass market adult combustion smokers."

460.    Second, using the tools available to it, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

461.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically, which is the exact result to be expected from an effective viral marketing campaign.  Its growth on Instagram was likely even more rapid.

462.    A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising.  Despite JLI's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.

463.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.

464.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the

COMPLAINT
CASE NO. 19-MD-02913-WHO

authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

465.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.

466.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL products.

467.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.

468.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.

469.    Some Twitter users have reported what appear to be JUUL bots.  Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.

470.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.  Of these, a huge number were plainly related to underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."

471.    In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.

COMPLAINT
CASE NO. 19-MD-02913-WHO

### c. JLI Worked with Veratad Technologies To Expand Youth Access to JUUL Products.

472.    At the same time JLI and the Management Defendants were taking coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base through unlawful marketing and distribution activities, they worked with an outside entity—Veratad Technologies LLC—to get JUULs into the hands of the largest number of consumers possible.

473.    In furtherance of JLI and the Management Defendants' efforts to secure youth sales so crucial to expanding JUUL's market share (and JLI's profits), and as detailed below, from approximately 2015 to 2018, JLI and Veratad worked together to try to pass as many people as possible through an online "age verification" system that users had to pass to be able to order JUUL products.

474.    JLI's website, including its online store, was pivotal to these efforts.  Early marketing documents show that JLI planned a "consumer journey" that started with a consumer being exposed to misleading JUUL marketing in stores, where JUUL's "fun" and "approachable" in-store marketing would lead consumers to JLI's website for additional misrepresentations and omissions about JUUL products, an email subscription sign-up, and purchases through JLI's ecommerce platform:

COMPLAINT
CASE NO. 19-MD-02913-WHO

CUSTOMER JOURNEY

SEE JUUL AT CONVENIENCE
Stand out as a promising next-gen version of whatever they are vaping

ENGAGING POINT-OF-SALE
Eye-catching video displays that inform & excite consumers of JUUL benefits

OUT-OF-STORE MARKETING
Word of mouth via influencers or through local promotions like direct mailers, radio and billboard

BUY JUUL
Available at their local smoke shop or convenience store

BUILDING BRAND LOYALTY
@ JUULvapor.com for reviews, informative 'how to' videos, organic search, online ads, engage with and form brand loyalty, gain confidence through a well-curated website as well as social media

INFLUENTIAL REVIEWS
Consumers will be influenced by product reviews from industry-leading media partners like Gear Patrol, Wired, reddit and more

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    INREJUUL_00329660

475.    JLI worked with Veratad to provide age verification services for its website from 2015 to 2018.  Veratad has also provided age verification services to other e-cigarette sellers, including Lorillard and Altria.  Consistent with the claim on Veratad's website that "*You can create your own verification rules*," the company encouraged sellers like JLI to set the desired compliance level for age verification.  As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

476.    Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process, rather than to minimize the number of underage sales.  As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUULpods to unverified customers, many of whom were minors.

COMPLAINT
CASE NO. 19-MD-02913-WHO

477.     From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad.  Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database.  If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the minimum legal sales age in its database, then it would return a "pass" result to JLI.  If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

478.     If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address.  If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

479.     If Veratad, supplied with the last four digits of a consumer's social security number, still could not match the consumer to a person of the minimum legal sales age in its database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document.  A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

480.     Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process.  JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

481.     By the fall of 2015, JLI and Veratad knew that bulk purchases were being made for resale on JLI's website by minors and for resale to minors.  For example, on May 25, 2016,

COMPLAINT
CASE NO. 19-MD-02913-WHO

JLI employees discussed an online purchase of JUUL products made by a fifteen-year-old boy. A JLI employee wrote that "[t]his order had failed age verification a few times with the person's information as below.  The person even uploaded an ID, which was obviously fake and rejected by us.  Then, the user entered a different email address and passed from Veratad, and the order was sent."  The employee discussed a communication with Veratad that confirmed that Veratad did not review the date of birth entered by the user when determining whether a person passed age verification for JUUL.  JLI recognized that "[t]his situation can potentially happen again."

482.    Internal JLI documents confirm that JLI discussed underage purchases with Veratad.  For example, on May 27, 2016, JLI's Head of Compliance & Brand Protection wrote that an "underage purchaser changed his email address; which, allowed the order to be passed by Veratad. . . . I believe that Nick and his team are still looking into the matter with Veratad to see if they can get a better understanding of what happened."  A JLI employee replied "hmmm. Probably impossible to put up an age gate that thwarts a committed teenager from penetrating it :)"

483.    Nevertheless, the two companies worked together to find ways to "bump up [JLI's] rate of people who get through age verification."  JLI repeatedly sought, and Veratad repeatedly recommended and directed, changes to the age verification process so that more prospective JUUL purchasers would "pass."  Both did so in an effort to increase direct sales of JLI's e-cigarettes without regard to whether its less stringent age verification process would permit more underage consumers to purchase them.

484.    Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of the purchaser's personal information—e.g., the purchaser's street address or date of

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    birth—did not match the information corresponding to a person of the minimum legal sales age

2    in Veratad's database.

3        485.    Similarly, between June 2015 and August 2017, JLI and Veratad tailored the

4    system to "pass" a prospective purchaser under certain circumstances even when the prospective

5    purchaser's year of birth did not match the information corresponding to a person of the

6    minimum legal sales age in Veratad's database.

7        486.    JLI and Veratad sought to increase "pass" rates by modifying the age verification

8    system to allow users multiple opportunities to change their personal information if a match was

9    not initially found in an appropriate government database.  A Veratad Performance Report from

10   August 5, 2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions—an

11   average of 1.93 attempts per consumer.  Only 966 consumers—less than half—passed age

12   verification on the first attempt.  By allowing consumers to alter their personal information and

13   attempt age verification up to three times, JLI was able to increase its database match pass rate

14   from 49.2% to 61.2%.

15       487.    By design, these lax requirements ensured underage consumers could "pass" JLI's

16   age verification process and purchase JUUL e-cigarettes directly from JLI's website by using

17   their parent's name, home address, and an approximate date of birth.  JLI was aware of this fact,

18   as evidenced by the multiple complaints it received from parents who alleged their children did

19   just that.

20       488.    JLI directed and approved the system it had implemented with Veratad that

21   caused accounts with "bad info" to be "AV approved" but, as a Senior Business Systems

22   Manager at JLI commented, "if [V]eratad passed it [then] it's not on us."

23       489.    JLI customer service representatives even encouraged those who failed age

24   verification to "make multiple accounts in order to pass AV [age verification]."  Customer

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

service representatives would go so far as to alter identifying information for them; a Slack chat among customer service representatives confirmed that representatives were authorized to "adjust the street address, apartment number, or zip code" associated with shipment.

490.    The age verification procedures designed by JLI and Veratad have allowed hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious individuals at fictitious addresses.  Many of these improper sales may have been made to underage purchasers or to resellers who sold the products to underage consumers on the grey market.

491.    By divorcing the address from the other customer data in the age verification process, JLI and Veratad allowed consumers to request that tobacco products be sent to locations other than their permanent legal residences.  For example, JLI sent thousands of orders to commercial high rises and office parks.  It is unlikely these orders would have been approved had JUUL and Veratad required that addresses provided by users match information in an appropriate government database and followed the requirement that the shipping address and billing address be the same.

492.    The failure of the JLI/Veratad age verification procedure was intentional.  And despite JLI's concerted effort to enable the sale of federally regulated tobacco products to minors, JLI nevertheless publicly touted Veratad as the "gold standard" of age verification services.  For example, JLI told a reporter with CBS, Pam Tighe, that "[t]here is an extensive age verification process in place to purchase JUUL online" and that JLI "work[s] with Veratad Technologies, the state-of-the-art, gold-standard for age verification. . . . Veratad uses billions of records from multiple trusted data sources to verify the information customers provide and to ensure customers qualify to access and purchase products from JUULvapor.com."  JLI later planned on sending this same canned, false language to a student journalist at Georgetown University.  Similarly, a JLI spokesperson told a reporter at a New York newspaper, *ANMY*, that

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   JLI uses "industry-leading ID match and age verification technology to ensure that customers"

2   are over twenty-one years of age and that the "information is verified against multiple

3   databases."

4        493.    In August 2017, JLI responded to public scrutiny by publicly stating that it would

5   increase the purchase age on its website to 21+ by August 23, 2017.  In the weeks leading up to

6   that date, it emailed the approximately 500,000 or more potential customers to report that

7   customers who signed up for JLI's "auto-ship" subscription service before August 23, 2017

8   would not have to prove that they were 21+ for as long as they maintained the subscription to

9   receive JUULpods.  As discussed herein, JLI knew that these marketing emails were being sent

10  to underage individuals, including those who failed age verification.  And at the same time, JLI

11  advertised that the most popular flavor among youth, Mango, was now available on its "auto-

12  ship" subscription service.  As a result of this scheme, JLI's subscription gains more than offset

13  any losses from the site's heightened age verification requirements.

14

15

16

17

18

19

20

21

22

23

24

25



COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    494.    Further underscoring JLI's purpose of growing the e-cigarette market, even if that

16    meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits

17    of the social security number match exactly the information corresponding to a person of the

18    minimum legal sales age in Veratad's database until August 2018.

19    495.    Tellingly, after JLI and Veratad implemented industry-standard age verification

20    practices, JLI boasted to the FDA that approval rate for sales on its website had dropped to 27%.

21    496.    While on one hand JLI continued working with Veratad to ensure minors could

22    purchase JUUL products online, on the other JLI continued to make false and fraudulent

23    statements about the strength of its age verification system.  For example, on June 5, 2018, JLI

24    tweeted about its relationship with Veratad, claiming that "We've partnered with Veratad

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

1  Technologies to complete a public records search, only reporting back whether or not you are 21

2  years of age or older."  In addition, on November 13, 2018, JLI and the Managements

3  Defendants caused a post to appear on JLI's website stating that JLI was "Restricting Flavors to

4  Adults 21+ On Our Secure Website" and that JLI's age-verification system was "an already

5  industry-leading online sales system that is restricted to 21+ and utilizes third party verification."

6  A video accompanying this message stated "At JUUL labs we're committed to leading the

7  industry in online age verification security to ensure that our products don't end up in the hands

8  of underage users" and included an image of a computer with a chain wrapped around it and

9  locked in place.  These statements were fraudulent because JLI and the Management Defendants

10  were and had been coordinating with Veratad to ensure that their age verification system did not

11  actually prevent youth from purchasing JUUL products.

12      497.    Not only did JLI's efforts result in more sales to minors, JLI was also able to

13  build a marketing email list that included minors—a data set that would prove highly valuable to

14  Altria.

15      498.    In the summer of 2017, JLI engaged a company called Tower Data to determine

16  the ages of the persons associated with email addresses on its email marketing list.  According to

17  this analysis, approximately 269,000 email addresses on JLI's email marketing list were not

18  associated with a record of an individual who had "passed" JLI's age verification process.

19  Additionally, approximately 40,000 email addresses on JLI's email marketing list were

20  associated with records of individuals who had "failed" JLI's own age verification process.

21  Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's

22  marketing list could not be matched with the record of an individual at least eighteen years of

23  age.

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

499.    Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with Altria to use for its marketing purposes.

500.    JLI and the Management Defendants knew, however, that it was not enough to disseminate advertisements and marketing materials that promote JLI to youth or to open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency.  To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUULpods as to how much nicotine they were actually consuming.  And, through Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

**11.   JLI Engaged in a Sham "Youth Prevention" Campaign.**

501.    By April 2017, JLI had determined that the publicity around its marketing to children was a problem.  Ashley Gould, the company's General Counsel and Chief Regulatory and Communications Officer, thus sought to "hire a crisis communication firm to help manage the youth interest JUUL has received[.]"  By June 2017, JLI began developing a "youth prevention program[.]"  While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

502.    By December 2017, JLI's youth prevention program included extensive work with schools.  JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."  JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d] kids to use tobacco and become addicted Philip Morris customers[,]"  JLI's programs were shams intended to encourage youth e-cigarette use, not curb it.  According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and

COMPLAINT
CASE NO. 19-MD-02913-WHO

JUUL's messaging was that the product was 'totally safe.'  The presenter even demonstrated to the kids how to use a JUUL."  Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."

503.    The problems with JLI's youth prevention programs were widespread.  According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use." Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL products as among the potentially harmful products to avoid.  As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"

504.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts.  In April 2018, Julie Henderson, the Youth Prevention Director, emailed school officials about "the optics of us attending a student health fair" because of "how much our efforts seem to duplicate those of big tobacco (Philip Morris attended fairs and carnivals where they distributed various branded items under the guise of 'youth prevention')."  She later wrote that she would "confirm our participation w[ith] Ashley & Kevin"—an apparent reference to Kevin Burns, at the time the CEO of JLI, who would later personally approve JLI's involvement in school programs.  In May 2018, Julie Henderson spoke with former members of Philip Morris's "youth education" team, and Ashley Gould received and forwarded what was described as "the paper

- 153 -

that ended the Think Don't Smoke campaign undertaken by Philip Morris." The paper concluded that "the Philip Morris campaign had a counterproductive influence."

505.     JLI also bought access to teenagers at programs outside of school. For example, JLI paid $89,000 to the Police Activities League of Richmond, California, so that all youth in the Richmond Diversion Program—which targeted "youth, aged 12-17, who face suspension from school for using e-cigarettes and/or marijuana" and "juveniles who have committed misdemeanor (lesser category) offenses"—would "participate in the JUUL labs developed program, Moving Beyond" for as long as ten weeks. Similarly, JLI paid $134,000 to set up a summer program for 80 students from a charter school in Baltimore, Maryland. Participants were "recruited from grades 3 through 12" and worked closely with teachers to develop personal health plans. JLI paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.

506.     JLI was aware that these out-of-school programs were, in the words of Julie Henderson, "eerily similar" to the tactics of the tobacco industry. In June 2018, Ms. Henderson described "current executive concerns & discussion re: discontinuing our work w[ith] schools[.]" Eventually, JLI ended this version of the youth prevention program, but the damage had been done: following the playbook of the tobacco industry, JLI had hooked more kids on nicotine.

507.     The Board was intimately involved in these "youth prevention" activities. For example, in April 2018, Riaz Valani and Nicholas Pritzker edited a youth prevention press release, noting that they "don't want to get these small items wrong" and "think it's critical to get this right."

COMPLAINT
CASE NO. 19-MD-02913-WHO

**12. The FDA Warned JUUL and Others That Their Conduct is Unlawful.**

508.    Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that their practices of marketing to minors needed to stop.  It issued a series of warnings letters and enforcement actions.

509.    On February 24, 2018, the FDA sent a letter to JLI expressing concern about the popularity of its products among youth and demanding that JLI produce documents regarding its marketing practices.

510.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to minors. Manufacturers such as JLI were also sent letters requesting documents regarding their marketing and sales methods.

511.    In May 2018, the FDA again issued more warning letters to manufacturers, distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.

512.    In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1,300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors.

513.    On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.  The FDA additionally requested manufacturers enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.

COMPLAINT
CASE NO. 19-MD-02913-WHO

514.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.  Since then, the FDA, the Federal Trade Commission, multiple state attorneys general, and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth e-cigarette epidemic and whether JLI's marketing practices purposefully targeted youth.

515.    Siddharth Breja, who was senior vice president for global finance at JLI, "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."

### 13. In Response to Regulatory Scrutiny, Defendants Misled the Public, Regulators, and Congress that JLI Did Not Target Youth

516.    To shield their youth-driven success from scrutiny, Altria, JLI, and the Management Defendants had a long-running strategy to feign ignorance over JLI and the Management Defendants' youth marketing efforts and youth access to JLI's products.  They were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful, and that if it became widely known that this was how JLI obtained its massive market share, there would be a public outcry and calls for stricter regulation or a ban on JLI's products.  Given the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a disinformation campaign was urgently needed to protect the Defendants' bottom line.  For this reason, JLI, the Management Defendants, and Altria all hid JLI's conduct by vociferously denying that JLI had marketed to and targeted youth and instead falsely claimed that JLI engaged in youth prevention.  Defendants continued to make these statements while and after actively and

1   successfully trying to market to and recruit youth non-smokers. These false statements were

2   designed to protect JLI's market share, and Altria's investment, by concealing JLI's misconduct.

3   517.   For example, after 11 senators sent a letter to JLI questioning its marketing

4   approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee, and mango, JLI

5   visited Capitol Hill and told senators that it never intended its products to appeal to kids and did

6   not realize youth were using its products, according to a staffer for Sen. Dick Durbin (D-Ill.).

7   JLI's statements to Congress—which parallel similar protests of innocence by tobacco company

8   executives—were false.

9   518.   Defendants also caused JLI to make public statements seeking to disavow the

10  notion that it had targeted and sought to addict teens:

- "It's a really, really important issue. **We don't want kids using our products**." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017);

- "We market our products responsibly, following strict guidelines to have material directly **exclusively toward adult smokers and never to youth audiences**." (JLI Social Media Post, March 14, 2018);

- "Our company's mission is to eliminate cigarettes and **help the more than one billion smokers worldwide switch to a better alternative**," said JUUL Labs Chief Executive Officer Kevin Burns. "We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. **We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL**." (JLI Press Release, April 25, 2018);

- "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already smokers, particularly young people, are not attracted to nicotine products such as JUUL," said JUUL Labs Chief Administrative Officer Ashley Gould, who heads the company's regulatory, scientific and youth education and prevention programs. "We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how

COMPLAINT
CASE NO. 19-MD-02913-WHO

best to effectively keep young people away from JUUL." (JLI Press Release, April 25, 2018);

- "Of course, we understand that **parents and lawmakers are concerned about underage use of JUUL. As are we**. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018);

- "We welcome the opportunity to work with the Massachusetts Attorney General because, **we too, are committed to preventing underage use of JUUL**. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." (Statement from Matt David, JLI Chief Communications Officer, July 24, 2018);

- "**We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers**. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers."." (JLI's website as of July 26, 2018);

- "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . **Our intent was never to have youth use JUUL products**." (JLI Website, November 12, 2018);

- "To paraphrase Commissioner Gottlieb, **we want to be the offramp for adult smokers** to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);

- "Any underage consumers using this product are absolutely a negative for our business. We don't want them. **We will never market to them. We never have.**" (James Monsees, quoted in *Forbes*, November 16, 2018);

- "First of all, I'd tell them that I'm sorry that their child's using the product. **It's not intended for them**. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for

COMPLAINT
CASE NO. 19-MD-02913-WHO

them, and I have empathy for them, in terms of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019);

- "We have **no higher priority than to prevent youth usage of our products** which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019);

- James Monsees, one of the company's co-founders, said **selling JUUL products to youth was "antithetical to the company's mission."**(James Monsees' Statement to New York Times, August 27, 2019);

- Adam Bowen, one of the company's co-founders, said he was aware early on of the risks e-cigarettes posed to teenagers, and the **company had tried to make JUUL "as adult-oriented as possible**."(Adam Bowen's Statement to the New York Times, August 27, 2019);

- "**We have never marketed to youth and we never will**."(JLI Statement to Los Angeles Times, September 24, 2019);

- "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. **That has been this company's mission since it was founded,** and it has taken great strides in that direction." (JLI's CEO K.C. Crosthwaite, September 25, 2019);

- "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. **Our goal is to maximize the positive and reduce the negative.**" (JLI Website, March 6, 2020);

- "**JUUL was designed with adult smokers in mind.**" (JLI Website, last visited March 29, 2020).

519.   Defendants either made these statements directly or caused them to be transmitted as a part of their schemes to defraud the public about what they were selling and to whom.

520.   Altria also engaged in wire fraud when it made public statements seeking to disavow the notion that JLI had targeted and sought to addict teens:

- "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. **As JUUL previously said, 'Our intent was never to have youth use JUUL products.'**" (Altria News Release, December 20, 2018).

521.   However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    staving off regulation.  To accomplish this goal, they would also need to deceive the FDA and

2    Congress.  And so they set out to do just that through statements and testimony by JLI

3    representatives.  These include, but are not limited to, the following:

4    *Statements by JLI to the FDA:*

5      • "JUUL was not designed for youth, **nor has any marketing or research
         effort since the product's inception been targeted to youth**." (Letter to
6         FDA, June 15, 2018).

7      • "With this response, the Company hopes FDA comes to appreciate why
         the product was developed and **how JUUL has been marketed — to
         provide a viable alternative to cigarettes for adult smokers**." (Letter to
8         FDA, June 15, 2018).

9    *Statements by Altria to the FDA:*

10     • "**[W]e do not believe we have a current issue with youth access** to or
         use of our pod-based products, we do not want to risk contributing to the
11        issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb,
         October 25, 2018).

12     • "We believe e-vapor products present an important opportunity to **adult
         smokers to switch from combustible cigarettes**." (Letter to FDA
13        Commissioner Gottlieb, 10/25/18).

14   *Statements by JLI to Congress:*

       • "**We never wanted any non-nicotine user, and certainly nobody
15        under the legal age of purchase, to ever use JLI products**. . . .That is a
         serious problem. Our company has no higher priority than combatting
16        underage use." (Testimony of James Monsees, July 25, 2019).

17     • "Our product is **intended to help smokers stop smoking combustible
         cigarettes**." (Ashley Gould, JLI Chief Administrative Officer, Testimony before
18        House Committee on Oversight and Reform, July 25, 2019).

     *Statements by Altria to Congress:*
19
       • "In late 2017 and into early 2018, we saw that the previously flat e-vapor
20        category had begun to grow rapidly. JUUL was responsible for much of
         the category growth and **had quickly become a very compelling
21        product among adult vapers**. We decided to pursue an economic
         interest in JUUL, believing that an investment would **significantly
22        improve our ability to bring adult smokers a leading portfolio of non-
         combustible products** and strengthen our competitive position with
23        regards to potentially reduced risk products." (Letter from Altria CEO to
         Senator Durbin, October 14, 2019).

24

25
                                                              COMPLAINT
CASE NO. 19-MD-02913-WHO

522.     Each of the foregoing statements constitutes an act of wire fraud.  JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the Defendants' true intentions of hooking underage users.

523.     Their disinformation scheme was successful.  While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products," no such ban has been implemented to date.  Accordingly, JLI's highly addictive products remain on the market and available to underage users.

**F.  Altria Knew JLI was Targeting Youth and, Together with the Management Defendants, Exercised Control Over JLI to Protect and Expand Youth Sales and Defraud The Public About Their Actions.**

**1.  Before Altria's Investment in JLI, Altria Knew JLI Was Targeting Youth.**

524.     As stated above, according to Howard Willard, Altria first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" spearheaded by Pritzker and Valani, on the one hand, and senior executives of Altria and Altria Client Services on the other, beginning in the spring of 2017.  These continued for eighteen months, culminating in Altria's December 2018 equity investment in JLI.

525.     While at first blush, these meetings between Altria and Altria Client Services and Pritzker and Valani about potential investment—described in detail below—might seem like ordinary business activity, they were anything but.  For nearly 18 months, Altria and Altria Client Services dangled the carrot of a multi-billion dollar payout in front of Pritzker and Valani—months in which Pritzker, Valani, and the other Management Defendants committed numerous acts of fraud to grow the business of JLI in order to satisfy Altria's expectations.  And at the same time, Altria and Altria Client Services were actively courting Pritzker and Valani

1    with that promised payout, they were gathering information on JLI that confirmed Altria would

2    be purchasing a company with a proven track-record of sales to youths.

3         526.    Even before 2017, Altria and Altria Client Services—as with anyone paying

4    attention to the e-vapor industry at the time—were well aware that JLI had been targeting kids

5    with its youthful marketing.  As noted above, JLI's "Vaporized" campaign had made its way into

6    the national zeitgeist, with Stephen Colbert noting that the advertising appealed "to the youths."

7    So, not only did Altria and Altria Client Services know JLI was targeting kids at the time it

8    reached out to begin negotiations, it also knew that such targeting was highly successful.  A May

9    23, 2017 presentation by Altria Client Services observed that "[l]ines outside of vape shops

10   and/or calls to vape shops regarding stock [of JUUL] are common" and that JLI's sales revenue

11   was growing at an exponential rate.

12        527.    And beginning no later than January 2018, Altria received explicit warnings about

13   the youth appeal of the JUUL product.  During a January 3, 2018 meeting between David Wise,

14   Steven Schroeder, and Zane Underwood of Altria (Underwood was in communication with KC

15   Crosthwaite at the time) and Avail Vapor CEO James Xu and Avail Vapor scientists at Altria's

16   Headquarters—specifically, in the "Library" conference room—the Altria representatives

17   requested granular data that Avail had on the sale of JUUL and JUULpods.  The Altria

18   representatives asked for, and Avail's representatives provided, data on the number of sales of

19   certain flavor pods, purchasing patterns, and the demographics of JUUL users.  With regard to

20   the demographics of JUUL users, the Avail representatives showed the Altria representatives a

21   ski slope diagram indicating that the vast majority of JUUL purchasers at Avail stores were 18 or

22   19 years old.

23        528.    James Xu of Avail Vapor, who was intimately familiar with JUUL sales and

24   tracked data related to such sales closely, repeatedly warned Altria executives of the youth

25

- 162 -

COMPLAINT
CASE NO. 19-MD-02913-WHO

appeal of JUUL.  In November 2018, Xu presented the demographics data on JUUL directly to

KC Crosthwaite (and David Wise), thus providing further evidence that Altria and Altria Client

Services knew of JLI's role in the youth vaping epidemic prior to Altria's investment in JLI.

529.     Notwithstanding their own observations about JUUL's success with a young

demographic, the data Altria received from Avail which concerned the same, and Xu's repeated

warnings, Altria and Altria Client Services aggressively pursued a deal with Pritzker and Valani

throughout 2018.  Thus, for Altria and Altria Client Services, the large youth make-up of JLI's

market share was a feature—not a flaw—of the company that it sought to acquire.  It is no

surprise then that, even in the face of these warnings and knowledge, Altria continued to

aggressively pursue an investment or potential acquisition of JLI.

### 2. Altria Worked with Pritzker and Valani to Secure Control of JLI and to Exploit JLI for Their Mutual Benefit.

530.     The initial discussions between Altria (and Altria Client Services) and JLI's

leadership began no later than the week of April 16, 2017 when JLI's then-CEO Tyler Goldman

and Defendant James Monsees met with Steven Schroder, David Wise, and K.C. Crosthwaite of

Altria Client Services in San Francisco.  Crosthwaite, who would later become CEO of JLI, was

at the time the Vice President of Strategy and Business Development for Altria Client Services.

Goldman spoke again with Schroeder, Crosthwaite, and Wise on April 27, 2017 to discuss

"preliminary thoughts on potential ways to work together."

531.     Internal documents from the time show that Altria was eyeing JLI as an

acquisition target.  A May 23, 2017 presentation prepared by Altria Client Services for Altria

Group, Inc. titled "Project Mule: Review of E-vapor Closed-System Opportunities" identified

JLI (then PAXLabs) as one of two "Potentially Attractive Options."  Among the attractive

features of JLI was that JUUL had "early market success," had "projected sales to reach ~$300

COMPLAINT
CASE NO. 19-MD-02913-WHO

1  million at year-end 2017." But Altria knew that aggressive growth would be necessary, writing

2  that "[g]enerating an attractive return would require consistently strong EBITDA growth." The

3  presentation also viewed as attractive features that JLI offered "mint, berry, tobacco, and cream

4  varieties" with "[i]ndications of additional flavor pods in potential pipeline," and that there

5  "[l]ines outside of vape shops and/or calls to vape shops regarding stock are common." The

6  presentation also revealed that Altria (through an unidentified subsidiary, though likely Altria

7  Client Services) had tested "all five flavors" of JUULpods and was aware of the amount of

8  "[n]icotine per puff" in a JUULpod. Altria Client Services's conclusions about the popularity of

9  JUUL were consistent with the narrative JLI was presenting to potential investors. JLI's pitch

10  deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent

11  nicotine formulation was "cornering" the consumables market with the highest customer

12  retention rate of any e-cigarette.

13        532.    In a May 31, 2017 presentation prepared by Altria Client Services titled "Closed

14  Tank for AS Analysis," Altria Client Services stated that "Nu Mark [a subsidiary of Altria

15  Group, Inc.] and S&BD [a division of Altria Client Services] have engaged in discussions with

16  Pax Labs (Juul) . . . regarding a potential transaction." Altria Client Services noted that it was

17  seeking "a meeting of senior management of both firms in the next few weeks to explore

18  potential interest in a transaction." Notably, to Altria Client Services, the "senior management"

19  of JLI was interchangeable with Defendants Pritzker and Valani, as later in the same presentation

20  Altria Client Services stated that it was "[s]eeking a meeting between Altria management and

21  Pax lead investors to discuss deal interest."

22        533.    From the very beginning of their negotiations, it was clear to Altria and Altria

23  Client Services that they were operating within a closing window in which JLI's sales to youths

24  could continue unabated. In this same May 23, 2017 presentation, Altria Client Services focused

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

on the "significant risk" of unfavorable regulations to "this rapidly growing product segment" given that no PMTAs (Premarket Tobacco Product Applications) had been granted for closed-pod products.  And as set forth below, Altria and Altria Client Services were well aware of the public scrutiny of JLI's youth marketing efforts, which could only lead to unfavorable regulatory action.  Altria and Altria Client Services had to convince Pritzker and Valani to let Altria acquire or buy into JLI before it was too late.

534.     In a June 2017 internal presentation prepared by Altria Client Services in anticipation of the meeting with Pritzker and Valani on a potential deal involving a minority stake in JLI with a call option (i.e., the ability to acquire JLI at a later date), which Altria had codenamed "Project Tree," Altria Client Services identified Valani and Pritzker as "control[ling] majority of voting power [of JLI] and 44% of economic interests."  Altria Client Services's stated goal was to "build relationship/rapport" with Valani and Pritzker at their first meeting and to convey "Altria's strengths and potential strategic contributions," which included "[e]xpertise building premium and iconic brands," a "[b]est in class distribution and sales force," "[e]xperience and resources to navigate a complex [regulatory] environment," "[r]esources to navigate and respond to evolving [government affairs] landscape," and a "[s]trategic relationship with Philip Morris international."  More important, though, is that the presentation made clear that Altria and Altria Client Services sought to appeal to Pritzker and Valani's personal interest as investors, and not just the contributions that Altria and its subsidiaries could make for the business of JLI, noting that its potential deal would "[p]rovide return on percentage of equity invested to date; provide opportunity for upside on equity retained."

535.     From the very beginning of their relationship, Altria and Altria Client Services communicated to Pritzker and Valani—who, in turn, communicated to Defendants Bowen, Monsees, and Huh—that they would profit handsomely by accepting Altria's investment and

COMPLAINT
CASE NO. 19-MD-02913-WHO

following its lead in growing the business of JLI. Of course, as set forth herein, this growth would be pursued through fraud and deceit to both the public and regulators.

536.    Beyond controlling the "majority of voting power" of JLI, Pritzker and Valani were the perfect choice to liaise with Altria and Altria Client Services on behalf of the Management Defendants. Pritzker has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. And Valani, for his part, was intimately familiar with the business of JLI. He was the company's first "angel investor" and was a regular presence within the halls of JLI (then Pax Labs) well before the company even had a working product. Notably, Pritzker and Valani are the only Defendants who have admitted to using non-discoverable messaging services to communicate regarding JLI business. Pritzker and Valani both used the "Confide" messaging application, which allows users to send encrypted, ephemeral, and screenshot proof messages. And Pritzker and Valani both used Signal, which provides state-of-the-art end-to-end encryption for phone calls and messages.

537.    Altria was an ideal model for growing JLI. Altria, including through its subsidiaries, has decades of experience targeting kids through youth-appealing marketing images and themes. It also had decades of experience using flavors to hook kids and still does in many international markets. And, Altria has decades of experience misleading and lying to the public about their efforts to target kids through marketing and flavors and making similar fraudulent representations to regulators in order to delay or deter regulations. Yet, because it was a party to the Master Settlement Agreement, many of the tactics used by JLI to target kids were unavailable to Altria. So Altria and Altria Client Services found a new way, drawing on Altria's storied history of unlawful activity to partner to the Management Defendants in JLI's fraud at every turn. The result was bundles of cash for the Management Defendants, a new generation of youth

COMPLAINT
CASE NO. 19-MD-02913-WHO

customers for Altria and its subsidiaries, and a public left reeling from a rapidly growing youth vaping epidemic.

538.    Following early discussions with Nu Mark and Altria Client Services, Defendant Valani met with Howard Willard (then-CEO of Altria Group, Inc.) and William Gifford (then-CFO and now CEO of Altria Group, Inc.) on July 28, 2017.  They discussed Altria's "perspective on the industry, the future of reduced risk products, and your thoughts on possible collaboration between ourselves."  Valani followed up on this meeting with an email on July 31, 2017 connecting Gifford with Defendant Pritzker, "convey[ing] our warm regards to Howard," and offering to "come to Richmond" in order "to continue our discussion."

539.    Defendants Pritzker and Valani traveled to Richmond less than a month later for an August 25, 2017 meeting with Howard Willard and William Gifford.  Altria Client Services, in an internal presentation dated September 2017, would report that either at this meeting or the July 2017 meeting, Pritzker and Valani "asked Altria to consider three questions to be addressed at the next meeting being scheduled for mid-late September."  Those questions focused on the transaction structure and how Altria would assign a value to JLI, including its international prospects.

540.    This presentation also reveals that Pritzker and Valani were open to a deal and that they had "high value expectations," even though the presentation later notes that Pritzker and Valani conveyed that JLI "does not need capital."  Taken together, these observations make clear that Pritzker and Valani sought a massive payday for themselves and were not looking out for the strategic interests of JLI as a corporation.  JLI did "not need" the massive capital infusion that Altria's investment would ultimately provide.  It was the investors—i.e., Pritzker, Huh, Valani, Bowen, and Monsees—who stood to benefit.  It was that promise of an impending personal payout that incentivized and motivated the Management Defendants to accept Altria's

COMPLAINT
CASE NO. 19-MD-02913-WHO

and Altria Client Services's influence and control.  If their fraudulent schemes were successful, they would reap billions of dollars for themselves, regardless of what ended up happening to JLI itself.  In this way, Altria and Altria Client Services were able to influence JLI well before Altria formalized its investment in December 2018.

541.     Communications between Altria, Altria Client Services, Pritzker, and Valani were frequent and their meetings continued at a regular pace over the next year and a half.  For example, on December 15, 2017, Howard Willard, William Gifford, and Jay Moore (Senior Vice President of Business Development, Altria Client Services) met with the Project Tree investors (Defendants Pritzker and Valani) again, this time in White Plains, New York at the Andaz 5th Avenue Hotel.

542.     By no later than January 25, 2018, Howard Willard directly involved K.C. Crosthwaite, who had transitioned from Altria Client Services to become President and CEO of Defendant Philip Morris USA, in the negotiations with JLI.  For example, on January 25, 2018, Howard Willard sent a presentation about "Project Tree" (Altria's investment in JLI) to K.C. Crosthwaite, and the two men agreed to discuss the matter the next morning.  By June 2018, Crosthwaite would be rewarded through a promotion to Senior Vice President, Chief Strategy & Growth Officer for both Altria Client Services and Altria Group, Inc. and would assist Willard in quarterbacking the JLI deal.

543.     Altria and Altria Client Services and Pritzker and Valani continued their correspondence between December 2017 and July 2018.  An internal Altria Client Services presentation references a letter Altria received regarding the proposed deal in April 2018.  On April 13, 2018, Howard Willard sent an email to Nicholas Pritzker, Riaz Valani, and JLI's then-CEO Kevin Burns, "getting back to you" and requesting a call "early next week" in which Altria would share its plans for a "win/win partnership that enables us to fully collaborate" and to

COMPLAINT
CASE NO. 19-MD-02913-WHO

"deliver maximum value in the long run."  Altria also wanted to discuss the "critical item[]" of "strategy alignment and chemistry between our respective operating teams in supportive [sic] of a productive partnership that can create substantial value."  Prior to this call, Pritzker, Valani, and Burns on the one hand and Altria (and/or Altria Client Services) on the other shared "volume forecast for [JLI's] business."  The call between Willard, Pritzker, Valani, and Burns took place on April 16, 2018, prior to which Willard sent the JLI parties a "Payment Structure Proposal" and noted that legal counsel need to "connect to assess antitrust risk."  The Payment Structure Proposal provided various scenarios for a potential 50.1% investment by Altria in JLI, each of which contemplated billions of dollars in "Investor Value" for JLI's investors (i.e., the Management Defendants).  Valani forwarded this document to attorney Jorge A. del Calvo at Pillsbury Winthrop Shaw Pittman LLP who then forwarded the document to Defendants Adam Bowen and James Monsees.

544.    Willard followed up on this call with a May 3, 2018 Proposal Letter to Pritzker, Valani, and Burns.  The Proposal Letter also contemplated a 50.1% investment that contemplated majority of payment to be made after antitrust approval and a separate "earn-out payment" of "up to $3.5 billion" to the "selling JUUL shareholders"; Willard described the valuation as "compelling to your investors, particularly taking into account the substantial regulatory and legal contingencies relating to eVapor generally and JUUL products specifically."  Notably, Willard wrote that Altria was "open to discussing the exact terms of [the earn-out] payment **but prefer to discuss it in person.**"  The letter goes on to further state that Altria was "prepared to discuss offering a series of liquidity events for the current JUUL investors with respect to their residual 49.9% ownership interest."  This letter is yet another example of the ways in which Altria sought to influence Pritzker and Valani and indirectly control JLI, with the promise of a multi-billion dollar payment if they were to get JLI to go along with an Altria investment.

COMPLAINT
CASE NO. 19-MD-02913-WHO

Willard emphasized that they were aligned on a "strategic vision as to how to grow the JUUL business rapidly."  Altria sought to control the JLI business, with Willard writing that "we would require that, following the first two payments outlined above, Altria (a) owns a majority of the JUUL equity and voting rights and (b) **has the right to control generally the JUUL business**."

545.    Altria and Altria Client Services viewed these meetings, and Valani in particular, as a "back-channel" to communicate with the decision-makers behind JLI—i.e., the Management Defendants.  In a presentation by Altria Client Services in June 2018 to Altria Management regarding preparations for a July 13, 2018 meeting with Pritzker and Valani, Altria Client Services considered a "[b]ack-channel with Riaz and / or [Goldman Sachs] in advance of meeting."

546.    Altria and Altria Client Services were pursuing this "back-channel" even though the lawyers for JLI and Altria had grown concerned over Pritzker and Valani's roles in the negotiations.  On April 26, 2018, Pritzker sent an email to Howard Willard, copying Valani, regarding a "standstill" in the negotiations. Pritzker wrote:

> [O]ur lawyers are apparently at a standstill over the standstill (in the NDA). I understand that you want the continuing right to talk to Riaz and me. That's just fine, and we are both happy to talk to y'all any time, but it needs to be limited to in our capacity as directors: we need to avoid any appearance of conflict. I can't imagine this makes a difference. If not, can you intercede so we can get this going, and if so perhaps you could give us a call to explain.

This email makes clear that Willard wanted unfettered access to his back-channel of Pritzker and Valani, and that Altria and Altria Client Services had not been communicating with Pritzker and Valani "in [their] capacity as directors."  Again, Altria and Altria Client Services were appealing to Pritzker and Valani's personal financial interest, which inevitably affected the actions they took as directors of JLI.

COMPLAINT
CASE NO. 19-MD-02913-WHO

547.    Howard Willard responded that he conveyed "our joint view" to Altria's counsel and then suggested a meeting on May 6, 2018 involving lawyers for both sides.  Willard also set up a separate dinner or breakfast for himself and Pritzker.  Valani was not available on this date, so the meeting was rescheduled, and the back-channeling continued.

548.    The parties met again in July 2018.  According to the June 2018 presentation by Altria Client Services, at the July 13, 2018 meeting with Pritzker and Valani, Altria and Altria Client Services planned to push for a deal in which Altria would be able to "appoint[] majority of board" of JLI and have control of "board decisions by majority vote (including hiring/removal of CEO)."  Altria was planning on structuring part of its payment for its ownership in JLI to include a separate "PMTA payment" of "$1 - $3 Billion" which Altria Client Services conceded was, in part "to compensate Tree [JLI] investors for potential upside in the business."

549.    The same presentation revealed that Altria or Altria Client Services was planning on engaging with JLI regarding its "Youth vaping prevention plan" by August 10, 2018, with Altria or Altria Client Services preparing its own plan for JLI.

550.    The July 13, 2018 meeting was attended by Howard Willard, Billy Gifford, and K.C. Crosthwaite.

551.    At some point after negotiations had been ongoing between Altria, Altria Client Services, Pritzker, and Valani, Kevin Burns, then-CEO of JLI, joined the negotiations.  By this point, Pritzker and Valani had already pushed Altria and Altria Client Services to offer terms highly favorable to the individual investors in JLI, regardless of the true benefit to the company. And by virtue of their control of JLI, the Management Defendants ensured that Kevin Burns went along with the deal.

552.    On August 1, 2018, Pritzker, Valani, and Burns met with Howard Willard and William Gifford at the Park Hyatt Hotel in Washington, D.C. to further discuss the terms of an

COMPLAINT
CASE NO. 19-MD-02913-WHO

impending deal.  Following this meeting, Valani and Pritzker were working the machinery of JLI to obtain the information that Altria needed to consummate their deal.  On August 7, 2018, Tim Danaher (CFO of JLI) sent Burns, Valani, and Pritzker a "Summary Cap Table," which Burns forwarded to Howard Willard with a comment that he would "call you tomorrow."  Howard Willard forwarded this email to K.C. Crosthwaite, who at this point was intimately involved at the negotiations between Altria, Pritzker, and Valani.

553.    Around this time, K.C. Crosthwaite also made explicit Altria's goal to influence and control JLI.  In a presentation by Crosthwaite to Altria Group, Inc. at the Board of Directors' Strategy Session on August 22, 2018, Crosthwaite indicated that Altria should keep pursuing their "strategic investment in JUUL" because it would give Altria "[s]ignificant ownership and influence in U.S. e-vapor leader."  This presentation reveals that Altria sought to require JLI to seek "Altria approval" of its "Youth vaping prevention plan."

554.    The negotiations between JLI, Altria, and Altria Client Services continued full steam from August 2018 through the announcement of the investment in December 2018.  In an August 14, 2018 email from Nicholas Pritzker to Howard Willard and Billy Gifford, copying Kevin Burns and Valani, Pritzker wrote that "Riaz [Valani] met with Dinny [Devitre, Altria Group Board of Directors, Chair of Finance Committee] and that the two of you and maybe Dinny as well may be interested in meeting with us in San Francisco this Saturday."  Willard responded that he, Billy Gifford, K.C. Crosthwaite, and Dinny Devitre would attend the meeting. Pritzker responded that lawyers should attend, though Kevin Burns emailed him separately that he "wouldn't add lawyers to the meeting but would put them in back rooms for support," and that it "[l]ooks like we are a go pending Riaz's meeting today."  In advance of the Saturday meeting, Willard set up a separate call with Nicholas Pritzker to discuss the remaining negotiating points.  Burns and Valani were aware of, and possibly included in, this call.  So, in

COMPLAINT
CASE NO. 19-MD-02913-WHO

August 2018, information was being exchanged between Altria and Altria Client Services and JLI at a rapid pace, and numerous meetings between Valani, Pritzker, and Altria and/or Altria Client Services were taking place.

555.    On October 25, 2018, Howard Willard, Billy Gifford, KC Crosthwaite, and Murray Garnick participated in a call with Pritzker, and possibly Valani and Kevin Burns, to discuss the ongoing negotiations.  Pritzker, Valani, and Burns also met privately with Howard Willard and other Altria (and Altria Client Services) executives on October 28, 2018 for a dinner at Dinny Devitre's home to discuss the deal, while sending their lawyers to a separate meeting that same night.

556.    Also on October 25, 2018, the day Altria and Pritzker, Valani, and Burns held a call to discuss the deal, Howard Willard shared with Pritzker and Valani the letter that Altria had sent to the FDA, which was a key part of the Management Defendant's and Altria's scheme to deceive regulators and keep youth-appealing Mint JUULpods on the market long after other flavors were removed, as set forth below.

557.    Over the following six weeks prior to the announcement of Altria's investment in JLI, K.C. Crosthwaite became even more hands on, leading the aggressive diligence efforts on behalf of Altria and Altria Client Services.  On October 30, 2018, K.C. Crosthwaite sent JLI a preliminary diligence list which requested a list of all material intellectual property, including all patents (which, notably, would have included the '895 patent revealing that JLI's nicotine content was misrepresented to the public; of course, Altria already knew this because it had undertaken its own testing of the nicotine strength of JUULpods, as set forth above).  It also included requests for "materials related to underage use prevention, underage product appeal, and underage use."  JLI agreed to produce this information by November 9, 2018.  Crosthwaite

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2

and Kevin Burns, as well as others from Altria, Altria Client Services, and JLI, held a call to

discuss these diligence requests on November 2, 2018.

3

4

5

6

7

8

9

558.    By this point, Pritzker and Valani had brought in other senior leadership of JLI to

get the deal across the finish line. Kevin Burns, Tim Danaher, Bob Robbins (President, JUUL

Americas), Jerry Masoudi (Chief Legal Officer), Mark Jones (Associate General Counsel),

Ashley Gould, and Defendants Bowen and Monsees attended meetings with Altria and Altria

Client Services from November 15, 2018 through November 17, 2018.  As set forth below, the

deal was finally consummated—and Pritzker, Valani, Huh, Bowen, and Monsees handsomely

rewarded—in December 2018.

10

11

### 3.   Altria Participated in and Directed the Fraudulent Acts of JLI Designed to Protect the Youth Market for JUUL

12

#### a.   Altria Participated in and Directed JLI's *Make the Switch* Campaign.

13

14

15

559.    Altria did not simply take in information regarding JLI's youth sales passively

while it pursued ownership of JLI.  It also worked to ensure that the Management Defendants

would take steps to continue JUUL's exponential sales growth and to stave off any regulation

that might hinder that growth.

16

17

18

19

20

21

22

23

560.    Specifically, Altria worked behind the scenes to bolster JLI's public narrative

claiming that JUUL was a cessation device intended for adult smokers.  Well before JLI

launched the *Make the Switch* campaign in January 2019, Altria was pushing the narrative that e-

vapor products could help adult smokers "switch" off of combustible cigarettes.  In an October

25, 2018 letter from Howard Willard to the FDA—sent while Altria was finalizing the terms of

its deal with Pritzker, Valani, and Burns—Willard touted that "We believe e-vapor products

present an **important opportunity to adult smokers to switch from combustible cigarettes**."

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

As noted below, Howard Willard shared this letter with Pritzker and Valani the same day he sent it to the FDA.

561.    Moreover, Altria's partners within JLI—Valani and Pritzker—were involved in reviewing and approving the Make the Switch Campaign, allowing Altria to influence the marketing efforts of JLI.  For example, on December 27, 2018, Kevin Burns forwarded an email from Chelsea Kania to Pritzker and Valani with "assets for the [*Make the Switch*] campaign including 20/60 radio spots and 30/60 tv spots," and the next day Valani directed which videos should be aired as part of the campaign.

### b.  Altria Participated in and Directed JLI's Fraudulent Scheme to Keep Mint on the Market.

562.    Altria and Altria Client Services also came to the bargaining table with Pritzker and Valani armed with important knowledge – that flavors would be crucial to JLI's continued ability to target and sell to youth users and wanting to ensure JLI proactively and fraudulently protect those flavors.

563.    Within weeks of the FDA's July 2017 notice of proposed rulemaking (ANPR) regarding ENDS flavor regulations, Gal Cohen proposed that JLI and others "build a coalition and common agenda to influence or challenge FDA's approach" to regulating flavors. Foreshadowing their joint effort to portray Mint as a traditional tobacco or menthol flavor (as opposed to a flavor that appealed to kids), Cohen asked whether Altria and JLI might respond to the FDA with "a common approach and understanding," and asked if the companies might find "a damage limitation option" concerning the regulation of ENDS flavors.

564.    Ashley Gould, copying Adam Bowen, responded that the "Consensus seems to be there is a value in participating in a discussion.  **Less sure that participating in a joint effort to influence FDA makes sense, <u>so please don't commit to that at the meeting</u>**."  In the same

COMPLAINT
CASE NO. 19-MD-02913-WHO

email, Gould seemingly reversed course and gave Cohen the go-ahead to meet with Altria (or Altria Client Services) in pursuit of a damage limitation option "(but maybe best if the group is smaller)."

565.    Cohen attended a September 15, 2017 Global Tobacco Networking Forum (GTNF) industry event with James Xu, CEO of Avail Vapor, and Altria Client Services's Phil Park.  The small group Gould recommended seems to have materialized, as a September 27, 2017 email from Cohen notes that "Clive Bates organized a group that met on Friday with reps from Altria etc. . . . they want to help drive standards definitions."

566.    Through this meeting, Altria knew that JLI would be a good partner because it shared a similar vision of preserving flavors.  Indeed, Altria (or Altria Client Services) went into this meeting with Cohen expecting to find a willing partner on flavors.  As noted above, a May 2017 presentation from Altria Client Services touted that JLI offered "mint, berry, tobacco, and cream varieties" with "[i]ndications of additional flavor pods in potential pipeline."

567.    The following year, 2018, when it became clear that the FDA was increasing scrutiny of the e-vapor industry, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies—which had been made available to Altria and Altria Client Services as part of due diligence for its ultimate investment in JLI—indicated that mint users are not former menthol smokers and that mint pods were as popular with teens as Mango pods.  By fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market, willingly sacrificing other flavors in the process as a purported show of commitment to youth prevention.

COMPLAINT
CASE NO. 19-MD-02913-WHO

568.     Altria's specific fraudulent acts with regard to this fraudulent scheme are detailed further below.

### 4. JLI, the Management Defendants, and Altria Coordinated to Market JUUL in Highly Visible Retail Locations.

569.     JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

570.     A key aspect of this early coordination was Altria's acquisition of shelf space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products.  By acquiring shelf space, Altria took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.

571.     Altria's investment was not for its own e-cigarette products.  Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.  By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.  Yet Altria's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."

572.     In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share.

573.     When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.

COMPLAINT
CASE NO. 19-MD-02913-WHO

574.    Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI.  Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.

**5.    Altria Works with the Management Defendants to Direct JLI's Affairs and Commit Fraud.**

575.    In December 2018, Altria formalized its relationship with JLI's leadership by making a $12.8 billion equity investment in JLI through Altria Group and its wholly owned subsidiary, Altria Enterprises, the largest equity investment in United States history. ███

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████  In turn, Altria and its subsidiaries received millions of loyal teen customers, customers Altria was no longer able to get through the sale of its own cigarette products.  The Management Defendants' payout reflects their active role in JLI's growth, not just a return on their investment.

576.    In July 2018, JLI's valuation was approximately $15 billion.  But, in December 2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months

COMPLAINT
CASE NO. 19-MD-02913-WHO

earlier.  Defendants Monsees, Bowen, Pritzker, Huh, and Valani thus saw the value of their investments in JLI skyrocket as a result of the Altria agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.  This investment further intertwined JLI and Altria.

577.    While Pritzker, Valani, and Altria carefully structured the deal to avoid the appearance of Altria's control of JLI, for fear of drawing regulatory and public scrutiny, the structure does not tell the whole story.  Altria and Altria Client Services had been involved in directing the affairs of JLI indirectly long before its investment, and the Altria Defendants' involvement was even more direct following the investment.  And although Altria took only a 35% share initially, it retained the option to buy JLI outright in 2022.  This promise of a future purchase gave it significant influence over the actions of JLI's leadership—i.e., the Management Defendants, who stood to profit even more handsomely from an ultimate acquisition by Altria.

578.    While JLI and Altria remain separate corporate entities in name, following their equity investment in JLI, the Altria Defendants worked with the Management Defendants, and Pritzker and Valani in particular, to forge even greater significant and systemic links between Altria and JLI, i.e., shared leadership, contractual relationships, financial ties, and continuing coordination of activities with JLI's leadership.  Because Altria and its subsidiaries could no longer market Altria's products to children or lie to adults about the safety, addictiveness, or health effects of its own cigarettes as result of prior tobacco litigation and regulation, Altria took even greater control of JLI in order to accomplish both of these goals through JLI.

COMPLAINT
CASE NO. 19-MD-02913-WHO

### a. Altria Installs Its Own Executives into Leadership Positions to Direct the Affairs of JLI.

579. To exercise its influence and control of JLI, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C. Crosthwaite and Joe Murillo:

a. K.C. Crosthwaite, who was Vice President of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's Mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's and Altria Client Services's Chief Growth Officer and played a major role in Altria's investment in JLI, and had experience in the marketing of tobacco products from his time as president of Philip Morris USA.

b. Joe Murillo, who launched the MarkTen e-cigarette line at Altria (as President and General Manager of Nu Mark LLC) and more recently headed regulatory affairs for Altria (as Senior Vice President of Regulatory Affairs of Altria Client Services), is now JLI's chief regulatory officer. A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."

580. As mentioned above, K.C. Crosthwaite played a major role in Altria's investment in JLI. Crosthwaite frequently communicated with Altria Group's senior management about Altria's investment. For example, on January 25, 2018, Altria Group's CEO, Howard Willard sent a presentation about "Project Tree" (Altria's investment in JLI) to K.C. Crosthwaite (who was, at the time, President of Defendant Philip Morris USA) and the two men agreed to discuss the matter the next morning. Crosthwaite (who, at the time, had transitioned to his role as Senior Vice President and Chief Growth Officer of Altria Client Services and Altria Group) was also listed as one of three "meeting participants," along with Willard and Altria Group's CFO, Gifford, for a July 13, 2018 meeting with JLI's leadership about the deal between Altria and JLI. In addition, Crosthwaite led Altria Group's due diligence efforts, signed the investment

COMPLAINT
CASE NO. 19-MD-02913-WHO

exclusivity agreement on behalf of Altria Group shortly before the deal was publicly announced and was listed as the Altria point of contact for any "notices, requests and other communications" regarding the Services Agreement between Altria Group and JLI.

581.    While working on this investment, Altria, and Crosthwaite himself, discussed their goal to influence and control JLI.  For example, in a presentation by Crosthwaite to Altria Group, Inc., at the Board of Directors' Strategy Session on August 22, 2018, Crosthwaite indicated that Altria should keep pursuing their "strategic investment in JUUL" because it would give Altria "[s]ignificant ownership and influence in U.S. e-vapor leader."

582.    After the deal was official, in January 2019, Altria appointed Crosthwaite to the JLI Board of Directors.  Crosthwaite was required to be a non-voting observer until the FTC gave the Altria investment in JLI clearance, which has yet to occur.  Altria planned to use this role to help guide JLI.  According to Crosthwaite, Altria was focusing on "ensur[ing] JUUL maintains long-term leadership in global E-vapor by leveraging Altria's best-in-class infrastructure and providing guidance through board participation."

583.    However, despite his now official role, Crosthwaite continued to meet privately with Pritzker and Valani.  For example, on January 16, 2019, Pritzker asked Crosthwaite if he would meet with Valani and Pritzker after the JUUL Board meeting later that month. Crosthwaite promptly reported back to Willard that he "agreed to have dinner with Nick and Riaz on the 31st after the JUUL BOD meeting."

584.    Crosthwaite continued to be involved in meetings between Altria and the Management Defendants as his time as an "observer" on the JLI Board went on.  On March 26, 2019, Willard, Gifford, Crosthwaite, and a few other Altria employees flew to San Francisco to attend a dinner with the JLI leadership, including Bowen, Monsees, Pritzker, Valani, and others.

COMPLAINT
CASE NO. 19-MD-02913-WHO

After the dinner, Pritzker emailed Willard, Gifford, and Crosthwaite, telling them that "[w]e truly appreciate our partnership, and look forward to an even deeper collaboration in the future."

585.    To facilitate that "deeper collaboration" and its control of JLI, Altria decided to install one of its own career executives, Crosthwaite, as the head of JLI.  In furtherance of that goal, in April 2019, Howard Willard told Pritzker that he believed JLI would benefit from "a new direction."  That same month, Pritzker invited Crosthwaite to Pritzker's house in San Francisco for a weekend visit.  During this visit, according to JLI, Crosthwaite expressed concerns about JLI's leadership's ability to guide JLI, and Pritzker and Crosthwaite discussed Crosthwaite potentially joining JLI in some capacity.

586.    As the summer approached, JLI admits that "various Board members" continued to communicate with Crosthwaite and that "the Board valued his perspective on JLI's business," in other words, Altria's perspective on JLI's business.  In his discussions with the Board, Crosthwaite continued to express a view that JLI would benefit from a change in leadership.

587.    While Altria had not yet officially installed Crosthwaite as JLI's CEO, that did not prevent them from giving JLI's leadership, and specifically Pritzker and Valani, advice and direction about how to run the company.  On May 26, 2019, Pritzker emailed Willard and asked whether he was "coming to the youth/PMTA meeting in DC June 14" and "[i]f so, do you think we can find a time for you, Riaz, and I to get together separately?"  Willard responded "Yes and yes. We can arrange the plan next week."

588.    Similarly, on July 9, 2019, Willard emailed Valani, Pritzker, and JLI's then-CEO Kevin Burns and cc'd Crosthwaite giving JLI advice and feedback on their "Youth Vaping Prevention Plan."  Willard stated that the "plan represents a modest improvement rather than an impressive 'new day.'"  Willard also gave them advice and direction, telling them to "[k]eep

COMPLAINT
CASE NO. 19-MD-02913-WHO

working on it, but do not make a big announcement at this time" but that their proposed "internal changes sound reasonable and appropriate."

589.    In June 2019, Howard Willard spoke to Pritzker and Valani again, along with Frankel (who "[s]erves as Mr. Valani's second board seat"). Willard reiterated that he believed JLI would be benefit from a new direction. Willard conveyed explicitly that "JLI could benefit from Mr. Crosthwaite's leadership." Willard "expressed his view that Mr. Crosthwaite's unique experience would make him a strong leader for JLI."

590.    After this conversation, on July 22, 2019, a draft press release was created and sent to Crosthwaite announcing Crosthwaite as JLI's new CEO. The draft press release states that Crosthwaite was "most recently a JUUL Board Advisor" and includes a quote from Defendant Monsees, explaining that "Adam [Bowen] and [Monsees] . . . have had the pleasure of getting to know K.C. through our partnership with Altria and have already benefitted tremendously from his strategic insights as a Board observer." This document was sent to Crosthwaite by Carina Davidson, the President of communications firm Abernathy MacGregor, with whom Altria works regularly. Crosthwaite reviewed the document and discussed it with Davidson, including asking her to "tone down the language re: Kevin" Burns, JLI's then-CEO, who Crosthwaite would be replacing.

591.    On August 23, 2019, Valani met with Crosthwaite again to discuss "business and non-business topics."

592.    Throughout the month of September, Defendant Valani and Defendant Pritzker continued to meet with Altria about Crosthwaite taking over leadership of JLI. For example, on September 11, 2019, Valani and Pritzker spoke with Willard about "the challenges facing JLI" and Willard "expressed concern about Mr. Burns' [JLI's then-CEO] leadership" and "expressed his opinion that JLI would benefit from a new direction." As mentioned above, Willard had

COMPLAINT
CASE NO. 19-MD-02913-WHO

previously suggested Crosthwaite be installed in a leadership role.  Four days later, on September 15, 2019, Crosthwaite met with Valani and Frankel "to further discuss the possibility of Mr. Crosthwaite joining JLI."  During this meeting Crosthwaite told Valani and Frankel that he also wanted them to consider hiring Joe Murillo, then the head of regulatory affairs for Altria, as Chief Regulatory Officer for JLI.

593.    On September 17, 2019, Valani met with Crosthwaite in New York to further discuss Crosthwaite taking over as the formal leader of JLI. Valani and Frankel met with Crosthwaite again on September 18, 2019, in New York. On September 19, 2019, Bowen, Monsees, Pritzker, and Valani met with Crosthwaite for dinner in San Francisco.  On September 20, 2019, Pritzker and Valani met with Crosthwaite again in San Francisco to discuss the details of Crosthwaite's leadership role.

594.    On September 22, 2019, Pritzker, Valani, and Frankel spoke to Crosthwaite over the phone about taking over leadership at JLI. Crosthwaite continued to express the view that JLI would benefit from leadership changes and reiterated his view that JLI should hire Murillo, should Crosthwaite join JLI.  While Crosthwaite expressed some doubts about his position, the parties agreed to continue to discuss the matter.  Ultimately, the Board met that day and resolved to offer Crosthwaite a leadership position at JLI.

595.    On September 24, 2019, JLI's Board of Directors voted to accept the resignation of current JLI CEO Kevin Burns, approve Crosthwaite's appointment as CEO of JLI, and appoint him to the Board.  That same day, Crosthwaite told "JLI to begin preparations on an offer of employment for Murillo."

596.    Crosthwaite formally took over as CEO of JLI on September 25, 2019.  Murillo accepted a position as JLI's Chief Regulatory Officer on September 29, 2019 and began work on October 7, 2019.  Altria's plan was a success.

COMPLAINT
CASE NO. 19-MD-02913-WHO

**b. Altria Furthered the JLI Enterprise by Participating in and Directing the Marketing and Distribution of JUUL Products.**

597. In addition to installing its own executives as senior leadership at JLI, after their investment, the Altria Defendants worked with JLI's leadership to assist JUUL's growth through marketing and distribution, despite knowledge that JUUL's growth was based on selling to minors and lying to adults about JUUL products. The Altria Defendants helped JUUL thrive in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs." This included, among other things:

    a. "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

    b. "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

    c. "Executing direct mail and email campaigns and related activities. . . ."

    d. "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

    e. "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."

598. In an attempt to legitimize their support of JUUL's growth and despite public and regulatory concern, the Altria Defendants entered into a number of formal agreements with JLI. These agreements included collaboration with Defendants Altria Group Distribution Company, Altria Client Services, and Philip Morris USA, each known in the agreement as "the Altria Company." Each agreement listed Altria Group, Inc. as the "Provider" and was managed by Theodore J. Edlich IV of Altria Client Services as the "Provider Manager."

599. In each agreement, JLI agreed to "cooperate fully with the Altria Company in its performance of the Services, including without limitation, by timely providing all information,

materials, resources, decisions, and access to personnel and facilities necessary for the proper

performance of the Services by the Altria Company."

600.    In exchange, Altria Group Distribution Company agreed to distribute and sell

JUUL products across the country, greatly expanding JUUL's retail footprint.  While JUUL

products have typically been sold in 90,000 U.S. retail outlets, Altria's products reach 230,000

U.S. outlets.  Altria Group Distribution Company also brings its logistics and distribution

experience (although, after increasing public scrutiny, Altria announced on January 30, 2020 that

it would limit its support to regulatory efforts beginning in March 2020).

601.    Specifically, AGDC agreed to:

   a.  Market JUUL products in 1,073 Speedway stores initially, followed by
       a second wave of 1,937 stores, provide key account assistance and field
       sales force management, and install Point of Sale materials for JUUL
       products;

   b.  Sell and execute pre-books/pre-orders for JUUL products for 83 Chain
       accounts and up to 51 distributors;

   c.  Provide territory sales management, key retail account assistance, and
       field sales force management to perform a "full reset" (including
       merchandising JUUL products to replace Nu Mark products and installing
       JUUL graphics and other marketing materials) in up to 40,399 stores,
       including Circle K, 7-Eleven, Chevron, Sheetz, Speedway, Wawa, Giant
       Eagle, Walmart, and many more;

   d.  Provide sales support at 77,806 stores by improving out of stock and
       distribution gaps, providing labor and Field Sales Force services to handle
       merchandising, account management, tracking insights, and conduct
       inventory management;

   e.  Conduct supply chain management for distribution of JUUL products, as
       well as line haul freight, public warehouse storage in San Bernardino,
       CA, last mile fright to customers, and shipping to distributions (including
       Circle K, Core Mark, and McLane) in Nevada, Arizona, and California;

   f.  Provide distribution assistance, including freight from DCL to Richmond,
       Virginia and warehouse storage and handling of JUUL products;

COMPLAINT
CASE NO. 19-MD-02913-WHO

g.  Provide sales support for JUUL products including working in tens of thousands of stores number of stores to provide insights and conduct surveys, update and install point of sale marketing, address "inventory opportunities," including out of stock issues and distribution gaps, check prices and advertising the price in the store, and selling in new initiatives at the headquarters or store level, including new product launches, fixture merchandising, and training store personnel, and store and ship JUUL point-of-sale materials to support JUUL sales;

h.  Bring JLI into Altria Group Distribution Company's Retail Council in June 2019, including giving opening remarks, three breakout group sessions, and a trade show booth; and

i.  Distribute JUUL products and provide supply chain management for distribution to Arizona, California, Hawaii, Nevada, Texas, Louisiana, and Oklahoma (including line haul freight, public warehouse storage and handling in San Bernardino, California and Fort Worth, Texas, and last mile freight to customers).

602.  Through these distribution services, Altria Group Distribution Services and Altria Client Services (as the "Provider Manager") used the mail and wires to transmit JUUL collateral and packaging that contained the false representation that a single JUULpod was equivalent to a pack of cigarettes.  A representation which, as discussed above, Altria and Altria Client Services knew was false.

603.  Altria Group Distribution Company also worked to sell Mint JUUL products in particular.  For example, Altria Group Distribution Company led a "market blitz" for JUUL products starting in February 2019.  As part of this blitz effort, JLI employees recognized that "Mint growth is huge – may need double space for certain SKUs to avoid out of stock situations," but that "sales are low" for Classic Tobacco.

604.  Similarly, a March 18, 2019 AGDC presentation of its work to sell JUUL showed that it was pushing Mint more than Menthol and Virginia Tobacco combined.  The re-order form for 7-Eleven included seven choices, four of which were for Mint JUULpods.  In the

COMPLAINT
CASE NO. 19-MD-02913-WHO

presentation, AGDC also indicated that Mint was flying off the shelves and that the Mint 5% 4-pack in particular was out of stock 25% of the time.

605.    Crosthwaite, when he was still formally working for Altria and Altria Client Services, was directly involved in supervising the distribution of JUUL products, including Mint. For example, a senior director at Altria Group Distribution Company notified Crosthwaite that certain JUUL products, including Mint 5% JUULpods, were experiencing "inventory constraints" which "may be relevant to [Crosthwaite's] conversation with Kevin Burns," JLI's then-CEO.  Crosthwaite forwarded the email to Burns, asking him "Assume your guys are all over this?"

606.    AGDC's work was effective.  When listing JUUL Performance Results in March 2019, AGDC included a quote from "Alex Cantwel, VP JUUL Strategy" reporting "We just had our largest refill kit order in history. Thank you and your team for all the work."

607.    Altria Client Services, for its part, not only served as the "provider manager" for each of the formal agreements between JLI and various "Altria Compan[ies]", but also agreed to work with JLI's regulatory affairs employees on the PMTA application for JUUL and directly market JUUL to millions of customers.

608.    For example, to assist with PMTA, ACS agreed to:

a. Study JUUL products, including conducting pre-clinical (chemistry, toxicology and biological sciences), clinical, aerosol, modeling and simulation, sensory and population research (perception, behavior, population modeling, consumer research and post-market surveillance) and assist with JLI's regulatory affairs problems by providing with strategy and engagement, regulatory intelligence and insight, advocacy and regulatory narrative writing and submissions;

b. Study and consult with JLI for examination of consumer perception, behavior, and intentions relating to JUUL products, such as whether consumers comprehend JUUL's e-vapor communications (instructions for use, labeling and safety warning) and the impact of exposure to JUUL

COMPLAINT
CASE NO. 19-MD-02913-WHO

promotional materials among users and on users on, the likelihood of switching, dual use, initiation, and cessation of tobacco products, appeal of JUUL, absolute risk perceptions associated with use of JUUL, risk perceptions relative to other tobacco products, NRTs and quitting, and general harm perceptions associated with the use of JUUL;

c. Study and consult with JLI on preclinical in vivo inhalation exposure of JLI's 1.7% Glacial Mint flavor product and its effect on rats;

d. Study and consult with JLI on chemical profiling analysis of Golden Tobacco, Virginia Tobacco, Mango, Mint, and Menthol JUUL products in 1.7, 3, and 5 nicotine strength; and

e. Study and consult with JLI on population modeling, including on assessing the population health impact to the U.S. population with the introduction of JUUL products, focusing on tobacco use prevalence and all-cause mortality;

f. Conduct JUUL topical literature reviews relating to e-vapor products, including collecting and summarizing these articles into a literature review summaries and create evidence tables on information about initiation, cessation, relapse, patterns of use, abuse liability, gateway, perceptions, chemistry, and health effects topics;

g. Develop, execute, and document exposure characterization for JUUL's classic tobacco product;

h. Study and consult with JLI on passive vaping modeling, including modeling of second and third hand exposures to e-vapor and cigarette smoke aerosols; and

i. Provide access to and use of Altria's product testing services, including its Smoking Machine Vitrocell 1/7, Vitrocell 24/28 system, and Vitrocell Ames 48 System.

609. Altria Client Services also marketed JUUL products by sending out mailers, emails, and coupons to millions of people across the United States. For example, ACS agreed to:

a. Work with JLI to develop the final creative design for direct mail campaigns, execute the plans, and mail the JUUL advertisements and coupons to 1.5 million people in March 2019, 1 million people in May 2019, 2.5 million people in September 2019, and 3.8 million people in December 2019;

b. Work with JLI to develop the final creative design for an email campaign and send out direct marketing via email, including three email campaigns with a combined total audience of 515,000, including coupons of JUUL.

COMPLAINT
CASE NO. 19-MD-02913-WHO

610.     Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes.  As memorialized in an agreement between Philip Morris USA, Inc., and JLI, "the Altria Company" worked with JLI to design inserts to put in Altria's cigarettes and eventually distributed coupons for JUUL starter kits in 20 million packs of L&M and Parliament brand cigarettes and 30 million packs of Marlboro cigarettes:



611.     Both the inserts distributed by Philip Morris and the mail and email advertisements sent by Altria Client Services were advertisements for JLI's fraudulent *Make the Switch* campaign described above.

612.     In order to help JUUL expand and be able to keep selling to kids and lying to adults, Altria and Altria Client Services also directed JLI in combatting legal and regulatory challenges, helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure.  For example, in 2019, internal documents from Altria Client Services confirm that the Altria Defendants were engaged in ongoing efforts to provide "services and insight to accelerate JUUL's U.S. performance" and "actively engage FDA and other stakeholders to address youth vaping."

COMPLAINT
CASE NO. 19-MD-02913-WHO

613.    Altria also brings lobbying muscle to the table, which worked to prevent new federal or state legislation targeting JUUL or the e-cigarette category more broadly.  Altria "has a potent lobbying network in Washington [D.C.] and around the country."  Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."  While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts.  Crosthwaite admitted internally that Altria would be "collaborat[ing] on regulatory matters" with JLI (likely through Altria Client Services).  And Altria installed Joe Murillo, then the head of regulatory affairs for Altria and a 24-year Altria veteran with extensive experience in e-cigarette regulations, as Chief Regulatory Officer for JLI.  Indeed, since Altria worked with the Management Defendants to assume some control over JLI, JLI's spending on lobbying has risen significantly.  JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.

614.    Contrary to public statements, Altria's investment in JLI was not only a financial contribution nor were these agreements about just "services"; rather, they were manifestations of Altria's and the Management Defendants' plan to continue selling JUUL to kids and lying to adults about JUUL products, all while staving off regulation and public outcry.  Internal documents show that Altria did not consider itself a mere non-voting minority investor or service provider.  Instead, it viewed itself as JLI's "valued partner" and wanted to ensure it could "completely unlock partnership benefits," "guide [JLI's] strategic direction through board engagement," including "providing strategic advice and expertise," and "collaborate on youth vaping."  According to an Altria Group Distribution Company presentation, AGDC should be "viewed as more than a vendor but as a strategic partner in supporting JUUL's mission."

COMPLAINT
CASE NO. 19-MD-02913-WHO

615.    The Altria Defendants' services agreements with JLI obscured Altria's takeover of large portions of JUUL's distribution and marketing.  Altria's goal was always to expand the reach and sales of JUUL products, despite the knowledge of their lies and youth targeting. According to the Altria Client Services employees working with KC Crosthwaite on summarizing Altria Group's 2019 "Strategic Initiatives", Altria Group's CEO Howard Willard "investment thesis from the beginning" was that Altria could accelerate JUUL growth "as it gains more prominent shelf space" and "category management."  And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses.  This is not just any shelf space; it is space near Altria's (Philip Morris USA's) blockbuster Marlboro cigarettes and other premium products and retail displays.  The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

616.    Altria's investment and the Altria Defendants' collaboration with the Management Defendants was not just about investing in a legitimate business or selling to adult smokers.  Instead, Altria used its relationship with the Management Defendants and with JLI to continue selling to youth and lying to the public, just as it had done in the past.  Despite its knowledge of JUUL's youth targeting, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."  Altria sought to achieve this goal through "strategic guidance," "board influence," and marketing and distribution assistance.  And with the help of the Management Defendants, and Pritzker and Valani in particular, the Altria Defendants have successfully ensured that JUUL would maintain and expand its market share—a market share that, based on Altria's own October 25, 2018 letter to

COMPLAINT
CASE NO. 19-MD-02913-WHO

the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**G.    JLI, Altria, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis.**

617.    Defendants' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

618.    Defendants' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children would believe JUULing was a cool, fun, and safe activity.

619.    To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

**1.    Defendants' Scheme Caused Consumers to be Misled into Believing that JUUL was Safe and Healthy.**

620.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.

621.    Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine.  Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.

COMPLAINT
CASE NO. 19-MD-02913-WHO

622.     Similarly, in 2018, a literature review of seventy-two articles published in the International Journal of Environmental Research and Public Health found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.  Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be less harmful than tobacco flavors among adult and youth e-cigarette users.  In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.

623.     In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.

624.     In 2019, a study published in the British Medical Journal Open systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.  Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.  In addition, among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.

**2.     Use of JUUL by Minors Has Skyrocketed**

625.     On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."

626.     The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.  This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

COMPLAINT
CASE NO. 19-MD-02913-WHO

627.     By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly, and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.  As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JUUL as their usual brand.



628.     The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."  Then FDA Commissioner Dr. Gottlieb described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.  The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."  CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."  Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."

COMPLAINT
CASE NO. 19-MD-02913-WHO

629.     Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

630.     The JUUL youth-addiction epidemic spread rapidly across high schools in the United States. J UUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.

631.     In response to the post above, several others reported similar experiences:

> a.   "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."

> b.   "Same thing at my school. JUUL fiend is a term too."

COMPLAINT
CASE NO. 19-MD-02913-WHO

c.   "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."

d.   "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."

e.   "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."

f.   "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'"

g.   "It's the same at my school and just about every other school in Colorado."

h.   "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"

i.   "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."

j.   "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."

k.   "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."

632.   The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic.  While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth.  Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   last date for which data was available), rates of youth e-cigarette use continued to increase,

2   tracking the growth of JUUL.



12   633.    The unique features of the JUUL e-cigarette—high nicotine delivery, low

13   harshness, and easy-to-conceal design—have caused patterns of addiction with no historical

14   precedent.  It is not uncommon for fifteen-year-old students, even those who live at home with

15   their parents, to consume two or more JUULpods a day.

16   634.    The downwards trend in youth smoking that public health departments and school

17   anti-tobacco programs worked so hard to create has completely reversed.  In 2018, more than

18   one in four high school students in the United States reported using a tobacco product in the past

19   thirty days, a dramatic increase from just one year before.  But there was no increase in the use

20   of cigarettes, cigars, or hookahs during that same time period.  There was only increased use in a

21   single tobacco product: e-cigarettes.  While use of all other tobacco products continued to

22   decrease as it had been for decades, e-cigarette use increased 78% in just one year.  This drastic

23   reversal caused the CDC to describe youth e-cigarette use as an "epidemic."

COMPLAINT
CASE NO. 19-MD-02913-WHO

### H. JLI Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products

#### 1. E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.

635.    One of the main reasons e-cigarettes like JUUL were so appealing from an investment and business development perspective is that, unlike combustible cigarettes, e-cigarettes were relatively unregulated.  This regulatory void was not an accident; the cigarette industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and delaying government action.  A 1996 article in the *Yale Law & Policy Review* detailed how cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo any regulatory efforts.

636.    In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (TCA).  The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to regulate tobacco products.

637.    Although the TCA granted the FDA immediate authority to regulate combustible cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including those that had not yet been invented or were not yet popular.  To "deem" a product for regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

638.    The TCA also mandated that all "new" tobacco products (i.e., any product not on the market as of February 15, 2007) undergo a premarket authorization process before they could be sold in the United States.

639.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

- 199 -

COMPLAINT
CASE NO. 19-MD-02913-WHO

640.   Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness.  For example, in comments to the 2014 Proposed Rule, companies such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA [] blatantly ignored evidence that our products improve people's lives."

641.   *The New York Times* reported that Altria was leading the effort to dilute, diminish, or remove e-cigarette regulations.  Notwithstanding Altria's professed concern about flavors attracting youth customers, Altria submitted comments in August 2014 in response to the proposed rule opposing the regulation of flavors.  Altria asserted that restrictions could result in more illicit sales and that adults also liked fruity and sweet e-cigarette flavors.

642.   In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health."  In effect, Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime.  That proposed legislation was endorsed by R.J. Reynolds.  Altria delivered its proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.  Seventy other representatives signed on to Altria's legislation.

643.   The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products.  Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain: that any regulations proposed by the FDA would bankrupt small

COMPLAINT
CASE NO. 19-MD-02913-WHO

businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

644. Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole receiving $10,000 from Altria in the 2015-2016 cycle.

645. By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

646. Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use. Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at the FDA.

647. The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association (AVA), stated that but for the extension, "over 99 percent of vaper products available on the market today would be banned next year." Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story, who had

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2

since become commissioner of the Tobacco Vapor Electronic Cigarette Association, lauded the

decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a no brainer."

3

4

### 2. JLI, the Management Defendants, and Altria Defendants Successfully Shielded the Popular Mint Flavor from Regulation.

5

6

648.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for

7

staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the

market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of

8

JLI's role in the youth e-cigarette epidemic.  These schemes involved acts of mail and wire fraud

with the intent to deceive the FDA, Congress, and the public at large.

9

10

649.    First, JLI, the Management Defendants, and Altria publicly defended mint

11

flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that

mint users are not former menthol smokers.  Second, by fighting to keep mint as the last flavor

12

on the market, the cigarette industry could continue to appeal to non-smokers, including youth.

13

14

JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to

convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the

15

process.

16

650.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral

17

study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other

18

tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").

19

20

651.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study

21

to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had

ever used a JUUL and that only 0.8% of youth had used a JUUL in the last 30 days.  And in stark

22

23

contrast to the McKinsey and DB Research studies discussed above, the Youth Prevalence Study

suggested that mango was four times as popular as mint. Specifically, the study found that 47%

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

of youth who reported use of a JUUL device in the last 30 days professed to using mango most often, with only about 12% reporting the same for mint.

652.    JLI's study was a sham.  JLI, the Management Defendants, and Altria knew their reported data was inconsistent with the McKinsey and DB Research studies conducted just a few months earlier.  JLI's report featured responses to a carefully selected survey question—which single flavor youth used most often?—that obscured the widespread use of mint JUULpods among youth.

653.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released.  Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (i.e., consumed e-cigarettes within the last 30 days).

654.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading.  JLI, the Management Defendants, and Altria knew as much.  Indeed, they counted on it.

655.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI, and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."

656.    As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017, Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to continue marketing mint JUULpods.

COMPLAINT
CASE NO. 19-MD-02913-WHO

657. Defendants' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

658. JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 12, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting and presented to the public on November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical. JLI purported to "share a common goal—preventing youth from initiating on nicotine." As part of this plan, JLI stated that it would be "stopping flavored JUULpod sales to all 90,000+ retail stores."

659. But this statement was not true. JLI was continuing retail sales of its mint JUULpods, which JLI categorized as a non-flavored "tobacco and menthol product." In JLI's Action Plan, then-CEO Burns stated that only products that "mirror what is currently available for combustible cigarettes—tobacco and menthol-based products (menthol and mint pods)—will be sold to retail stores."

660. In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for adult smokers. The image below was included in both the public-facing Action Plan and JLI's presentation to the FDA.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9



10    661.    JLI knew that non-smoking youth liked mint as much as any flavor.

11    662.    Numerous internal studies had informed JLI that mint's success was "not because

12    it's a menthol/a familiar tobacco flavor but because it is the best JUUL flavor profile on multiple

13    levels."  Indeed, despite JLI's attempts to explicitly link mint to menthol, JLI knew there was

14    "No Implied Relationship Between Mint & Menthol," and "menthol smokers are not the only

15    driver behind the popularity of mint flavored JUULpods."

16    663.    Most importantly, JLI knew that mint was the most popular JUULpod.  Though

17    other flavors might draw new customers, JLI's most addictive "flavor" predictably became its

18    most popular.

19    664.    The characterization of mint as an adult tobacco product was also fraudulent

20    because JLI knew firsthand from the McKinsey and DB Research studies that teens viewed mint

21    as favorably as mango, which implies that mango and mint were fungible goods for JLI's

22    underage users.  The McKinsey and DB Research studies also showed that youth preferred mint

23    over the more stereotypically youth-oriented flavors like fruit medley, crème brulée, and

24
25

COMPLAINT
CASE NO. 19-MD-02913-WHO

cucumber.  As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."

665.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic.  Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA.  While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing.  Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors."  Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and Altria, knew this was not true.

666.    That same day—October 25, 2018—Altria continued its deception on an earnings call with investors.  Altria fraudulently described its decision to remove its pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

> We recently met with Commissioner Gottlieb to discuss steps that could be taken to address underage access and use. Consistent with our discussion with the FDA and because we believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.
>
> First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the

COMPLAINT
CASE NO. 19-MD-02913-WHO

youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.

After removing Nu Mark's pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market.

667.    Willard reiterated that "pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.

668.    Willard emphasized that Altria's withdrawal of its own pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward."  He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."  As noted above, however, it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."

669.    Thus, while Altria publicly announced that it would pull its pod-based products to combat youth usage and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits

COMPLAINT
CASE NO. 19-MD-02913-WHO

associated with JLI's mint JUULpods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

670.     In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that Altria Client Services had conducted and presented at a conference that JLI attended.  But Willard did *not* disclose that Altria Client Services's "study" was merely a "quasi-experimental online survey" and not a true scientific study.  Notably, JLI's current CEO, K.C. Crosthwaite, was the Vice President of Strategy and Business Development of Altria Client Services when it conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria and Altria Client Services began their "confidential negotiations."  Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

671.     Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors—from banning JLI's mint JUULpods.

672.     Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1) JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

673.     On October 25, 2018, the same day Howard Willard sent the FDA his letter fraudulently misrepresenting the Mint flavor and Altria's view on pod-based products, Willard provided Pritzker and Valani with a copy of the very same letter.

674.     It is no surprise that Altria was coordinating with Pritzker and Valani on the scheme to protect flavors.  It knew a potential ban on flavors would have a material impact on the ability of JLI to continue its youth sales, and on the value of those sales.  For example, in

COMPLAINT
CASE NO. 19-MD-02913-WHO

November 2018, Crosthwaite asked Brian Blaylock at Altria Client Services to model a scenario for Altria's investment in JLI where the FDA enacts a flavor ban.

675.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers.  This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products.  Altria supported this plan and helped execute it.  Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

676.    The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

677.    By February of 2019, the FDA became aware that it had been deceived by JLI and Altria.  On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] **contradict the commitments you made to the FDA**" in a prior meeting and Willard's October 25, 2018 letter to the FDA.  Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."

678.    The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes."  Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe

COMPLAINT
CASE NO. 19-MD-02913-WHO

these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

679.    JLI and Altria met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."  Gottlieb did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by *The New York Times*, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

> We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.

680.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors *except* "tobacco-, mint- and menthol-flavored products."  He cited the strong support of President Trump (whose administration JLI had aggressively lobbied) and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."

681.    The scheme had succeeded in saving mint JUULpods, as well as each Defendant's bottom line.  JLI's sale of mint JUULpods rose from one third of its sales in September 2018 to approximately two thirds in February 2019.  JLI's 2019 revenues were estimated to be between \$2.36 billion and \$3.4 billion, and mint JUULpods accounted for approximately 75% of JLI's total 2019 sales.  And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny, thousands, if not millions, of underage JUUL users suffered the consequences.

COMPLAINT
CASE NO. 19-MD-02913-WHO

682.     As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."

683.     JLI continues to sell menthol-flavored products.

**3.     In Response to the Public Health Crisis Created by JUUL, the FDA Belatedly Tried to Slow the Epidemic.**

684.     In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL.  In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices.  But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."  In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.

685.     In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect.  However, on May 15, 2019, the lawsuit filed by the American Academy of Pediatrics was successful—the U.S. District Court for the District of Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket authorization applications for all new deemed products" ("new" referred to any product launched after February 15, 2007 and thus would include JUUL) be submitted within ten months, by May 2020.

686.     In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket

COMPLAINT
CASE NO. 19-MD-02913-WHO

Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry, which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of flavored e-cigarette products and prohibiting the targeting of youth and minors.  The 2020 FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint: "[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."

### 4. The Government's Efforts to Address the JUUL Crisis Were Too Late and the Damage Has Already Been Done.

687.    By the time the FDA acted, youth consumption of e-cigarettes had already reached an all-time high, and the e-cigarette industry's presence on social media became an unstoppable force.  The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys of youth cigarette use found that e-cigarette use had reached the highest levels ever recorded.  By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization for lung injury, including over fifty confirmed deaths.  Despite the FDA's efforts between 2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school students over the same period.  In 2019, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.

688.    JLI's presence on social media has also persisted, even without further initiation by JLI—the hallmark of a successful viral marketing campaign.  When the "#juul" hashtag was first used on social media, it was a series of thirteen tweets on Twitter.  By the time JLI announced it would shut down its Instagram account, "#juul" had been featured in over 250,000 posts on Instagram.  A study by Stanford University found that in the eight months after JLI ceased all promotional postings, community posting accelerated to nearly half a million posts.

COMPLAINT
CASE NO. 19-MD-02913-WHO

Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day, that number tripled to 1,084 posts per day after JLI shut down its Instagram account.

689.    The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students.  The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes.  A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram.  By comparison, e-cigarette related hashtags were used as many as 10,000 times more often.  Despite the FDA's social media intervention, the number of e-cigarette related posts and the median number of likes (a strong metric of viewer engagement) the posts received increased three-fold and six-fold, respectively.

690.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine and were sharing e-cigarette related posts on social media on their own.

**I.    JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries**

**1.    JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries.**

691.    The use of e-cigarettes, including JUUL, causes significant lung toxicity and has been implicated in multiple severe pathological lung injuries.

692.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells. An impaired epithelial barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically.  This can lead to acute

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory

2    infections in users of e-cigarettes, including JUUL.

3         693.    Research has also demonstrated that ultrafine metal particles from heating devices

4    have been found in e-cigarette aerosol and in e-cigarette users' lungs.

5         694.    In addition, exposure to JUUL aerosol has been shown to significantly impair

6    endothelial function comparable to impairment of endothelial function caused by use of

7    combustible cigarettes.

8         695.    It is well established that endothelial dysfunction and injury from direct toxic

9    effects of inhalants such as cigarette smoke can cause lung injuries such as chronic obstructive

10   pulmonary disease (COPD), emphysema, asthma, and chronic bronchitis.

11        696.    Recent epidemiological and toxicological studies detected links between asthma

12   frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the

13   same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.

14        697.    A study published in December 2019 found that among individuals who never

15   smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of

16   chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.

17        698.    In addition, the flavoring compounds used in e-cigarettes such as JUUL include

18   numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and

19   benzaldehyde.  These chemicals are linked to serious lung disease.

20        699.    A multitude of published case reports have linked e-cigarette use, including

21   JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis

22   obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity

23   pneumonitis, chemical pneumonitis, and collapsed lungs, among others.

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

700.    In 2012, one article reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers that began when the patient had begun using e-cigarettes.  The authors hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."

701.    A 2014 report described a 20-year-old, previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device.  The patient was diagnosed with acute eosinophilic pneumonia.  The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.

702.    In 2015, Atkins and Drescher reported the case of a 60-year-old man admitted repeatedly with weakness, chills, cough, a fever, and hypoxemia, with "bilateral upper lung zone crackles."  The patient revealed before each emergency room admittance he had used e-cigarettes and was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of e-cigarette use.

703.    In another case in 2015, a 31-year-old woman was admitted to the hospital for dyspnea and cough.  The patient "became increasingly hypoxic and was intubated due to concerns of acute respiratory distress syndrome."  The patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms.  The patient rapidly improved with steroids and cessation of use of e-cigarettes.  A different published a case report in 2015 describes bilateral pneumonia and pleural effusions associated with e-cigarette use.

704.    In 2016, another case report described the case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after

COMPLAINT
CASE NO. 19-MD-02913-WHO

increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence.  The patient worsened and required intubation and mechanical ventilator support.  There were no notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely."

705.    Also in January 2020, another article reported on a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other vaping products. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls.  Subpleural sparing and pneumomediastinum described elsewhere in vaping-associated lung injury were also seen.  The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique.  The images characterized AFOP, a newly evolving rare lung pathology, which is now associated with vaping.

706.    Additional case reports and case series were published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use.  Despite the increasing reports in the published medical literature and the widespread use of JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL products.

707.    Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes.  This prompted a Center for Disease Control (CDC) investigation of an outbreak of vaping associated lung injuries.  The reported injuries mirrored the injuries that had been reported in the medical literature since 2012.  In October 2019, the CDC issued treatment guidelines to assist doctors in clinical practice.  The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

708.     Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis.  Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.

709.     Further, a recent publication in 2020 noted that there were almost 2,000 cases of EVALI at the time it was written.  The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.

710.     Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI who reported the use of nicotine only e-cigarettes.  The authors concluded that EVALI was also associated with nicotine only products.

711.     In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.  Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature.  It often results in acute respiratory failure.  Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.  In 2018, researchers published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.  Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.

COMPLAINT
CASE NO. 19-MD-02913-WHO

712.     The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation, and death.

713.     It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema, and COPD.  Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

714.     The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety.

**2.  JUUL Products Cause Cardiovascular Injuries.**

715.     In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries.  Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks.

716.     Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of strokes and heart attacks.  Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries.

717.     Biological and epidemiologic studies have found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose-

COMPLAINT
CASE NO. 19-MD-02913-WHO

dependent.  Biological investigations support this association, whereby a prothrombotic

phenotype may develop after exposure to nicotine-containing e-cigarette vapors.

718.    Researcher Floridan Rader and others found that chronic e-cigarette users

demonstrated substantially impaired coronary microvascular endothelial function, even more

pronounced than that seen in chronic tobacco cigarette users.  These findings also suggested that

chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not

directly related to nicotine.

719.    Talal Alzahrani found that daily e-cigarette use was associated with an increased

risk of myocardial infarction.

720.    A systematic review of the literature found that acute mainstream exposure to

aerosol from JUUL, or from previous generations of e-cigarettes using free-base nicotine,

impaired vascular function comparably to combusted cigarette smoke and delivered considerably

more nicotine to the blood on a per-puff basis.

721.    The overarching conclusion from dozens of studies published in the past eight

years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury

which can lead to strokes, heart attacks, and death.  JLI never warned the public or consumers of

the serious and significant risk of cardiovascular injuries associated with its products.

**3.  JUUL Products Cause and Contribute to Seizure(s).**

722.    On April 3, 2019, the FDA Center for Tobacco Products issued a Special

Announcement notifying the public of an increase in reports of tobacco-related seizures,

specifically relating to an increase in e-cigarette use, and particularly among youth.

723.    Additionally, FDA Commissioner Gottlieb and the Principal Deputy

Commissioner Amy Abernethy issued a joint statement addressing the FDA's ongoing scientific

investigation of seizures following e-cigarette use as a potential safety issue in youth and young

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   adults.  The statement identifies seizures following e-cigarette use as a source of concern for the

2   FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA

3   "recognize[s] that not all of the cases may be reported" due to their voluntary nature.

4        724.   Symptomatic nicotine toxicity is a consequence of excessive vaping.  As the FDA

5   acknowledges in their statement, "seizures or convulsions are known potential side effects of

6   nicotine toxicity."  It is well documented that nicotine poisoning can cause seizures, including

7   ingestion of e-cigarette fluid.  Nicotine-induced seizure has long been considered a possible side

8   effect of long-term nicotine exposure.  JUUL's high nicotine content and addictive nature cause

9   JUUL users to be highly susceptible to seizures.  Moreover, it has been suggested that the use of

10  e-cigarettes has been associated with an exacerbation of seizures in individuals who are

11  predisposed.

12       725.   Seizures following e-cigarette use are a significant cause for concern due to the

13  unnecessarily high levels of nicotine delivered, by design, via JUUL.  As described herein, JLI

14  intentionally designed its products to deliver a higher amount of nicotine, particularly targeting

15  young people, and then failed to warn of the subsequent risks.  JUUL devices were deliberately

16  designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating

17  the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine

18  exposure.

19       726.   JLI never warned the public or consumers of the risk of seizures associated with

20  the use of e-cigarettes including JUUL.

21       **4.  Animal Studies Demonstrate Carcinogenic Potential of JUUL**

22       727.   Several studies conducted on animals show a significant likelihood that JUUL

23  could cause cancer for users.

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

728.     In 2017, a report by Donatella Canistro and others found that e-cigarettes induce toxicological effects that can raise the risk of cancer.  Similarly, a 2018 study measured the DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor and concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs.  They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).  And in 2019, a report by Moon-shong Tang and others found that exposure to e-cigarette vapor induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.

729.     There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

**J.   JUUL and Indian Tribes**

730.     Smoking rates have continued to remain disproportionately high among American Indians and Alaska Natives.  According to the CDC, "American Indians/Alaska Natives have the highest prevalence of cigarette smoking compared to all other racial/ethnic groups in the United States," but the progress made in recent years in reducing cigarette smoking within the American Indian/Alaska Native population is quickly vanishing due to the explosive increase in the use of JUUL vaping devices.

731.     More than 22% of American Indian and Alaska Native adults currently smoke cigarettes compared to 13.7% of American adults overall.  The reasons for this discrepancy are numerous but are generally attributed to the fact that American Indians "suffer from the effects

1   of historical trauma and stressors in [their] lives, and have problems in the areas of poverty,

2   housing, all of these social determinants of health."

3       732.    E-cigarette use has been and continues to be a growing problem for American

4   Indian youth.  According to National Youth Tobacco Survey data, 16.1% of American Indian

5   and Alaska Native middle school students and 40.4% of American Indian and Alaska Native

6   high school students were current users of e-cigarette products.  This is much higher than the

7   general population rate of 10.5% of middle school students and 27.5% of high school students

8   who use e-cigarette products.

9       733.    Defendants' conduct in conspiring to target AI/AN youth is contrary to 25 C.F.R.

10  § 140.17, which prohibits the sale of "tobacco, cigars, or cigarettes to any Indian under 18 years

11  of age."  Tribes (including those acting through their intertribal health organizations) have an

12  obligation to protect their young members, and the federal prohibition of selling tobacco

13  products and cigarettes to AI/AN youth highlights the federal recognition of the unique adverse

14  situation of tribal youth.

15      734.    JLI has specifically and repeatedly targeted the American Indian population with

16  false and misleading statements about its products.  On February 5, 2020, the United States

17  House of Representatives Subcommittee on Economic and Consumer Policy found that, among

18  other damaging things, "JUUL's targeting of Native American Tribes was more pervasive than

19  initially known."  The Subcommittee "exposed JUUL's pervasive targeting of American Indian

20  children by obtaining testimony about JUUL: (1) presenting to kids in school and falsely

21  claiming that JUUL was 'totally safe'; (2) sponsoring summer camps for kids as young as eight;

22  (3) targeting Native Americans as guinea pigs for its product; (4) targeting other vulnerable

23  populations, including veterans and minority communities; and (5) implementing a vast and

24  sophisticated network of social media influencers . . . ."

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

735.     In particular, the Congressional Subcommittee received testimony from JLI that in a three-month span, between December 2018 and February 2019, it had specifically targeted at least eight Indian Tribes: (i) the Moapa Band of the Paiute Tribe; (ii) the Lummi Nation; (iii) the Nooksack Tribe; (iv) the Cheyenne River Sioux Tribe; (v) the S'Klallam Tribe; (vi) the Chickasaw Nation; (vii) the Muckleshoot Tribe; and (viii) the Kalispel Tribe.  JLI also admitted that it "had contact with representatives from other tribes" relating to its marketing initiatives, but the Subcommittee noted that Juul has "refused to identify those additional tribes or to state how many it contacted."

736.     The Congressional Subcommittee heard testimony that JLI representatives have approached leaders of various Indian Tribes, proposing a program under which tribal members would receive free JUUL vaping devices.  JLI representatives told tribal leaders and members their product was less harmful than cigarettes and that cigarette smokers could switch to JLI's cool electronic vaping devices and cartridges as part of a cigarette-cessation "switching program."  For example, representatives of JLI made multiple claims to the Cheyenne River Sioux Tribe that JUUL is effective for smoking cessation and less harmful than other tobacco products.

737.     Ted Kwong, a spokesperson for JLI, publicly promoted the falsehood that JUUL products could help tribal members switch from combustible cigarettes, saying that "Given the high smoking population among Native Americans, particularly compared to the total U.S. population, the intent of these programs was to provide Native American tribal members who were known smokers (21 years or older) with access to JUUL products, for purchase, to facilitate their switch from combustible use."

738.     Representative Raja Krishnamoorthi (D-IL), Chairman of the Subcommittee, later stated in light of the evidence gathered, "Big Tobacco targeted Native Americans and caused

1    them to have the highest rate of tobacco use in America.  It is disturbing to see [JLI] following in

2    Big Tobacco's footsteps by preying on Native American communities."

3        739.    The effect of JLI's deceptive promotion of a "switching program" is that tribes

4    and other Indian entities have expended resources on ineffective and even harmful programs that

5    could have otherwise been spent reducing tobacco use.  Targeted tribes reasonably relied on

6    JLI's misrepresentations about their products, worsening the e-cigarette epidemic and leading to

7    the injuries described in this Complaint.

8        **K.  Impacts on the Aleutian Pribilof Islands Association, Inc.**

9        740.    APIA has been directly and severely impacted by the e-cigarette epidemic and

10   surge in vaping created by Defendants' misconduct.  Vaping use by members of APIA's service

11   population has reversed their positive trend of decreased cigarette use and nicotine addiction.

12       741.    Defendants' activities have caused members of APIA's service population to

13   become addicted to JUUL products.

14       742.    Defendants' marketing strategy, advertising, and product design directly targets

15   minors, especially teenagers, and has dramatically increased the use of JUUL products amongst

16   youth and underage members of APIA's service population.

17       743.    More and more of APIA's resources are needed to combat these problems now

18   and in the future, leaving a diminished pool of already scarce resources to devote to other

19   healthcare and public health programs.

20       744.    As a direct and proximate result of the conduct of each of the Defendants, and in

21   particular, their pattern of racketeering activity, APIA has been injured in its business and

22   property in multiple ways, including, but not limited to, the diversion of funds derived from

23   tribally owned business enterprises that could otherwise have been fruitfully reinvested in those

24   business enterprises.

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

745.    Because APIA is in an isolated location, it has only limited ability and resources to address urgent priorities, including efforts to stem the vaping epidemic, which has had a particularly harmful impact on the young members of APIA's service population.

746.    APIA's resources have been severely burdened by the nicotine addiction epidemic that Defendants' conduct has created, requiring APIA to expend funds derived from its business activities to address the crisis, when such funds otherwise could have been utilized or reinvested in businesses.  These expenditures therefore constitute an injury to the APIA's business or property.

747.    APIA has been compelled to redirect its limited resources to help combat Defendants' false, deceptive, and misleading marketing scheme, and to educate members of its service population on the true dangers of e-cigarettes.

748.    Even if e-cigarettes were entirely banned today, the young tribal members of APIA's service population would remain addicted because of the powerful kind of nicotine contained in JUUL products.

749.    APIA's actions are necessary, but these measures cannot fully address the existing widespread use of vaping products and resulting nicotine addiction.  Because of the potency of JUUL's nicotine and ease of delivery, widespread use of JUUL products has created a problem of addiction much greater than what APIA can deal with given its current limited resources.

750.    APIA's Tobacco Cessation Services has made presentations to young tribal members on the negative impacts of using e-cigarette.  APIA has conducted significant outreach efforts within its communities and has assisted school districts to develop enhanced e-cigarette prevention policies.

751.    In response to the youth vaping epidemic, APIA has devoted its limited resources to advertise and promote e-cigarette prevention and cessation directed toward young tribal

members to address the youth vaping epidemic, including adding vaping to its prevention programs.

752.    Fully dealing with the harms to APIA caused by Defendants' conduct will require a comprehensive approach.  Without the resources to fund these measures now and in the future such as those described herein, APIA will continue to be severely harmed by the ongoing consequences of Defendants' conduct.

753.    The harm that APIA has suffered and will continue to suffer cannot be addressed by ordinary agency or regulatory action.  There are no rules that the FDA could promulgate or actions that the agency could take that would provide APIA with the relief it seeks in this case.

754.    Regulatory action would not be sufficient to compensate APIA for the money and resources that it has already expended on addressing the impacts of the vaping epidemic and the resources it will need to spend in the future.

755.    The costs that APIA has incurred and will incur in the future in responding to the vaping epidemic and in providing the public services described in this Complaint are recoverable pursuant to the causes of action raised by APIA.  Defendants' misconduct alleged herein is not a series of isolated incidents, but instead involves a sophisticated and complex marketing scheme and related cover-up that has caused a continuing, substantial, and long-term burden on the services provided by APIA.  Additionally, the public nuisance created by Defendants and APIA's requested relief in seeking abatement further compels Defendants to compensate APIA for the substantial resources it will need to continue to expend to address the vaping epidemic created by Defendants' misconduct.

756.    The creation and maintenance of the e-cigarette epidemic directly harms APIA by imposing costs on the members of its service population.  As a result of Defendants' misconduct, APIA has been, and will be, forced to go far beyond what a tribal organization would be

COMPLAINT
CASE NO. 19-MD-02913-WHO

expected to pay to enforce the laws to promote the general health and welfare of members of its service population in order to combat the vaping crisis. This includes providing new programs and services in direct response to the damage caused by Defendants' misconduct.

757. Defendants' actions and omissions have substantially, unreasonably, and injuriously interfered with the functions and operations of APIA and have affected the public health, safety, and welfare of APIA's community. Without the vaping epidemic within APIA's community, more time, money, and resources could have been used for APIA's goal of increasing the health and welfare of its members.

## V.  INTERSTATE AND INTRASTATE COMMERCE

758. Defendants' conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

759. At all material times, Defendants participated in the manufacture, marketing, promotion, distribution, and sale of substantial amounts of JUUL products in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

## VI.    CAUSES OF ACTION

### COUNT 1
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *et seq.*

**1.  Violation of 18 U.S.C. § 1962(c)**

760. APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

761. This claim is brought by Plaintiff APIA against Defendants Monsees, Bowen, Pritzker, Huh, Valani, and Altria (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*

COMPLAINT
CASE NO. 19-MD-02913-WHO

762.   Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).

763.   At all relevant times, each RICO Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

764.   APIA is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendants' wrongful conduct described herein.

765.   Each RICO Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

   **a.   JLI is an Enterprise Engaged in, or its Activities Affect, Interstate or Foreign Commerce**

766.   Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

767.   JUUL Labs, Inc. (JLI) is a corporation and therefore meets the definition of "enterprise" under the RICO Act.  Specifically, JLI is registered as a corporate entity in the State of Delaware.

768.   Each of the Management Defendants controlled the JLI Enterprise—that is, they used JLI as the vehicle through which an unlawful pattern of racketeering activity was committed—through their roles as officers and directors of JLI.  As set forth below, their roles allowed them to control the resources and instrumentalities of JLI and use that control to

COMPLAINT
CASE NO. 19-MD-02913-WHO

perpetrate a number of fraudulent schemes involving the use of mail and wires, including sales to youth and fraudulently misrepresenting or omitting the truth about JUUL products to adult consumers and the public at large.

769.    For its part, Altria and Altria Client Services began conspiring with Defendants Pritzker and Valani to direct the affairs of JLI as early as spring 2017, messaging that if JLI continued its massive growth—which they knew was achieved through youth marketing and fraudulent misrepresentations and omissions—they would receive a massive personal pay-off.

770.    The Altria Defendants started personally transmitting statements over the mail and wires in furtherance of the fraudulent schemes even before Altria's December 2018 investment in JLI.  After that point, Altria gained even further influence over the JLI Board of Directors and installed its own personnel in key roles at JLI, cementing its direction of the Enterprise.

771.    JLI is an enterprise that is engaged in and affects interstate commerce because the company has sold and continues to sell products across the United States, as alleged herein.

**b.    "Conduct or Participate, Directly or Indirectly, in the Conduct of Such Enterprise's Affairs"**

772.    Conducting or participating in the conduct of an enterprise requires participation in the enterprise's operation or management.

773.    As described herein, each RICO Defendant participated in the operation or management of the JLI Enterprise and directed the affairs of the JLI Enterprise through a pattern of racketeering activity, including masterminding schemes to defraud that were carried out by and through JLI using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### c. Defendants Bowen and Monsees founded the JLI Enterprise and started its mission of hooking kids and lying to the public and regulators.

774.     Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against Defendants Bowen and Monsees above.

775.     As described above in more detail, Defendants Bowen and Monsees were the visionaries behind JUUL, led JLI in its infancy to develop a highly addictive product, and formed JLI with the aim of creating a growing base of loyal users, including an illicit youth market of nicotine users, by following the same tactics that the cigarette industry has used for decades: selling to kids and lying to adults about their products.  Together, Bowen and Monsees set out to "deliver solutions that refresh the magic and luxury of the tobacco category."

776.     Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the state Attorneys General of forty-six states, five U.S. territories, the District of Columbia, and the four largest cigarette manufacturers in the United States.  "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

777.     Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation of youth users, with JLI as the dominant supplier, by concealing the nicotine content and addictiveness of the products and promoting these products to youth users.  To achieve that goal, they knew they would need to create and market a

COMPLAINT
CASE NO. 19-MD-02913-WHO

product that would make nicotine cool to kids again without the stigma associated with cigarettes, deceive the public about what they were doing, and prevent and delay regulation that would hinder their efforts to expand JUUL sales.

778.   Bowen led the design of the JUUL product, including by participating as a subject in many of the company's human studies.  Bowen was instrumental in making the JUUL product appealing to youth, even though "he was aware early on of the risks e-cigarettes posed to teenagers."  He drew on his experience as a design engineer at Apple to make JUUL resonate with Apple's popular aesthetics.  This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device.  This wasn't smoking or vaping, this was JUULing."  The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers.  According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."

779.   Bowen designed JUUL products to foster and sustain addiction, not break it.  JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery.  Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what Bowen created an initiation product, not a cessation or cigarette replacement product.  Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

780.   Bowen worked to minimize "throat hit" and maximize "buzz" of the JUUL e-cigarette.  Dramatically reducing the throat hit is not necessary for a product that is aimed at

COMPLAINT
CASE NO. 19-MD-02913-WHO

smokers who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youth.

781.    The "buzz" testing results demonstrate that Bowen's goal was not to match the nicotine delivery profile of a cigarette, but to surpass it by designing a maximally addictive product, which could only be marketed as a cigarette substitute through a sophisticated fraud campaign.

782.    Bowen designed the JUUL product to deliver nicotine in larger amounts and at a faster rate than traditional cigarettes.  This feature made the product more likely to capture users with the first hit.

783.    Bowen was also heavily involved with JLI's marketing strategy, which primarily targeted youth users.

784.    Bowen personally developed JLI's strategy to market to youth and make JLI as profitable as possible, so that it would be an attractive investment for a major manufacturer of traditional cigarettes.  In a 2016 e-mail exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."  Bowen knew that to achieve the ultimate goal of acquisition, JLI would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

785.    Bowen's role in marketing included changing the name of "Crisp Mint" to "Cool Mint" in 2015.  Bowen also oversaw JLI's formation of a commercial relationship with Avail Vapor, LLC, an Altria subsidiary, which Altria and JLI used to coordinate the flavor preservation schemes described below.

COMPLAINT
CASE NO. 19-MD-02913-WHO

786.   Like Bowen, Monsees was instrumental to founding JLI with the aim of expanding the market of nicotine addicted e-cigarette users to include those "who aren't perfectly aligned with traditional tobacco products."

787.   Monsees personally helped to market JLI to the "cool kids," using a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages, to ensure their uptake and distribution among young consumers.  Then, he subsequently and personally denied to the public and regulators that JLI had done just that.

788.   With help from their early investors and board members, who include Nicholas Pritzker, Hoyoung Huh, and Riaz Valani, Bowen and Monsees succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, delaying regulation that would have stopped their unlawful activities, and, of course, earning billions of dollars in profits.

**d.   Defendants Pritzker, Huh, and Valani exercised control and direction over the JLI Enterprise**

789.   Plaintiff incorporates by reference, as if fully set forth herein, the factual allegations stated against Pritzker, Huh, and Valani above.

790.   As described above, Pritzker, Huh, and Valani were early investors in JLI who worked closely with Bowen and Monsees, and took control of the JLI Board of Directors in 2015.  Working in close collaboration with Bowen and Monsees, Pritzker, Huh, and Valani directed JLI's affairs and used the corporation to effectuate and continue fraudulent schemes for their own personal profits and financial benefits.  Pritzker, Huh, and Valani were "more active than most" board members and, unlike most corporate board members, had active involvement in directing the company's actions week to week, including JLI's marketing efforts.

COMPLAINT
CASE NO. 19-MD-02913-WHO

791.     Pritzker, Huh, and Valani exercised an intimate level of control over JLI during a key period—from October 2015 through at least May 2016—when the three Defendants (Pritzker, Huh, and Valani) served as the Executive Committee of the JLI Board of Directors.

792.     As detailed above, in 2015, there was a power struggle within JLI about whether to grow JLI's consumer base by targeting young people.  Pritzker, Huh, and Valani favored aggressive marketing of JUUL products to young people.  By October 2015, the power struggle was over, with the debate resolved in favor of selling to teens.  At that time, Monsees stepped down as CEO to be replaced by the three-member "Executive Committee" comprised of Pritzker, Huh, and Valani.  Huh served as the Executive Committee Chairman, and Pritzker served as Co-Chairman.  The Executive Committee had the final say over all day-to-day operations of the JLI business.  Huh, as Chairman, and Pritzker, as Co-Chairman of JLI, were involved in the management of the company on a weekly basis.  By December 2015, for example, the Executive Committee gave Pritzker and Huh supervisory responsibility for JLI employees.  Valani, for his part, was also an active Board member, involved in the management of the company on a weekly basis.  Dating back to 2011, Valani was a regular presence in JLI's offices, appearing in person at JLI's offices "a couple times a week."

**e.   Bowen, Monsees, Pritzker, Huh, and Valani Exercised a Firm Grip over JLI**

793.     By the summer of 2015, and at all times prior to Altria's investment in JLI, JLI was controlled by a Board of Directors with a maximum of seven seats.  JLI co-founder Bowen has occupied a seat on JLI's Board from its inception.  Likewise, Defendant Monsees was a member of the Board of Directors of JLI until he stepped down in March 2020.  Defendant Pritzker has been on the Board of Directors of JLI since at least August 2013.  He controlled two of JLI's maximum seven Board seats.  Defendant Valani has been on JLI's Board of Directors since at least 2007.  He also controlled two of JLI's maximum seven Board seats.  Beginning

1    around March 2015, Hank Handelsman occupied Valani's second seat.  Notably, Handelsman

2    has a close relationship with Pritzker, as he serves as general counsel for the Pritzker

3    Organization.  He also was a senior executive officer and general counsel for the Pritzkers' Hyatt

4    Corporation for several decades.

5        794.    Collectively, and prior to Altria's investment, Pritzker, Valani, Huh, Bowen, and

6    Monsees controlled at least six of the seven seats on the JLI Board of Directors, which in turn

7    allowed them to appoint the seventh member of the JLI Board of Directors.  Thus, the

8    Management Defendants had total control of the decisions of the Board of Directors.  Pritzker

9    and Valani, each holding two Board seats (and thus a majority of the seven-seat Board), had the

10   ability to control the outcome of all decisions of the Board of Directors, as Board decisions were

11   decided by a majority vote.  It also follows that, by controlling the majority of the JLI Board of

12   Directors at all relevant times, Pritzker and Valani had an effective "veto" over any decisions

13   made by the JLI Board of Directors.  And, Pritzker, Huh, and Valani exercised even more close

14   control during the time period in which they served on the Executive Committee.

15       795.    Through the Board of Directors' control over all aspects of JLI's business,

16   Bowen, Monsees, Pritzker, Huh, and Valani used JLI as a vehicle to further fraudulent schemes

17   of targeting youth, misrepresenting and omitting to consumers of all ages what JLI was really

18   selling and to whom, and seeking to delay or prevent regulation that would impede the

19   exponential growth of JUUL's massive youth market share.  They achieved their ultimate goal of

20   self-enrichment through fraud when Altria made an equity investment in JLI in December 2018.

21   In 2017, Altria Conspired with Pritzker and Valani to influence and indirectly exercise control

22   over JLI.

23       796.    Plaintiff incorporates by reference, as if fully set forth herein, the factual

24   allegations stated against the Altria Defendants above.

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

797.   As set forth above, Altria (through its subsidiary, Defendant Philip Morris) has been manufacturing and selling "combustible" cigarettes for more than a century, but, recognizing that regulation and litigation had resulted in declining cigarette sales, Altria was looking to enter the e-cigarette space.  It formed a subsidiary, Nu Mark LLC, to develop and market an e-cigarette product, the Mark Ten.  The Mark Ten was not a success, so Altria began eyeing an acquisition of the biggest player in the youth addiction game, JLI.

798.   Altria's pursuit led to eighteen months of negotiations with Altria and Altria Client Services on the one hand, and Defendants Pritzker and Valani on the other, regarding a potential acquisition or equity investment in JLI.  They conspired to achieve the best outcome for Pritzker and Valani personally and for Altria as an entity.  During these eighteen months, Altria, and Altria Client Services specifically, enticed Pritzker and Valani with a potential multi-billion dollar payout.  During that time, Pritzker, Valani, and the other Management Defendants committed numerous acts of fraud to grow the business of JLI to satisfy Altria's expectations.  Meanwhile, Altria and Altria Client Services actively conspired with Pritzker and Valani to continue growing JLI's youth market by continuing JLI's fraudulent activities, their compliance ensured by that promised payout.  Altria was gathering information on JLI to confirm Altria would be purchasing a company with a proven track record of sales to youths.

**f.   Altria directly exercises control of and participates in the JLI Enterprise**

799.   By October 2018, Altria was directly transmitting statements over the mail and wires to support the JLI enterprise's efforts to fraudulently market JUUL products and to prevent or delay regulation.

800.   In December 2018, Altria publicly announced its ties to the JLI enterprise by making a $12.8 billion equity investment in JLI, the largest private equity investment in United States history.  This investment led to massive personal financial benefit for each of the

COMPLAINT
CASE NO. 19-MD-02913-WHO

Management Defendants and gave Altria three seats on the JLI Board of Directors, allowing it to assert greater management and control over the JLI Enterprise, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

801.    Following the investment, Altria also directly distributed fraudulent statements that JLI was a cessation device, that JLI did not target youth, and that the nicotine in a single JUULpod was equivalent to a pack of cigarettes.

802.    Moreover, to further bolster its influence and control of JLI, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C. Crosthwaite and Joe Murillo.

**g.   The Fraudulent Schemes**

803.    As detailed above, the operation of the JLI Enterprise, as directed by the Marketing Defendants and Altria, included several  schemes to defraud that helped to further the goals of the RICO Defendants—i.e., to expand the e-cigarette market, particularly among youth, for the five individual Defendants to reap huge personal profits, and for Altria to regain the market share that it was losing in the traditional cigarette arena and could no longer openly pursue through the same tactics used by JLI and the Management Defendants.

**h.   Fraudulent Marketing Scheme**

804.    As described above, JLI and the Management Defendants directed and caused JLI to make false and misleading advertisements that omitted references to JUUL's nicotine content and potency to be transmitted via the mail and wires, including the Vaporized campaign.

805.    As early as 2014, Pritzker participated in planning discussions with Monsees and Valani about how to expand JUUL's market share through marketing.

COMPLAINT
CASE NO. 19-MD-02913-WHO

806.    In 2015, Bowen helped to finalize the messaging framework for JUUL's launch plan, including sponsored content on social media.  This messaging was patently youth oriented and intentionally targeted children.

807.    Monsees studied the marketing techniques of the traditional cigarette industry, and he personally reviewed the photographs that were used in the youth-oriented advertisements that accompanied JUUL's launch.  The "Vaporized" campaign featured bright colors and young models who were in "poses were often evocative of behaviors more characteristic of underage teen than mature adults."

808.    Monsees also provided specific direction as to the content of the JUUL website to JLI employees, and that content include false, misleading, and deceptive statements designed to induce consumers, and particularly young people, to purchase the JUUL product.

809.    Pritzker, Valani, Monsees, and Bowen—individually and collectively—approved images from the JUUL "Vaporized" ad campaign in 2015.  While they noted the youthfulness of the models, they expressed no concerns about the direction of the campaign, which was clearly directed to young users, they all supported launching the campaign—which then proved to be a great "success" in expanding vaping among underage users.  And even though Pritzker, Huh, and Valani knew—and explicitly stated—that what they were doing was wrong, JLI pressed ahead with its youth-oriented marketing through early 2016.

810.    Before the launch of new JUUL advertising campaigns in 2015, Pritzker, Valani, and Bowen advised the JLI marketing team to allay their concerns about the messaging regarding the nicotine content of the JUUL product.

811.    Along with Valani, Pritzker was so directly involved in the "Vaporized" advertising campaign—which, as described above, marketed the JUUL product to teens—that

COMPLAINT
CASE NO. 19-MD-02913-WHO

JLI's COO in 2015 remarked that he was concerned that the Board would try to write copy for future branding changes.

812.    Huh was also instrumental in these early marketing campaigns, which were targeted to youth and omitted references to JUUL's nicotine content.  In debates about whether to continue marketing JUUL aggressively to youth, Huh supported that action and asserted that the company could not be blamed for youth nicotine addiction.

813.    During his stint as Executive Committee chairman, which lasted at least until May 2016, Huh approved specific branding changes in 2015 and 2016, as JLI developed and implemented its plans for marketing to youth.

814.    Various communications post-October 2015 demonstrate that Monsees deferred to Huh with regard to the direction of the company.

815.    Pritzker also personally controlled several aspects of JLI's branding.  For instance, Pritzker was directly involved in creating JLI's corporate website in May 2017.  JLI used this website as another means to market its products to youth.

816.    Through the allegations above, Plaintiff APIA has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**i.   Youth Access Scheme**

817.    As described, the five Management Defendants who controlled JLI acted individually and in concert to expand youth access to JUUL products through schemes to mislead young customers about the products.

818.    JLI worked with Veratad to expand youth access while giving the appearance the JLI was combating youth access to its products.

COMPLAINT
CASE NO. 19-MD-02913-WHO

819.   Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**j.   Nicotine Content Misrepresentation Scheme**

820.   As alleged above, the Management Defendants and Altria caused thousands, if not millions, of JUULpod packages to be distributed to consumers with false and misleading information regarding the JUULpods' nicotine content.  The Management Defendants who controlled JLI also caused the same false and misleading information to be distributed via JLI's website.

821.   Defendant Bowen participated in studies regarding the nicotine content of JUULpods, including by altering or re-engineering his own studies concerning nicotine content to mask the true content and impact in the products he developed.  He discussed his engineering test results (the Phase 1 results) and how they differed from the Phase 0 results with Monsees, Pritzker, and Valani.  He helped to select the 4% benzoate formulation that served as a model for all formulations used with the JUUL product.  As formulated, JUULpods were foreseeably exceptionally addictive, particularly when used by persons without prior substantial exposure to nicotine.

822.   As alleged above, Defendants Monsees, Pritzker, and Valani had personal knowledge about JUUL product nicotine content through direct communications with Bowen discussing engineered test results (the Phase 1 results) and how they differed from the Phase 0 results.

823.   Defendants Bowen, Monsees, Pritzker, and Valani thus caused the distribution of numerous JUULpod packages and statements on the JLI website and elsewhere that fraudulently equated the nicotine content of one JUULpod as equivalent to one pack of cigarettes.  These

COMPLAINT
CASE NO. 19-MD-02913-WHO

1  statements were false, as a JUULpod had substantially more nicotine than a standard pack of

2  combustible cigarettes.

3      824.    Defendant Bowen also directed, on May 4, 2018, that Ashley Gould convey to

4  *The Washington Post* that JLI's studies "support that nic strength and pack equivalence holds

5  true," even though he knew this statement was false.  On May 10, 2018, *The Washington Post*

6  published an article quoting a JUUL spokesperson extensively and stating that JUUL "contains

7  about the same amount of nicotine as a pack of cigarettes"—the exact false statement Bowen

8  instructed Gould to convey to the Post.

9      825.    The following year, Monsees conveyed this same misinformation in deposition

10  testimony in a proceeding before the United States International Trade Commission.

11      826.    Defendant Monsees also required, by no later than July 2018, that JLI employees

12  obtain his personal approval for the artwork on all JUULpod packaging.

13      827.    Several Altria Defendants were involved in this scheme as well.  With the

14  approval and consent of Altria Group and under the management of Altria Client Services (the

15  "Provider Manager" for the contracts), Altria Group Distribution Company distributed millions

16  of JUULpod packages to stores across the country.  These packages included the false and

17  misleading information regarding JUULpods' nicotine content.

18      828.    Through the allegations above, Plaintiff has shown a direct connection between

19  the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in

20  some part, the affairs of the JLI Enterprise.

21      **k.  Flavor-Preservation Scheme**

22      829.    As alleged above, the RICO Defendants worked in concert to defraud the public

23  and deceive regulators to prevent regulation that would have impeded their plan to keep selling

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

to children.  Specifically, they worked to ensure that the FDA allowed JUUL's mint flavor to remain on the market.

830.    Altria and JLI had been working together on flavor strategy as early as September 2017, when Tyler Goldman and Gal Cohen (Valani's inside man within JLI) met with representatives of Altria Client Services to plan a strategy for responding to the FDA's proposed regulation of flavors in e-cigarettes.  This plan would be coordinated through Avail Vapor, LLC, a company partially owned by Altria.  Through Avail, the RICO Defendants obtained evidence that confirmed that mint was so popular with non-smoking teenagers that even with mint as its sole flavor option, JLI would remain a multi-billion dollar enterprise.

831.    Weeks before Altria's equity investment in December 2018, the regulatory pressure ramped up significantly, and Altria and JLI engaged in active fraud to lull the FDA that mint was simply a traditional cigarette flavor designed to help adult smokers switch, rather than a flavor that appealed primarily to youth.  With the scheme in place, Altria and JLI finalized their deal.

832.    In September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."

833.    Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, would allow JLI to continue marketing mint JUULpods.

834.    On October 25, 2018, Altria Group sent a letter to the FDA portraying mint as a traditional tobacco flavor.  Altria shared this letter with Pritzker and Valani.  JLI, at the direction of the five Management Defendants, subsequently sent a similar letter and false youth study, fraudulently claiming that mint was a traditional tobacco flavor and was not attractive to kids.

COMPLAINT
CASE NO. 19-MD-02913-WHO

835.    Altria Group Distribution Company and Altria Group (through K.C. Crosthwaite) then distributed hundreds of thousands of mint pods in 2019.  They focused on selling this flavor in particular to take advantage of delayed regulation.

836.    Through the allegations above, Plaintiff has shown a direct connection between the RICO Defendants and this fraudulent scheme, including personal involvement in directing, in some part, the affairs of the JLI Enterprise.

**l.    Cover-up Scheme**

837.    The RICO Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these Defendants continued their scheme to prevent a complete ban on JLI's product by portraying JUUL as a smoking cessation device and denying that the company ever marketed to youth.

838.    As alleged above, JLI maintained website pages that provided false information about the addictive potential of its products and denied that JLI marketed to youth.  Defendants Bowen, Monsees, Pritzker, Huh, and Valani directed the content of the JLI website and had "final say" over JLI's marketing messaging.

839.    Bowen understood that children were using the JUUL product and intentionally continued the youth-appealing marketing strategy.  For instance, in 2016, upon seeing social media posts of teenagers using JUUL products, he remarked that he was "astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on," and he added that Valani was plotting how JUUL could "leverage user generated content" to increase sales.

840.    Monsees knew before the JUUL launch that JUUL would be attractive to youth. In October 2014, Monsees received results from a JUUL prototype, including comments that while JUUL was "too much" for smokers, the "younger group" liked JUUL, and JUUL "might

COMPLAINT
CASE NO. 19-MD-02913-WHO

manage to make smoking cool again." Monsees saw this information as an opportunity, not as a warning.

841.   Bowen and Monsees were well aware that JUUL branding was oriented toward teens, and they mimicked the previous efforts of the tobacco industry to hook children on nicotine to increase JUUL sales.

842.   In 2015, JLI's Board—controlled by Bowen, Monsees, Pritzker, Huh, and Valani—met frequently, and the appeal of JUUL to underage users was a constant topic of discussion, as detailed above. Individually and collectively, Pritzker, Huh, and Valani affirmed this course of action, taking steps to continue marketing efforts to youth and rejecting efforts by other Board members to curtail them.

843.   Also in 2018, when concern grew about youth vaping, Valani directed JLI's strategy in responding to such concerns. As directed by Valani, the goal was to debunk studies linking the company with the youth vaping crisis and to try to focus attention on youth smokers who allegedly had switched to JUUL—a misinformation campaign designed to stave off regulation or the ban of JUUL products.

844.   Likewise, in 2018, Pritzker and Valani were heavily involved in planning sham "youth prevention" activities, whereby JLI would put on seminars for school children that ostensibly were designed to prevent youth vaping, but which actually told school children that vaping was safe and even taught children how to use the product.

845.   Pritzker was heavily involved in JLI's public relations activities, including granular detail such as directing responses to particular inquiries from teachers. Along with Valani, Pritzker also approved a press release in response to an inquiry by U.S. Senators, falsely detailing JLI's alleged youth vaping prevention efforts.

COMPLAINT
CASE NO. 19-MD-02913-WHO

846.     Pritzker and Valani each edited and revised press releases about JLI's youth prevention activities and steps it claimed to be taking to prevent youth sales, and they approved CEO Kevin Burns's op-ed to *The Washington Post* claiming that the company did not want to sell to youth and was only targeting adult smokers.

847.     The five Management Defendants caused false and misleading advertising to be distributed over television and the internet to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth.

848.     Valani and Pritzker routinely approved the copy for JUUL advertising spots.  For example, Kevin Burns sought Pritzker and Valani's approval of the fraudulent *Make the Switch* advertising campaign, which was distributed over the mail and wires.

849.     The *Make the Switch* campaign featured former smokers aged 37 to 54 discussing how JUUL helped them quit smoking.  According to JLI's Vice President of Marketing, the *Make the Switch* campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."  But these statements were false, as JUUL was not intended to be a smoking cessation device.

850.     Defendant Altria Group's subsidiaries Philip Morris USA and AGDC continued this scheme by transmitting the fraudulent *Make the Switch* advertisements in packs of its combustible cigarettes.  These advertisements falsely portrayed the JUUL product as a smoking cessation device for adults.  Defendant Altria Client Services did the same by e-mailing and mailing out hundreds of thousands of *Make the Switch* advertisements, with the approval and consent of Altria Group.

851.     Monsees perpetuated the myth that JUUL was designed as a smoking cessation device, even though it was designed to appeal to young non-smokers.  Monsees testified before

COMPLAINT
CASE NO. 19-MD-02913-WHO

congress that JUUL was an "alternative" to traditional "cessation products" that "have extremely low efficacy."

852.   In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."

853.   These statements were false, and Monsees knew that they were false, as JUUL devices were never intended to be smoking cessation devices or ever operated as one.

854.   Monsees also committed mail or wire fraud by giving the following written testimony to Congress, which was false: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . . That is a serious problem. Our company has no higher priority than combatting underage use."

855.   Monsees further committed mail or wire fraud with a false statement, through JLI's website, that: "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage."  In reality, the RICO Defendants, through JLI, knowingly and intentionally marketed its product to youth users.

856.   Beginning in October 2018, both Altria and JLI transmitted false and misleading communications to the public and the federal government, including Congress and the FDA, in an attempt to stave off regulation of the JUUL product.

857.   As detailed above, each RICO Defendant directed and participated in these fraudulent schemes, either directly or indirectly, with specific intent to defraud, and used JLI as a vehicle to carry out this pattern of racketeering activity.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

### m. "Pattern of Racketeering Activity"

2

858.    The RICO Defendants did willfully or knowingly conduct or participate in,

3

directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity

4

within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the

5

mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

6

859.    Specifically, the RICO Defendants—individually and collectively—have

7

committed, conspired to commit, and/or aided and abetted in the commission of, at least two

8

predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the

9

past ten years, as described herein.

10

860.    The multiple acts of racketeering activity that the RICO Defendants committed, or

11

aided or abetted in the commission of, were related to each other, pose a threat of continued

12

racketeering activity, and therefore constitute a "pattern of racketeering activity."

13

861.    The RICO Defendants used, directed the use of, and/or caused to be used,

14

thousands of interstate mail and wire communications in service of the Enterprise's objectives

15

through common misrepresentations, concealments, and material omissions.

16

862.    As described above, the RICO Defendants devised and knowingly carried out

17

material schemes and/or artifices to defraud the public and deceive regulators by (1) transmitting

18

advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine

19

content or potency (or any meaningful reference, where one was made); (2) causing false and

20

misleading statements regarding the nicotine content of JUULpods to be posted on the JLI

21

website; (3) causing many thousands, if not millions, of JUULpod packages containing false and

22

misleading statements regarding the nicotine content of JUULpods to be transmitted via U.S.

23

mail; (4) representing to consumers and the public at large that JUUL was created and designed

24

as a smoking cessation device; (5) misrepresenting the nicotine content and addictive potential of

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    its products; (6) making fraudulent statements to the FDA to persuade the FDA to allow mint

2    flavored JUULpods to remain on the market; and (7) making fraudulent statements to the public

3    (including through advertising), the FDA, and Congress to prevent prohibition of JUUL

4    cigarettes, as was being contemplated in light of JLI's role in the youth vaping epidemic.

5        863.   The RICO Defendants committed these racketeering acts intentionally and

6    knowingly, with the specific intent to defraud and to personally or directly profit from these

7    actions.

8        864.   The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1))

9    include, but are not limited to:

10           A.   Mail Fraud: the Enterprise violated 18 U.S.C. § 1341 by sending
               or receiving, or by causing to be sent and/or received, fraudulent
11             materials via U.S. mail or commercial interstate carriers for the
               purpose of deceiving the public, regulators, and Congress.
12
             B.   Wire Fraud: the Enterprise violated 18 U.S.C. § 1343 by
13             transmitting and/or receiving, or by causing to be transmitted
               and/or received, fraudulent materials by wire for the purpose of
14             deceiving the public, regulators, and Congress.

15       865.   As explained above, the RICO Defendants conducted the affairs of the Enterprise

16   through a pattern of racketeering activity by falsely and misleadingly using the mails and wires

17   in violation of 18 U.S.C. § 1341 and § 1343.  To the extent that JLI itself or a JLI officer other

18   than one or more of the RICO Defendants made a particular statement listed below, the

19   Management Defendants who controlled JLI and Altria caused those statements to be made

20   through their control of JLI and through their control of the communications that JLI was

21   disseminating to the FDA, to Congress, and to the general public in connection with directing the

22   affairs of JLI.  As detailed above, these statements are alleged to be part of the fraudulent

23   schemes masterminded by the RICO Defendants who conducted the affairs of JLI.

24       866.   Illustrative and non-exhaustive examples include the following:

25
                                                    COMPLAINT
                                                    CASE NO. 19-MD-02913-WHO

| From | To | Date | Description |
|------|-----|------|-------------|
| **Statements Omitting Reference to JUUL's Nicotine Content** | | | |
| JLI | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign and other advertising campaigns transmitted via the mails and wires which targeted under-age vapers and omitted any reference to JUUL's nicotine content. |
| **Statements that JUUL is a Cessation Device** | | | |
| JLI | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| JLI | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers. ... We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |

COMPLAINT
CASE NO. 19-MD-02913-WHO

| From | To | Date | Description |
|------|----|----|-------------|
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| **Statements Regarding Nicotine Content in JUULpods** | | | |
| JLI | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUULpod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| JLI | Public (via internet – JLI website) | April 21, 2017 | "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." |
| JLI; AGDC; Altria Client Services | Public (via U.S. mail distribution of JUULpod packaging) | 2015 to Present | JUULpod packages (1) claiming a 5% nicotine strength; (2) stating that a JUULpod is "approximately equivalent to about 1 pack of cigarettes." |
| **Statements to Prevent Regulation of mint Flavor** | | | |
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| Howard Willard (Altria CEO) | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |

COMPLAINT
CASE NO. 19-MD-02913-WHO

| From | To | Date | Description |
|------|----|----|-------------|
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| **Statements to Prevent Ban on JUUL Products** | | | |
| JLI | Public (via Television) | January 2019 | $10 million *Make the Switch* advertising campaign, which was designed to deceive the public and regulators into believing that JLI was only targeting adult smokers with its advertising and product, and that JUUL was a smoking cessation product. |
| AGDC; Philip Morris; JLI | Public (via inserts in combustible cigarette packs) | December 2018 - Present | *Make the Switch* advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |
| Altria Client Services; JLI | Public (via direct mail and email campaigns) | December 2018 – Present | *Make the Switch* advertising campaign, for the purpose of deceiving smokers into believing that JUUL was a cessation product. |
| JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |
| JLI | Public (via internet - social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |

COMPLAINT
CASE NO. 19-MD-02913-WHO

| From | To | Date | Description |
|------|-----|------|-------------|
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. ... Our intent was never to have youth use JUUL products." |
| Then-CEO of JLI (Kevin Burns) | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| JLI | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| James Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |

| From | To | Date | Description |
|---|---|---|---|
| JLI (via counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth," and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| James Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating: "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. ... That is a serious problem. Our company has no higher priority than combating underage use." |
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." |

COMPLAINT
CASE NO. 19-MD-02913-WHO

| From | To | Date | Description |
|------|-----|------|-------------|
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |

867.    The mail and wire transmissions described herein were made to further the RICO

Defendants' schemes and common course of conduct, thereby increasing or maintaining JLI's

market share.  The sections cross-referenced in the chart detail how the RICO Defendants caused

such mailings or transmissions to be made.  As described in those detailed factual allegations, the

RICO Defendants did so either by directly approving certain fraudulent statements or by setting

in motion a scheme to defraud that would reasonably lead to such fraudulent statements being

transmitted via the mail and wires.

868.    As described above, the RICO Defendants used JLI to further schemes to defraud

the public and deceive regulators, to continue selling nicotine products to youth, and to protect

their market share by denying that JLI marketed to youth and falsely claiming that JUUL was

created and designed as a smoking cessation device (or a mitigated risk product).

869.    The RICO Defendants used these mail and wire transmissions, directly or

indirectly, in furtherance of this scheme by transmitting deliberately false and misleading

statements to the public and to government regulators.

COMPLAINT
CASE NO. 19-MD-02913-WHO

870.    The RICO Defendants had a specific intent to deceive regulators and defraud the public.  For example, as alleged above, JLI made repeated and unequivocal statements through the wires and mails that it was not marketing to children and that its products were only designed for adult smokers.  These statements were false.  Each of the RICO Defendants knew these statements were false but caused these statements to be made anyway.  Similarly, the RICO Defendants caused to be transmitted through the wires and mails false and misleading statements regarding the nicotine content in JUULpods, which JLI's own internal data, and Altria's own pharmacokinetic studies, showed were false.  Moreover, each of the Enterprise Defendants had direct involvement in marketing statements by JLI and thus caused such statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

871.    The RICO Defendants intended the public and regulators to rely on these false transmissions, and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

872.    The public and government regulators relied on the Enterprise's mail and wire fraud.  For example, the regulators, including the FDA, relied on the Enterprise's statements that mint was not an appealing flavor for nonsmokers in allowing mint JUULpods to remain on the market.  Regulators also relied on the Enterprise's statements that it did not market to youth in allowing the RICO Defendants to continue marketing and selling JUUL.  Congress likewise relied on the Enterprise's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that.  And, the public relied on statements (or the absence thereof) that were transmitted by the RICO Defendants regarding the nicotine content in and potency of JUULpods in deciding to purchase JUUL products.

873.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the RICO

COMPLAINT
CASE NO. 19-MD-02913-WHO

Defendants' books and records.  Plaintiff has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, the RICO Defendants engaged in clearly fraudulent activity in furtherance of their overlapping schemes.

874.    These were not isolated incidents.  Instead, the RICO Defendants engaged in a pattern of racketeering activity by committing thousands of related predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a serious threat that such conduct will continue or recur in the future.  That each RICO Defendant participated in a variety of schemes involving thousands of predicate acts of mail and wire fraud establishes that such fraudulent acts are part of the Enterprise's regular way of doing business.  Moreover, Plaintiff expects to inevitably uncover even more coordinated, predicate acts of fraud as discovery in this case continues.

**n.  Harm to Plaintiff, Aleutian Pribilof Islands Association, Inc.**

875.    For a pattern of racketeering activity to be a cognizable cause of civil RICO injury to a private plaintiff, it is well settled that one or more of the predicate acts must not only be the "but for" cause of the injury, but the proximate cause as well.  A wrongful act is a proximate cause if it is a substantial factor in the sequence of responsible causation.  A plaintiff must show a direct relation between the injury asserted and the injurious conduct alleged.  What matters, though, is not whether there is a direct relationship between the plaintiff and defendant, but whether there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury.

876.    Each member of the JLI Enterprise profited from the Enterprise, and APIA suffered injury to its property because it has incurred substantial expense, is incurring substantial expense, and will continue to incur substantial expense in mitigating and combatting the harmful

COMPLAINT
CASE NO. 19-MD-02913-WHO

effects resulting from JUUL use by APIA's service population, including increased healthcare costs and the cost of public health programs necessary to correct JLI Enterprise's deceptive and illegal marketing.  APIA has been compelled to divert a substantial portion of its limited resources and programming funds to educational programs, employee training, and new treatment programs in order to curb the effects of the JUUL epidemic.  APIA has also been compelled to reassign staff members to work on prevention programs to curb the effects of the JUUL epidemic.  The members of the JLI Enterprise used the proceeds from their deceptive acts to further the scheme by, among other things, expanding the depth and breadth of the deceptive marketing.  For example, the JLI Enterprise began offering to sponsor purportedly education-related activities under the guise of preventing underage use of e-cigarettes.  In reality, the JLI Enterprise sought to foster positive views of its products only to gain additional users.  The members of the JLI Enterprise conspired to deceive members of APIA's service population.

877.    The JLI Enterprise has existed since at least 2015.  It has functioned as a continuing entity and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.  Each member's participation in the JLI Enterprise is necessary for the successful operation of the deceptive marketing scheme and the financial gains that resulted therefrom.

878.    APIA has sustained injury by reason of the acts and conduct of Defendants alleged in this Complaint, including but not limited to APIA incurring costs in funding mitigation and remedial programs regarding JUUL use by youth which, but for the deceptive marketing and other acts of the JLI Enterprise, it would not have incurred.

879.    But for the conduct of Defendants alleged herein, APIA would not have suffered the injuries alleged in this Complaint.  These injuries suffered by APIA were a foreseeable and natural consequence of the scheme to defraud.  The injuries of APIA were directly and

proximately caused by Defendants' racketeering activity that deceived and defrauded consumers and resulted in a meteoric rise of tribal youth vaping.

880.    As a result and by reason of the foregoing, APIA has been injured, suffered harm, and sustained damage to its business and property and is therefore entitled to recover actual and treble damages and its costs of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

881.    There are no intervening acts or parties that could interrupt the causal chain between the RICO Defendants' mail and wire fraud and APIA's injuries.

882.    As to predicate acts undertaken to further the conspiracy which occurred more than five years before the date of this Complaint, Plaintiff APIA did not discover, and could not have been aware despite the exercise of reasonable diligence, until shortly before the filing of this case, that the RICO Defendants transmitted fraudulent statements via the mails and wires regarding the topics described above including, *inter alia*, the true nicotine content in and delivered by JUUL products.  The RICO Defendants concealed and failed to truthfully disclose this information.

### 2.  Violations of 18 U.S.C. § 1962(d)

883.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

884.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  *See* 18 U.S.C. § 1962(d).

885.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), as described herein.  The conspiracy is

COMPLAINT
CASE NO. 19-MD-02913-WHO

coterminous with the time period in which the Enterprise has existed, beginning before JLI was officially formed in 2015 and continuing to this day (with Defendant Altria joining the conspiracy no later than Spring of 2017).

886.   The RICO Defendants' unlawful agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c).  In particular, as described above, Altria's specific agreement is shown by the fact that it was well aware of JLI's fraudulent activities in marketing its products to youth but claiming that it would not do so, yet Altria nonetheless secretly collaborated with JLI to continue and increase those unlawful activities, and it eventually made a multi-billion dollar investment in JLI and continued the deception by directing the affairs of JLI.

887.   The acts in furtherance of the conspiracy attributable to the RICO Defendants include each of the predicate acts underlying the RICO Defendants' use of the JLI Enterprise to directly or indirectly engage in a pattern of racketeering activity in violation of Section 1962(c), as described above.  Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the members of the Enterprise in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.  Where a RICO Defendant did not commit a predicate act itself, it agreed to the commission of the predicate act.

888.   Plaintiff APIA has been injured as described above.

889.     There are no intervening acts or parties that could interrupt the causal chain between the RICO Act violations in furtherance of their RICO conspiracy and Plaintiff APIA's injuries.

890.     As to acts undertaken in furtherance of the conspiracy which occurred prior to five years before the date of this Complaint, Plaintiff APIA did not discover and could not have been aware despite the exercise of reasonable diligence until shortly before the initiation of the instant litigation that the RICO Defendants through the JLI Enterprise transmitted fraudulent statements via the mails and wires regarding the topics described above including, *inter alia*, the true nicotine content in and delivered by JUUL products, such information the Enterprise concealed and failed to truthfully disclose.

891.     As set forth above, Defendants have violated 18 U.S.C. §§ 1962(c) and (d) and will continue to do so in the future unless a court enjoins them from doing so.

892.     Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity and disgorging ill-gotten gains is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to issue appropriate orders to provide equitable relief to APIA and enjoin violations of 18 U.S.C. § 1962.

893.     APIA seeks compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees.

## COUNT II
## VIOLATION OF ALASKA PUBLIC NUISANCE LAW

894.     APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

895.     Section 821B of the Restatement (Second) of Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

COMPLAINT
CASE NO. 19-MD-02913-WHO

1    896.    This action is brought by APIA to abate the public nuisance created by

2    Defendants.

3    897.    Defendants, through the actions described in this Complaint, have created and

4    maintained or were a substantial factor in creating and maintaining a public nuisance by

5    substantially and unreasonably interfering with a right that is common to the general public and

6    that harms the health, safety, peace, comfort, or convenience of the general community.

7    898.    Defendants' design, marketing, and distribution of their products to minors and

8    their conduct of specifically targeting AI/ANs, who often face health disparities that make them

9    more susceptible to nicotine addiction than non-AI/AN Americans, caused or assisted in causing

10   the public nuisance of the vaping epidemic in APIA's service area, as well as the adverse social,

11   economic, and human health outcomes associated with the widespread nicotine epidemic.

12   899.    Defendants had specific knowledge that their conduct would increase or would

13   assist in increasing addiction, and specifically AI/AN addiction, to nicotine.

14   900.    Defendants' design, manufacture, production, marketing, distribution, and sale of

15   highly addictive and harmful e-cigarettes and nicotine pods, when such actions were taken with

16   the intent to market and, in fact, were marketed to youth through repeated misstatements and

17   omissions of material fact, substantially and unreasonably interfered with a public right in that

18   the results of Defendants' actions created and maintained a condition dangerous to the public's

19   health, and were clearly offensive to the moral views of APIA.

20   901.    Defendants intentionally created and maintained a public nuisance by, among

21   other acts: (a) actively seeking to enter school campuses, targeting children as young as eight

22   through summer camps and school programs, extensively targeting youth through social media

23   campaigns, and recruiting "influencers" to market to teens; (b) engaging in marketing tactics

24   specifically designed to mislead children and youth and to ensnare minors into nicotine

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

addiction, including by explicitly adopting tactics prohibited for Big Tobacco with the knowledge that those tactics were very likely to lead children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push JUUL products on the JLI Enterprise's behalf and by selling JUUL in flavors designed to appeal to youth; (c) engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion; (d) directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels; (e) hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media; (f) formulating JUULpods with sweet flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products; (g) promoting and assisting the growth of the JUUL market and its availability with knowledge that JUUL products were being purchased and used by large numbers of youth; and (h) targeting AI/AN youth, knowing that AI/ANs fight high rates of addiction to substances such as nicotine due to historical trauma and other health disparities.

902.    Defendants' conduct has been continuous, has occurred over a span of years, and is ongoing.  Defendants' conduct has affected and continues to affect a substantial number of members of APIA's service population and is likely to continue causing significant harm.

903.    But for Defendants' actions, JUUL use would not be as widespread as it is today, and the vaping public health epidemic that currently exists as a result of Defendants' conduct would have been averted.

904.    APIA has a right to be free from substantial injury to the public health, safety, peace, comfort, or convenience that has resulted from Defendants' wrongful conduct.

COMPLAINT
CASE NO. 19-MD-02913-WHO

905.    The health and safety of the members of APIA's service population who use, have used, or will use JUUL products, as well as the members of APIA's service population who are affected by others' use of JUUL products, are matters of substantial public interest and of legitimate concern to APIA.  APIA has incurred and continues to incur substantial costs in addressing healthcare needs brought on by JUUL products.

906.    The significant time and resources necessary for APIA to combat the epidemic are harms that are unique from the harm suffered by the general public.

907.    The particular harms suffered by APIA, as a Tribal organization of the Unangan/Unangas people in Alaska that represents thirteen Tribes located in the Aleutian Islands, are different than those suffered by the community at large, both in kind and quality. APIA has incurred and will continue to incur significant expenditures of time and resources to combat rampant use of Defendants' nicotine products by its members.  The true scope and nature of the harm and the extent of resources that are going to be required to abate the harm continues to evolve as the epidemic still exists and best practices to combat it are still being developed.

908.    APIA has been severely limited in the action it has been able to take given severe budgetary and resource constraints.  Expenditures past and future required as a direct result of the public nuisance include, but are not limited to: (a) time and resources spent collecting and analyzing data regarding vaping and factors associated with vaping; (b) time and resources spent obtaining and considering medical and scientific literature; (c) time and resources spent educating persons on the effects of vaping; (d) time and resources associated with changing health curricula to include dangers regarding vaping; (e) costs associated with signage or printed materials regarding vaping; (f) time and resources associated with changing codes of conduct, rules, and disciplinary methods; (g) time and resources spent on prevention; (h) time and resources to establish cessation programming on vaping; (i) time and resources spent

- 263 -

COMPLAINT
CASE NO. 19-MD-02913-WHO

participating in coalitions and working groups to address the JUUL epidemic; (j) time, resources, and programming funds diverted to vaping prevention programs; and (k) the reassignment of staff members to work on prevention programs to address the JUUL epidemic.

909.    Defendants' unfair and deceptive conduct has caused the damage and harm described in this Complaint.  Defendants knew or reasonably should have known that their statements regarding the risks and benefits of JUUL were false and misleading; that their marketing methods were designed to appeal to minors; that their products would be particularly addictive and harmful to children; that AI/AN children were particularly susceptible to addictive substances, including specifically nicotine; and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of JUUL products and grow JUUL's market share were causing harm to minors, including the Tribal members served by APIA who are minors.  Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the economic losses incurred by APIA.

910.    Alternatively, Defendants' conduct was a proximate cause in bringing about the public nuisance.  By directly marketing to youth and continuing marketing practices after it was evident that children were using JUUL products in large numbers and specifically using these products in school, JUUL directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting APIA.  By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of the JLI Enterprise's practice of marketing its products to youth as well as its failure to control youth access to its products, Altria directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting APIA.

911.    The public nuisance created and maintained by Defendants has resulted, and continues to result, in significant damage and annoyance to APIA.  Again, the FDA and others

COMPLAINT
CASE NO. 19-MD-02913-WHO

have recognized that teen vaping is an epidemic and that Defendants' actions are at the heart of that epidemic.

**COUNT III**
**NEGLIGENCE**

912.    APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

913.    APIA brings this negligence claim under Alaska law as to all Defendants.  Under Alaska law, the elements of a negligence claim are: duty, breach of duty, causation, and harm.

914.    Defendants owed APIA a duty to not expose its members to an unreasonable risk of harm.

915.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its JUUL products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

916.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its JUUL products.  Defendants' duty of care owed to consumers and the general public, including APIA and the Tribal members within its service population, included providing accurate, true, and correct information concerning the risks of using JUUL products and appropriate, complete, and accurate warnings concerning the potential adverse effects of vaping and nicotine use and, in particular, JUUL's patented nicotine salts and the chemical makeup of JUULpods' liquids.

917.     At all times relevant to this litigation, Defendants knew or in the exercise of reasonable care should have known of the hazards and dangers of JUUL products and specifically the health hazards posed by vaping JUULpods and continued use of nicotine.  Given the widespread and mainstream public health message of the significant illnesses and fatalities caused by the use of tobacco and nicotine; the enactment of the Family Smoking Prevention and Tobacco Control Act of 2009, designed in part to reduce smoking rates among adolescents; and Defendants' prominent presence in the tobacco industry; Defendants actually knew or had significant reason to know of the hazards and dangers of JUUL products.

918.     Accordingly, at all times relevant to this litigation, Defendants knew or in the exercise of reasonable care should have known that use of JUUL e-cigarettes and JUULpods, especially among AI/AN children, could cause the injuries and thus would create a dangerous and unreasonable risk of injury to APIA.

919.     Defendants also knew or in the exercise of reasonable care should have known that users and consumers of JUUL products were unaware of the risks and the magnitude of the risks associated with the use of JUUL products, including but not limited to the risk of continued nicotine use and nicotine addiction.

920.     As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their JUUL e-cigarettes and JUULpods, in that Defendants manufactured and produced defective products containing nicotine and other chemicals known to cause harm to consumers, and failed to prevent or adequately warn of these risks and injuries.

921.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so.  In fact, Defendants did just the

COMPLAINT
CASE NO. 19-MD-02913-WHO

opposite.  Defendants plotted, schemed, and investigated a marketing strategy designed to attract children to use the highly addictive product, especially AI/AN children.  Moreover, Defendants have wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or use of JUUL products and nicotine vaping.

922.    Defendants' negligence also included: (a) manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its JUUL products without thorough and adequate pre- and post-market testing; (b) failing to undertake sufficient studies and to conduct necessary tests to determine whether or not JUUL products were safe for their intended use; (c) failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of JUUL products so as to avoid the risk of serious harm associated with the prevalent use of JUUL products and nicotine; (d) failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use its JUUL products; (e) failing to disclose to APIA, users, consumers, and the general public that the use of JUUL products presented severe health risks including nicotine addiction; (f) misrepresenting that its JUUL products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use; (g) declining to make or propose any changes to JUUL products' labeling or other promotional materials that would alert the consumers and the general public of the true risks of JUUL products; (h) advertising, marketing, and recommending the use of JUUL products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of JUUL products; (i) continuing to disseminate information to its consumers, which indicates or implies that Defendants' products are not unsafe for their intended use; and (j) continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

COMPLAINT
CASE NO. 19-MD-02913-WHO

923.    Defendants knew and/or should have known that it was foreseeable that APIA would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of JUUL products.

924.    APIA did not know and could not discover the nature and extent of the injuries that could result from the intended use of JUUL products or JUUL's patented JUULpods by the Tribal members within APIA's service population.

925.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that APIA suffered, and will continue to suffer, as described in this Complaint.

**COUNT IV**
**UNFAIR COMPETITION: VIOLATIONS OF ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, AS § 45.50.471, *et seq.***

926.    APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

927.    Alaska Unfair Trade Practices and Consumer Protection Act (UTPA), AS § 45.50.471(a) prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."

928.    The Alaska State Legislature has declared that it is the public policy of the State to prohibit minors' access to tobacco products, including e-cigarettes.  For example, pursuant to AS § 11.76.100, it is a criminal violation to give or sell tobacco products to minors.  Further, AS § 11.76.105 prohibits a person under the age of 19 from knowingly possessing tobacco products.

929.    In addition, the Alaska State Legislature has declared that it is the public policy of the State to prohibit a person from aiding, inducing, causing or encouraging a child under 18 years of age to do any act prohibited by state law.  AS § 11.51.130(a)(1).

930.     As described in this Complaint, Defendants intentionally, deceptively, unfairly, and unlawfully encouraged minors to use vaping products, which violates the declared public policy of the State of Alaska, and is therefore an unfair and deceptive act or practice in violation of AS 45.50.471.

931.     Defendants marketed to youth in violation of Alaska law, took steps to conceal that fact, and deceptively marketed the nicotine content of JUUL products.  Defendants represented that their products would allow users to reduce or eliminate their cigarette consumption entirely and are a less harmful alternative to other tobacco products, even though Defendants' products have not been approved by the FDA as a smoking cessation product or as a modified risk product, and even though Defendants' products are more potent in the delivery of nicotine than combustible cigarettes.  Defendants employed omissions and misrepresentations to delay and prevent regulation and publicly proclaimed that they are against encouraging youth to use e-cigarettes while secretly launching a course of conduct designed to encourage youth e-cigarette use.

932.     Defendants' business practices as described in this Complaint are deceptive and violate the UTPA because the practices are likely to deceive consumers in Alaska.

933.     Defendants knew and should have known at the time of making or disseminating the false and misleading statements described in this Complaint, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

934.     Defendants' omissions, which are deceptive and misleading in their own right, render even Defendants' seemingly truthful statements about JUUL products false and misleading.  All of this conduct, separately and collectively, was likely to deceive APIA and members of its service population.

COMPLAINT
CASE NO. 19-MD-02913-WHO

935.    Defendants' business practices as described in this Complaint are unlawful and violate the UTPA.  These unlawful practices include, but are not limited to, representing that JUUL products have uses or benefits as cessation devices in violation of § 45.50.471(b)(4), misleading consumers in violation of (b)(11), and misleading consumers regarding the material fact of nicotine content in violation of (b)(12).

936.    Defendants' business practices as described in this Complaint are unfair and violate the UTPA because they offend established public policy, and because the harm they cause to APIA, APIA's service population, and Tribal members and other consumers throughout Alaska greatly outweighs any benefits associated with those practices.

937.    As a direct and proximate result of the foregoing acts and practices, Defendants have received and continue to receive income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UTPA described in this Complaint.

938.    As a direct and proximate result of the foregoing acts and practices, Defendants have obtained an unfair advantage over similar businesses that have not engaged in such practices.

939.    Defendants' unfair and deceptive practices occurred in the course of conduct involving trade or commerce.  Among other things, Defendants' unfair and deceptive conduct occurred in the course of advertising, offering for sale, selling, and distributing e-cigarettes, flavor pods, and accessories, and soliciting and receiving money or property.

**COUNT V**
**CIVIL CONSPIRACY**

940.    APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1   941.   Defendants entered into a conspiracy to violate the statutes set forth above in

2   Counts I and IV and the common law set forth above in Counts II and III.  In addition,

3   Defendants' conspiracy to target the youth market resulted in repeated violations of 25 C.F.R.

4   § 140.17, which prohibits the sale of "tobacco, cigars, or cigarettes to any Indian under 18 years

5   of age."

6   942.   Defendants have engaged in, and continue to engage in, a massive campaign to

7   misrepresent the risks of JUUL products, delay and prevent regulation, and target youth.

8   943.   Without the demand generated by Defendants' misrepresentations, omissions, and

9   unfair marketing to youth, Defendants would not have been able to sell JUUL products in the

10   enormous quantities they did.

11   944.   No one of the Defendants would have succeeded in creating and preserving their

12   market share or profiting as much as they have without the concerted conduct of the other

13   parties.

14   945.   Defendants agreed with each other to accomplish the unlawful purposes of

15   marketing and selling JUUL products through violations of law, omissions, and

16   misrepresentations.  Defendants performed numerous overt acts in furtherance of this conspiracy,

17   including marketing and selling JUUL products by means of misrepresentations and omissions

18   both to the public and to the FDA and violating Federal and state laws.

19   946.   Through their conspiracy to unlawfully market JUUL products, Defendants have

20   caused many AI/AN, including the tribal members of APIA's service population, to become

21   addicted to nicotine.

22   947.   As a result of the concerted action between Defendants, APIA has suffered

23   damages.

24

25

COMPLAINT
CASE NO. 19-MD-02913-WHO

948.    Defendants are jointly and severally liable for the results of their concerted efforts.

## VII.    REQUEST FOR PUNITIVE DAMAGES

949.    APIA hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

950.    Alaska law provides for punitive damages where the defendant's conduct either (1) was outrageous, including acts done with malice or bad motives, or (2) evidenced reckless indifference to the interest of another person.  AS § 09.17.020.

951.    Defendants' corporate acts described herein showed a reckless and wanton disregard of the interests of the youth Tribal members of APIA's service population are beyond human decency.

952.    Defendants' corporate acts evidence reckless indifference toward APIA and, in particular, to the young Tribal members of APIA's service population.

953.    Defendants' deliberate and outrageous corporate acts were aimed at securing financial gain at the expense of APIA and, in particular, the young Tribal members of APIA's service population.

954.    A motivation behind Defendants' corporate acts was to place its desire and greed for profits ahead of the well-being and safety of members of APIA's service population, and as a result, ahead of the interests of APIA.

955.    Defendants' corporate acts were outrageously reprehensible.

956.    Defendants' corporate acts have the character of outrage frequently associated with crime.

COMPLAINT
CASE NO. 19-MD-02913-WHO

957.     Defendants intentionally, voluntarily, and willfully targeted young people, including young members of APIA's service population, when they knew that their brains were not fully developed, that they were particularly vulnerable, and that they were more susceptible to marketing and more easily addicted to nicotine than adults.

958.     Defendants intentionally marketed to young members of APIA's service population when they knew that nicotine was especially harmful to children's developing brains.

959.     Defendants intentionally, voluntarily, and willfully sold JUULpods to minors through the use of an internet sales platform and allowed internet websites to sell to minors without controls on whether purchasers were of the legal age to purchase.

960.     Defendants knew that children under the age of 18, including young Tribal members of APIA's service population, were obtaining and using their products at disturbing levels, yet failed to act in a timely manner to stop the illegal diversion of its products.

961.     Defendants knew that there was a high risk of substantial harms to the Tribal members of APIA's population but deliberately proceeded to act and failed to act in conscious disregard of those risks.

962.     Defendants knew that it was not legal to target minors and intentionally did so anyway for purposes of maximizing profit.

963.     Defendants knew JUUL's products were the types of products that could endanger children if negligently made, promoted, or distributed.  Defendants knew the risks that young people would be attracted to their e-cigarettes and JUULpods and knew the importance of ensuring that the products were not sold and/or distributed to anyone under age 26, but especially to minors.

COMPLAINT
CASE NO. 19-MD-02913-WHO

964.    Defendants knew that their marketing, distribution, and sales practices did not adequately safeguard minors from the sale and distribution of e-cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

965.    As a powerfully addictive and dangerous nicotine-delivery device, Defendants knew JUUL's products needed to be researched, tested, designed, advertised, marketed, promoted, produced, packaged, labeled, manufactured, inspected, sold, supplied, and distributed properly and without defects to avoid needlessly causing harm.  Defendants knew that their products could cause serious risk of harm.

966.    Defendants failed to perform adequate testing of JUUL products prior to marketing to ensure safety, including long-term testing and research of the product and testing for injury to the brain and cardiovascular systems, and other related medical conditions.

967.    Defendants promoted JUUL's products to young people under age 26 and especially to minors, despite knowing that it was unsafe for minors.

968.    Defendants used flavors and design to appeal to young people under age 26 and especially to minors.

969.    Defendants designed the products to smell good, look cool, and be easy to conceal from adults.

970.    Defendants were aware of social media on the internet encouraging the use of JUUL, explaining how to use JUUL, explaining how to conceal JUUL, and suggesting products created by others to facilitate concealing JUUL.

971.    Defendants knew of products designed to help conceal JUUL, including hoodies and backpacks.

COMPLAINT
CASE NO. 19-MD-02913-WHO

972.  Defendants designed JUUL to maximize nicotine delivery while minimizing "throat hit" thereby easily creating and sustaining addiction and causing deep inhalation into the child's lungs.

973.  Defendants failed to prevent JUUL products from being sold to young people under age 26, particularly to minors.

974.  Defendants failed to prevent use of JUUL products among young people under age 26, particularly for minors.

975.  Defendants failed to curb use of JUUL products among young people under age 26, particularly for minors.

976.  Defendants failed to develop tools or support to help people addicted to JUUL products cease using the products, including manufacturing lesser amounts of nicotine.

977.  Defendants failed to reasonably and properly test and properly analyze the testing of JUUL products under reasonably foreseeable circumstances.

978.  Defendants failed to warn their customers about the dangers associated with use of JUUL products in that it was unsafe for anyone under age 26; significantly increases blood pressure; carries risks of stroke, heart attacks, and cardiovascular events; is powerfully addictive especially in AI/AN individuals; causes damages to the lungs; increases the risk of respiratory failure; and can cause permanent brain changes, mood disorders, and impairment of thinking and cognition.

979.  Defendants failed to instruct customers not to use the product if they were under 26, particularly minors and AI/AN individuals.

980.  Defendants failed to take reasonable steps to ensure that JUUL products would not be used by persons like young members of APIA's service population who were not smokers.

COMPLAINT
CASE NO. 19-MD-02913-WHO

981.    Defendants failed to warn customers that JUUL had not adequately tested or researched JUUL products prior to marketing to ensure safety, including long-term testing of the product and testing for injury to the brain, lungs, and cardiovascular systems; susceptibility to respiratory viruses and bacteria; and other related medical conditions.

982.    Defendants failed to utilize proper materials and components in the design of JUUL products to ensure they would not deliver unsafe doses of nicotine in unsafe pathways to the lungs.

983.    Defendants failed to take necessary steps to modify JUUL products to avoid delivering high doses of nicotine to children and repeatedly exposing them to toxic chemicals.

984.    Defendants failed to recall JUUL products.

985.    Defendants failed to inspect JUUL products for them to operate properly and avoid delivering unsafe levels of nicotine to young person.

986.    Defendants were either (a) intentionally knowing of the susceptibility of AI/AN to nicotine addiction and other addictive substances, or (b) grossly negligently making themselves unaware of said susceptibility and directly targeting and marketing to AI/AN children and minors.  Defendants thus engaged in reprehensible conduct either intentionally calculated to harm AI/AN individuals, or in total and utter disregard for the health of AI/AN individuals, including the members of APIA's service population.

987.    A responsible company whose claimed primary purpose was to help adult smokers would not design a product to appeal to minors and non-smokers, nor market their products to minors and non-smokers.  If they were aware of the dangers of smoking and nicotine ingestion enough to create a device ostensibly designed to help people stop smoking, then Defendants should also have been aware of the dangers to know that it would be harmful for young people, children, AI/AN individuals, and/or non-smokers to use.

COMPLAINT
CASE NO. 19-MD-02913-WHO

988.   Responsible management personnel within Defendants' corporations had actual knowledge of wrongdoing on the part of lower-level employees or were involved in the wrongful acts themselves.

989.   The governing officers and leadership representatives of Defendants directed, participated, and ratified the wrongful acts of corporate agents of Defendants herein described.

990.   As a foreseeable consequence of Defendants' aforementioned conduct, APIA suffered direct and consequential economic injuries as described in this Complaint as a result of dealing with the JUUL epidemic.

991.   At the time of Defendants' conduct, it was likely to cause serious harm as described in this Complaint, and Defendants were aware of that risk.  Defendants expected to and did experience extraordinary financial gain as a result of the conduct described herein. Defendants' conduct spanned a period of several years.  Defendants acted to conceal their conduct as described in this Complaint.

992.   APIA is therefore entitled payment of exemplary damages from Defendants meant to punish them, deter their future conduct, and to send a message to the community at large that Defendants' outrageous conduct will not be tolerated.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aleutian Pribilof Islands Association, Inc. prays to the Court and/or jury for judgment from and against Defendants, jointly and severally, as follows:

(a) Entering an Order that Defendants are jointly and severally liable;

(b) Entering an Order that Defendants' conduct as alleged herein constitutes a violation of RICO and entitles APIA to compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees;

COMPLAINT
CASE NO. 19-MD-02913-WHO

(c)  Entering an Order that Defendants' conduct as alleged herein constitutes a public nuisance under applicable law;

(d)  Entering an Order that Defendants shall be required to abate and remediate the public nuisance described herein;

(e)  Entering an Order that Defendants were negligent and that said negligence caused the harm and damages herein alleged and to be proven at trial;

(f)  Enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein;

(g)  Awarding APIA equitable relief to fund prevention education and addiction treatment, as well as to abate the nuisance;

(h)  Entering an Order that Defendants engaged in a civil conspiracy to commit and promote the wrongful conduct herein alleged;

(i)  Awarding APIA actual and compensatory damages as determined by the trier of fact;

(j)  Awarding APIA exemplary damages as determined by the trier of fact;

(k)  Awarding APIA statutory damages in the maximum amount permitted by law;

(l)  Awarding reasonable attorneys' fees and the costs and expenses of this civil action and lawsuit;

(m)  Awarding pre-judgment and post-judgment interest; and

(n)  Such other and further relief as the Court and/or jury deems just and proper under the circumstances.

## IX.     DEMAND FOR JURY TRIAL

The Aleutian Pribilof Islands Association, Inc. hereby demands a trial by jury.

COMPLAINT
CASE NO. 19-MD-02913-WHO

1

2      Dated: June 7, 2021                    */s/ Geoffrey D. Strommer*
                                              Geoffrey D. Strommer, *pro hac vice*
3                                             (*Lead Counsel*)
                                              Hobbs, Straus, Dean & Walker, LLP
4                                             215 SW Washington Street, Suite 200
                                              Portland, OR 97204
5                                             Phone: (503) 242-1745
                                              Fax: (503) 242-1072
6                                             gstrommer@hobbsstraus.com

7                                             Jerry C. Straus, *pro hac vice*
                                              Riley F. Plumer, *pro hac vice*
8                                             Hobbs, Straus, Dean & Walker, LLP
                                              1899 L Street NW, Suite 1200
9                                             Washington, DC  20036
                                              Phone: (202) 822-8282
10                                            Fax: (202) 296-8834
                                              jstraus@hobbsstraus.com
11                                            rplumer@hobbsstraus.com

12                                            T. Roe Frazer II, *pro hac vice*
                                              FRAZER PLC
13                                            30 Burton Hills Blvd., Ste. 450
                                              Nashville, TN 37215
14                                            Phone: (615) 647-6464
                                              Fax: (866) 314-2466
15                                            roe@frazer.law

16                                            J. Nixon Daniel, III, *pro hac vice*
                                              W. Lee Elebash, *pro hac vice*
17                                            Beggs & Lane, RLLP
                                              501 Commendencia Street
18                                            Pensacola, LA 32502
                                              Phone: (850) 469-3306
19                                            Fax: (805) 469-3331
                                              JND@beggslane.com
20                                            wle@beggslane.com

21                                            *Attorneys for Aleutian Pribilof Islands Association, Inc.*

22

23

24

25
                                              COMPLAINT
                        - 279 -               CASE NO. 19-MD-02913-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 7, 2021, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system.

<i>/s/ Geoffrey Strommer</i>